1

1        IN THE UNITED STATES DISTRICT COURT FOR THE

2                 DISTRICT OF HAWAII

3  UNITED STATES OF AMERICA,    )   CRIMINAL NO. 04-00054ACK
                       )

4           Plaintiff,   )   Honolulu, Hawaii
                       )   August 25, 2005

5       vs.            )   9:10 a.m.
                       )

6  LARRY PAGAN,          )   FURTHER JURY TRIAL
                       )   VOLUME 3

7         Defendant.   )

8  ————————————————————————————

                TRANSCRIPT OF JURY TRIAL
9        BEFORE THE HONORABLE ALAN C. KAY,
        SENIOR UNITED STATES DISTRICT JUDGE

10

   APPEARANCES:

11

12  For the Government:        THOMAS MUEHLECK, Esq.
                         Assistant U.S. Attorney
                         District of Hawaii
13                      Room 6100 – PJKK Federal Bldg.
                         300 Ala Moana Blvd.
14                      Honolulu, Hawaii 96813

15

16  For the Defendant:         RUSTAM A. BARBEE, Esq.
                         Century Square
17                      1188 Bishop Street, Suite 2606
                         Honolulu, Hawaii 96813
18

19

20  Official Court Reporter:    Cynthia Tando Fazio, RMR, CRR
                         United States District Court
21                      P.O. Box 50131
                         Honolulu, Hawaii 96850
22

23

24

25  Proceedings recorded by machine shorthand, transcript produced
    with computer-aided transcription (CAT).



EXHIBIT A1

1                          I N D E X

2    GOVERNMENT'S WITNESSES:                              Page No.

3    STACEY ANDERSON
      RESUMED DIRECT EXAMINATION BY MR. MUEHLECK.....       4
4     CROSS-EXAMINATION BY MR. BARBEE................       40

5    TANYA TANO
      DIRECT EXAMINATION BY MR. MUEHLECK............       45
6     CROSS-EXAMINATION BY MR. BARBEE................       55

7    SHANNON DiPARI
      DIRECT EXAMINATION BY MR. MUEHLECK............       59
8     VOIR DIRE EXAMINATION BY MR. BARBEE...........       61
      RESUMED DIRECT EXAMINATION BY MR. MUEHLECK.....      62
9     CROSS-EXAMINATION BY MR. BARBEE................       84

10   JOHN RYAN
      DIRECT EXAMINATION BY MR. MUEHLECK............       85
11    VOIR DIRE EXAMINATION BY MR. BARBEE...........       94

12   FERNANDO SALAS
      DIRECT EXAMINATION BY MR. BARBEE...............      114
13    CROSS-EXAMINATION BY MR. MUEHLECK.............      121

14   VIOLET DIEDERIKS
      DIRECT EXAMINATION BY MR. BARBEE...............      142
15    CROSS-EXAMINATION BY MR. MUEHLECK.............      153

16   NATALIE PAGAN
      DIRECT EXAMINATION BY MR. BARBEE...............      154
17    CROSS-EXAMINATION BY MR. MUEHLECK.............      166
      REDIRECT EXAMINATION BY MR. BARBEE............      169
18    RECROSS-EXAMINATION BY MR. MUEHLECK...........      170

19   JOVY SAYLES
      DIRECT EXAMINATION BY MR. BARBEE...............      171
20    CROSS-EXAMINATION BY MR. MUEHLECK.............      175

21

22

23

24

25

1                          <u>EXHIBITS</u>

2

3    <u>GOVERNMENT'S:</u>

4      23 through 27 were received in evidence.........    4

5      9 was received in evidence.....................    77

6      7 was received in evidence.....................    77

7      8 and 10 were received in evidence.............    83

8      13 was received in evidence....................    98

9      11 and 12 were received in evidence............    98

10     29 was received in evidence....................    106

11

12    <u>DEFENDANT'S:</u>

13     A and B were received in evidence..............    120

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | THURSDAY, AUGUST 25, 2005                    9:10 A.M. |
| 2 | THE CLERK:  Criminal Number 04-00054ACK, United States |
| 3 | of America versus Larry Pagan. |
| 4 | This hearing has been called for further jury trial. |
| 5 | Counsel, your appearances for the record, please. |
| 6 | MR. MUEHLECK:  Tom Muehleck and DEA Agent Richard |
| 7 | Jones for the United States, Your Honor.  Good morning. |
| 8 | THE COURT:  Good morning. |
| 9 | MR. BARBEE:  Good morning.  Rustam Barbee appearing |
| 10 | with Larry Pagan.  He's present in court. |
| 11 | THE COURT:  Good morning. |
| 12 | Good morning, ladies and gentlemen of the jury. |
| 13 | Please proceed, Mr. Muehleck. |
| 14 | MR. MUEHLECK:  Yes, Your Honor.  Thank you. |
| 15 | Your Honor, I believe the court admitted Exhibits 23 |
| 16 | through 27? |
| 17 | THE COURT:  Correct.  I'll formally admit them for the |
| 18 | record at this time. |
| 19 | MR. MUEHLECK:  Thank you, Your Honor. |
| 20 | (Government's Exhibits 23 through 27 |
| 21 | were received in evidence.) |
| 22 | STACEY ANDERSON, |
| 23 | called as a witness by the Government, having been previously |
| 24 | sworn, was examined and testified as follows: |
| 25 | RESUMED DIRECT EXAMINATION |

1    BY MR. MUEHLECK:

2    Q    Ms. Anderson, good morning.

3    A    Good morning.

4    Q    Let me ask you a couple of preliminary questions here.

5    These entries on these exhibits, Exhibits 23 through 27, are

6    the entries made by employees and agents of Western Union?

7    A    Yes.

8    Q    And were the entries made by -- and were they under duty

9    to make those -- were they under a duty to make those entries?

10   A    Yes, they are.

11   Q    And were the entries in these exhibits made

12   contemporaneous with the events recorded in these records?

13   A    Yes, sir.

14   Q    And are the entries relied -- or the records relied upon

15   by Western Union in their normal course of business?

16   A    Yes, they are.

17   Q    Are these entries -- these records, I should say, 23

18   through 27, maintained by Western Union in their normal course

19   of business?

20   A    Yes, they are.

21   Q    All right.

22        MR. MUEHLECK:  Your Honor, I'd like to publish these

23   exhibits.  We have copies for all members.

24        THE COURT:  You may, and I will formally --

25        MR. MUEHLECK:  And I think -- have you passed them

 1   out, Ms. Sai?

 2          THE COURT:  You may.  And, again, I formally admit

 3   those exhibits.

 4          MR. MUEHLECK:  Thank you.

 5          THE CLERK:  Do you have them?  I don't have them in

 6   front of me.  You just gave me the tabs.

 7          MR. MUEHLECK:  I'm sorry.

 8                 (Pause in the proceedings.)

 9   BY MR. MUEHLECK:

10   Q    Let me ask a few questions here.  Let me ask you a couple

11   of questions here.  Western Union, what does -- what does

12   Western Union do?

13   A    Mostly known for wire transfers.

14   Q    All right.  Can I wire transfer money from Honolulu to --

15   back to New York?

16   A    Sure.

17   Q    Okay.  And where would I go to do that if I wanted to do

18   that in Honolulu?

19   A    You would go to any office that is considered a Western

20   Union agent.

21   Q    All right.  And who are normally in your experience agents

22   of Western Union in -- outside your main office?

23   A    Normally the biggest agents are the chain of grocery

24   stores.  We've had them in tax offices, a number of places.

25   Anyone can become a Western Union agent.

1    Q    Okay.  And are they -- are they paid for this function?

2    A    They receive commission based on the number of

3    transactions that they perform.

4    Q    Okay.  So I can wire transfer money to New York City?

5    A    Yes.

6    Q    And how much would it cost me to wire transfer a hundred

7    dollars to New York City, any idea?

8    A    I think the amount for $100 will be $15, but the fee

9    depends on the amount that you send.

10    Q    Okay.  And does it go up gradually?

11    A    Yes.

12    Q    All right.  And if I sent a hundred dollars to New York

13    City and I wanted to send it to my brother Jim, what -- what

14    would I have to do to send it to Jim?

15    A    You would go into a Western Union agent and complete a "to

16    send" money form.

17    Q    All right.

18    A    On the form you would include the recipient's name and the

19    expected payout location.

20    Q    Okay.

21    A    And also include your name, address and phone number.

22    Q    All right.  And now if -- what would Jim do to get that

23    money at -- he could go to a grocery store, like a 7-Eleven or

24    something?

25    A    Sure.

1    Q    Okay.  A convenience store, something like that?

2    A    Yes.

3    Q    And if I want to send it to a 7-Eleven in Brooklyn, what

4    would I -- what would I have to do; would I have to know who

5    the -- where the store is in Brooklyn?

6    A    No, you don't.  Any -- the money can be picked up at any

7    Western Union office.  We don't specifically state that you

8    have to pick it up at a certain location.  Any office that has

9    Western Union services can pay out the money transfer.

10    Q    And what would my brother Jim have to do if he wanted to

11    come in and get that hundred dollars in Brooklyn?

12    A    He would go in and complete a "to receive" money form.

13    That includes his name, address, phone number, the sender's

14    name and the amount he's expecting and where the money is

15    coming from.  And your brother Jim will present identification

16    and -- and give it to the agent.

17    Q    And do I have to present identification when I send him a

18    hundred dollars?

19    A    No.

20    Q    All right.  What if I wanted to send Jim a thousand

21    dollars?

22    A    Yes, you would have to provide identification.

23    Q    Where is the limit where I have to send -- or give

24    identification to send money and where I don't have to give

25    identification to send money?

1    A    $1,000 or more requires the sender to provide photo I.D.

2    A valid state-issued I.D.

3    Q    Okay.  Like -- like a driver's license?

4    A    Yes.

5    Q    Or a State of Hawaii identification license?

6    A    Sure.

7    Q    What does it have to have on the identification, a photo?

8    A    Yes, a photo, your name, number -- a license number or

9    identification number.

10   Q    All right.  What if I wanted to send more than a thousand

11   dollars, say like $2,500, would I have to -- would the

12   procedure be any different?

13   A    No, you still would have to show identification.

14   Q    And Jim, back in Brooklyn, would he have to show

15   identification still?

16   A    Yes.

17   Q    What if I wanted to send $3,000, would the procedure be

18   the same?

19   A    No.  You would need to provide your Social Security

20   number, your date of birth, and your occupation, in addition to

21   the valid photo I.D.

22   Q    Okay.  And Jim, back in Brooklyn, would have to still show

23   an I.D.?

24   A    Yes.  For 3,000, he would actually have to provide the

25   exact same information.

1    Q    Oh, he would have to show an occupation or give an

2    occupation?

3    A    Yes.

4    Q    All right.  And show a photo I.D.?

5    A    Yes.

6    Q    Let me ask you if you would look at Exhibit 23, please.

7    Just look at that for a moment.

8            What is Exhibit 23, please?

9    A    It's a detailed record of a money transaction that was

10   sent on January 30th, 2003.

11   Q    Okay.  And the first page is, is it a three-page document,

12   ma'am?

13   A    Yes.

14   Q    Okay.  The first page is what?

15   A    The first page is -- shows the detailed information

16   regarding the transaction.

17   Q    Is that a computer printout?

18   A    Yes.

19   Q    All right.  And the second page, what is that?

20   A    Is a copy of the check issued to the payee.

21   Q    Okay.  When Jim goes to Brooklyn and I've wired him

22   $3,000, does he get cash right there; how does it work?

23   A    The agent has to print a check first, and then the

24   recipient has the option to cash the check there or take the

25   check with him.

1    Q    So the recipient, Jim, can take the check to a different

2    store or to a bank, or something?

3    A    Yes.

4    Q    All right.  And this second page is what, you said?

5    A    The second page is a copy of the check that was endorsed

6    by the payee.

7    Q    All right.  And what is the third page then, ma'am?

8    A    Is another copy of a check issued for the same money

9    transfer, but since the transaction was more than $1,000, it

10   required more than one check.

11   Q    So the maximum check from Western Union provides is

12   $1,000?

13   A    Yes.

14   Q    All right.  And could you hold up the exhibit, please, and

15   tell me at the top showing to the jury, it says, what, "money

16   transfer" at the top on the first page?

17   A    Yes.

18   Q    And then -- and then to the right of that is what?

19   A    To the right is the date of the -- it's not necessarily

20   the date of the transaction, but the date in the database that

21   this particular record was pulled.

22   Q    Okay.  The record in the database, what do you mean?

23   A    Someone can access this record a number of times, and each

24   time it creates a new record in the database.  So if someone,

25   say one of our customer service operators, were to go in on the

1    1st of February and -- and enter any comment as far as why they

2    looked at the transaction, then that would be considered the

3    last occurrence.  So that would be the date that the

4    transaction was pulled.

5    Q    Okay.  And the next line down, it says "payee"?

6    A    Payee, that's the person that received the money.

7    Q    And who is the payee in this occasion?

8    A    Sergio Cruz.

9    Q    And to the right of that, it says "sender"?

10   A    Yes.

11   Q    Who is the sender?

12   A    Larry Pagan.

13   Q    All right.  And then underneath payee, there is a bunch of

14   numbers?

15   A    Yes.

16   Q    What is -- what is that, please?

17   A    (808)935-5043 represents the number -- the phone number

18   the sender gave at the time the money transaction was sent.

19   That's the number that was provided on the "to send" form.

20   Q    So it's provided in -- can you tell us where that number

21   or where this originated, this transaction?  Where the sender

22   was?

23   A    Kamuela, Hawaii.

24   Q    All right.

25   A    Is that correct?

1    Q    Well, it's close enough.

2    A    Okay.

3    Q    And how can you tell that?

4    A    It states it on the -- on the record.

5    Q    To the right of that phone number?

6    A    Yes.

7    Q    All right.  And then there's numbers after Hawaii, HI.

8    A    Mm-hmm.

9    Q    What is that, please?

10   A    I'm not sure what the 15 represents, but next to it is

11   01-30, which is January 30th.  Then you have 1955P EST, which

12   is 7:55 p.m. Eastern Standard Time.

13   Q    Okay.  And that would be the time that the sender sent the

14   money?

15   A    Yes.

16   Q    All right.  And then under that, you have a GIS and WMOX?

17   A    Yes.  That basically means the money transfer is in will

18   call status and ready for pick up.

19   Q    Okay.  And then we have, again, underneath that starting

20   out with 88, you have a code?

21   A    Yes.

22   Q    What is that, please?

23   A    That represents the money transfer control number.

24   Q    What is the money transfer control number?

25   A    It's the unique -- unique number assigned to each money

14

```
 1   transfer that's sent.

 2   Q    Okay.  And it says then after that Van Nuys, California?

 3   A    Yes.

 4   Q    What does that mean?

 5   A    That is the location the money transaction was paid.

 6   Q    Where it was paid?

 7   A    Yes.

 8   Q    So the long and the short of this is what, the -- the

 9   sender -- excuse me.  The sender on January 30th of what year?

10   A    2003.

11   Q    Okay.  And that is a person named?

12   A    The sender's name?

13   Q    Yes.

14   A    Larry Pagan.

15   Q    Okay.  Sent from Hawaii?

16   A    Yes.

17   Q    To Van Nuys, California?

18   A    Yes.

19   Q    To Mister?

20   A    Sergio Cruz.

21   Q    And how much did he send?

22   A    $2,000.

23   Q    How can you tell that?

24   A    It states it on the transaction.

25   Q    And then there are how many $1,000 checks attached to
```

1    this?

2    A    Two.

3    Q    All right.  And then there is the name under -- under the

4    figure $2,000 of Sergio Cruz, and under that it says "will

5    call."

6    A    Yes, that means it was sent and ready for pickup

7    immediately.

8    Q    Okay.  And then it has Larry, slash, Pagan under that, and

9    DYID, and then dash, dash, ALA, and more information, and then

10   prin, P-R-I-N, equals 2,000.

11   A    Right.

12   Q    What does that mean?

13   A    The principal amount sent was $2,000.

14   Q    Okay.  And then it says PREF CUST, and then an equal

15   number, and then another figure.  What is that?

16   A    Whenever someone sends a transaction, they're enrolled in

17   a preferred customer program.  And that is the preferred

18   customer number.

19   Q    Who is the preferred customer here?

20   A    The sender, Larry Pagan.

21   Q    And then it says MOD under that.

22   A    Just money order.

23   Q    Okay.  And then under that, it says REC, and an equal and

24   a 151, and it looks like a date 1/30/03, 19:55:34 PM.

25   A    That is the recording time, the time the money transaction

1   was sent.

2   Q    So it was sent in Hawaii and recorded at that time?

3   A    Yes.

4   Q    And that time is what, Eastern Standard Time?

5   A    Yes.

6   Q    Okay.  And then under that, it says Pay, equals, 092 ALOD,

7   and 1/30/03 with a 21:43:59 PM.  What does that mean?

8   A    When the money transfer was marked paid.

9   Q    Okay.  So there's a difference -- and is that Eastern

10  Standard Time?

11  A    Yes.

12  Q    So we have a difference of approximately two hours from

13  when it was sent to two hours when it was paid?

14  A    Right.

15  Q    And the next line, could you tell us what that is; it's a

16  W, slash, C092?

17  A    When the agent first went to the computer to pay out the

18  transaction or pull it up, it was in will call status, and that

19  was the particular time that that happened.

20  Q    Okay.  And that is -- it was -- came up, you say, to the

21  agent at 21:42:16?

22  A    Yes.

23  Q    So that means within approximately a minute when the agent

24  pulled it up, it was paid out?

25  A    Correct.

1    Q    All right.  And then we have the next line down, it has

2    151 T568 and 052148, slash, and then and then a nine-digit -- a

3    nine-digit number, slash, carpenter, slash 01/30/03 and 19:55

4    date or time.  What is that line, please?

5    A    That line represents the sender's date of birth, Social

6    Security number and occupation.

7    Q    So that is Mr. Pagan's date of birth, Social Security

8    number and occupation?

9    A    Yes.

10   Q    Okay.  And the next line, please?

11   A    The line below it is -- it represents the type of

12   identification shown, the identification number, and the state

13   the identification was issued.

14   Q    So someone has -- who is showing the I.D. here; is it the

15   sender?

16   A    Yes.

17   Q    And the I.D. he is showing is a?

18   A    A driver's license.

19   Q    From what state?

20   A    Hawaii.

21   Q    Okay.  And that driver's license number is the same as the

22   Social Security number on the line above?

23   A    Yes.

24   Q    Okay.  And the next line has 151, and goes through with

25   numbers, and it says "for PIN call."

1    A    That is automatically put on each money transaction, it's

2    a rewards program, and it -- I guess this person had some type

3    of reward coming at that time, maybe free minutes, any

4    promotion at the time, I'm not really sure.

5    Q    Okay.  What is -- what does one have to be to be a

6    preferred customer, do you know?

7    A    Just a sender of money.

8    Q    Okay.  And you said it gets a preferred status as a

9    preferred customer when we mentioned up above PREF CUST?

10   A    Right.

11   Q    That means?  I'm sorry.

12   A    Preferred customer.

13   Q    And what does one have to get to be a preferred customer?

14   A    They just need to send at least one money transfer, and

15   they'll receive a card in the mail.

16   Q    Okay.

17   A    And each time they use it, they accumulate points.  It's a

18   reward program.

19   Q    Like a frequent flyer miles?

20   A    Something like that.

21   Q    Okay.  And then under that, you have a "SENDDA220" with

22   more information, and a date of 1/30/03, with 19:55 --

23   A    Right.  All of that information is systematically stamped

24   on the transaction at the time of the send.

25   Q    Okay.  And then underneath that, you have a 092 ALOD

1    1/C2387063/CA.  What is that?

2    A    That represents the receiver's identification information.

3    Q    So now you're into the receiver side of the data

4    information?

5    A    Yes.

6    Q    Okay.  And what is that supposed to be, that information?

7    A    A driver's license number issued by the State of

8    California.

9    Q    How can you tell it's California?

10    A    The CA.

11    Q    All right.  And then underneath that, again, it says 092

12    ALOD 9214 Wakefield Avenue, slash, PC, slash, CA, 91402, and

13    more information.

14    A    That is the address provided by the receiver.

15    Q    Okay.  That's his -- the receiver's address that he gives?

16    A    Yes.

17    Q    Okay.  And then underneath that, you have what?

18    A    A phone number provided by the -- the receiver.

19    Q    (818)364-2734?

20    A    Yes.

21    Q    Okay.  And then underneath that, you have in parentheses

22    apparently, Larry Pagan, slash, P.O. Box, Kamuela, Hawaii,

23    967 -- 96743, Sergio Cruz, slash, and then more information.

24    A    Right.

25    Q    What is that line?

1   A     The sender's name, address, city, state, and the payee's

2   name.

3   Q     Okay.  And then there is a (808)935-5043.  That's the same

4   number as up at the top under "Payee, Sergio Cruz"?

5   A     Yes.

6   Q     And that is the sender's information, the sender's number?

7   A     Yes.

8   Q     Telephone number?

9   A     Yes.

10  Q     Okay.  And then underneath that, you have a D, slash,

11  2123.96.

12  A     The total amount paid by the sender.

13  Q     So this person sent $2,000 out?

14  A     Yes.

15  Q     To Van Nuys?

16  A     Yes.

17  Q     And the cost to -- for this service that Western Union

18  charges is?

19  A     $123.96.

20  Q     Could you tell if the checks were cashed?

21  A     Yes.

22  Q     How can you tell?

23  A     The endorsement on the back of the check.

24  Q     All right.  If you look at Exhibit 24, please.  What is

25  Exhibit 24, please?

1    A    A computer printout detail sheet of a money transfer sent

2    on February 15th, 2003.

3    Q    Okay.  And at the top, it says 2/16/03.  Why -- why have

4    you given us a discrepancy of 2/15 and 2/16?

5    A    The last occurrence on the transaction was 2/16/03, when

6    the money transfer was paid.

7    Q    I see.  And this is, it says at a code on the left-hand

8    side, MOCN, and then it says, CITYKAILUA KONA, and then it goes

9    through to the right, HO-agent.  What is that, please?

10   A    That is the city -- the originating city of the money

11   transfer.

12   Q    Kailua-Kona?

13   A    Yes.

14   Q    Okay.  And then the agent -- there are two different

15   agents there, two different codes?

16   A    Yes, one represents the paying -- the sending agent and

17   the second one represents the paying agent.

18   Q    Okay.  And who is the payee; who is going to get the money

19   here?

20   A    Sergio Cruz.

21   Q    Is that the same name as before?

22   A    Yes.

23   Q    Okay.  And the next line to the right says "sender."  Who

24   is the sender?

25   A    Ramon Lopez.

```
 1              MR. MUEHLECK:  May I, Your Honor?

 2              THE COURT:   You may.

 3    BY MR. MUEHLECK:

 4    Q    Ms. Anderson, can you just stand up a little bit, look

 5    over this way.

 6    A    (Complying).

 7    Q    You see this name?

 8    A    Yes.

 9    Q    Is that the same name that's on the exhibit that we're

10    talking about?

11    A    Yes.

12    Q    Exhibit 24?

13    A    Yes, it is.

14    Q    As the sender?

15    A    Yes.

16    Q    Thank you.  And where is this sender?

17    A    Kailua-Kona.

18    Q    Okay.

19    A    Hawaii.

20    Q    All right.  And does the sender give a phone number?

21    A    Yes.

22    Q    What is the sender's phone number?

23    A    (808)989-4269.

24    Q    Okay.

25              MR. MUEHLECK:  A moment please, Your Honor.
```

```
 1                    (Pause in the proceedings.)
 2    BY MR. MUEHLECK:
 3    Q     And what is the sender's -- excuse me, what is the payee's
 4    location or where it's being sent to, I should say?  What store
 5    or what location is this money being wired to?
 6    A     The expected payout location shows Van Nuys, California.
 7    Q     Okay.  So even though it's expected at Van Nuys, someone
 8    could take it from Van Nuys, California, and go to San Diego,
 9    California, and get it paid once they got the check, the money
10    orders?
11    A     Yes, they can.
12    Q     All right.
13    A     Or it could be paid within a certain radius.  If you
14    put --
15    Q     Could it be restricted?
16    A     It is supposed to be restricted.  However, some of the
17    cities, there could be an agent closed in your area, so they'll
18    go to the next city, pick up the money transfer.
19    Q     All right.  And how much is this money transfer?
20    A     $3,000.
21    Q     All right.  And it says the payee, you said, was a Sergio
22    Cruz?
23    A     Yes.
24    Q     Same payee as before in the Exhibit 23?
25    A     Yes.
```

1  Q    And then it says "will call," means?

2  A    Available for pick up after it was sent.

3  Q    All right.  And then we have, if we go down through

4  various lines, you have a REC 420, and then PAY 725, and we

5  have two different dates.   REC says 2/15/03, and payee --

6  excuse me, PAY says 2/16/03.

7  A    Right.

8  Q    Different dates.  Can you explain that, please?

9  A    The sender sent the money transfer on February 15th;

10  however, it wasn't paid until February 16th.

11  Q    And then various lines down through, let me ask you if you

12  can look down to a line, it says 420 J474, then 060576, then

13  more information, and it says 6295300184, slash, Cook and

14  Maintenance.

15  A    That is the sender's date of birth, Social Security number

16  and occupation.

17  Q    So Mr. Ramon Lopez gave that information when he sent the

18  money out?

19  A    Yes.

20  Q    All right.  And then the next line, it has -- well, the

21  next line I'd ask you about, it goes down to California, 725

22  1212, then 555176986, slash, California, 02/16/03.  Do you see

23  that line?

24  A    Yes.

25  Q    What does that mean?

1  A    That is the payee's date of birth, Social Security number,

2  and it should be the occupation, but apparently the agent typed

3  in something different.

4  Q    Okay.  And then underneath that, it has same heading 725,

5  and then C2387063, slash, California, and the date 2/16.  What

6  is that?

7  A    That is the payee's identification number and the state it

8  was issued.

9  Q    That's Mr. Cruz' information?

10  A    Yes.

11  Q    Okay.  And the state would be California?

12  A    Yes.

13  Q    A California identification?

14  A    Yes.

15  Q    And then the next line, it says 725 again, and then 1461

16  Blythe Street, slash, Panorama City, California.  What is that,

17  please?

18  A    The address provided by the payee.

19  Q    Okay.  And down two lines from that in parentheses, Ramon,

20  slash, Lopez, slash, 75-5708 Alahou Street, apartment 35 --

21  three, dash, five, Kona.  What is that, please?

22  A    The address information provided by the sender.

23  Q    Okay.  And the next three pages on this exhibit?

24  A    Those are copies of the checks paid to Mr. Cruz.

25  Q    And each check is?

1    A    $1,000.

2    Q    Okay.  And can you tell us the -- and were those checks

3    cashed?

4    A    Yes, they were.

5    Q    You can tell that by?

6    A    The endorsement on the back.

7    Q    All right.  And what was the cost of this service that

8    Western Union charged Mr. Ramon Lopez to send $3,000 to Sergio

9    Cruz on February 15th of 2003?

10   A    $144.56.

11   Q    All right.  Let's turn to Exhibit 25, please.  The first

12   page of Exhibit 25 is?

13   A    A detailed money transfer dated March 4th, 2003.

14   Q    And it's a wire transfer of money done by Western Union?

15   A    Yes.

16   Q    And where did the transaction or where did the sender go

17   to arrange for this transaction?

18   A    To an agent in Kamuela.

19   Q    Okay.  Can you tell us what state that is, Hawaii?

20   A    Yes.

21   Q    All right.  And who is the sender?

22   A    Miguel A. Torres.

23   Q    All right.  And let me ask you, who is the payee?

24   A    Sergio Cruz.

25   Q    Okay.  And is there a phone number for -- is there a phone

1    number under payee Sergio Cruz?

2    A    Yes.

3    Q    What is that phone number?

4    A    (808)640-5427.

5    Q    And whose phone number is that supposed to be?

6    A    The sender Miguel Torres.

7    Q    The sender gives that phone number?

8    A    Yes.

9    Q    And does he give a -- an address, or is there a Western

10   Union office that's listed after that?

11   A    Yes, the city that the money transfer was sent from.

12   Q    Okay.  And that's Kamuela?

13   A    Yes.

14   Q    All right.  And the -- the date and the time of this

15   transaction?

16   A    March 4th, 2003, 5:33 p.m. Eastern Standard Time.

17   Q    And it's -- you say 5:33, so is it given in military time,

18   1733?

19   A    Yes.

20   Q    And then it's going -- going where?

21   A    Expect the payout location of Van Nuys, California.

22   Q    And the amount of this wire transfer, please?

23   A    $2,500.

24   Q    And then the next line says, what, the payee, Mr. Sergio

25   Cruz?

1   A   Yes.

2   Q   And the next line, "will call" means again?

3   A   Available for pick-up.

4   Q   All right.  And it went out, you said, at 5:33 p.m.

5   Eastern Standard Time?

6   A   Yes.

7   Q   When did the agent pull it up?

8   A   The paying agent?

9   Q   Yes.

10  A   It was paid less than an hour at 1829 p.m.

11  Q   So 6:29 p.m. Eastern Standard Time?

12  A   Yes.

13  Q   Okay.  And the next line down from that is 151 and a T568,

14  then 050867, slash, 591706446, slash, mechanic.  What is that,

15  please?

16  A   The sender's date of birth, Social Security number and

17  occupation.

18  Q   That's the information he provided?

19  A   Yes.

20  Q   And the next line is 151 T568 f, and then 4748817, slash,

21  Mexico?

22  A   Yes.

23  Q   What is that?

24  A   Seems to be a resident alien card issued in Mexico.

25  Q   Who used the resident alien card?

1   A   The sender.

2   Q   Okay. That's the information or the I.D. he provided?

3   A   Yes.

4   Q   Okay. And then the next line, 220, is a CNJJ, and then 3,

5   slash, C2387063, slash, CA. What is that?

6   A   California I.D. number.

7   Q   Whose number -- I.D. number is that?

8   A   The payee Sergio Cruz.

9   Q   Mr. Cruz used that?

10  A   Yes.

11  Q   Okay. And then the next line, it says 220, and some more

12  numbers, and it has Wakefield Ave.

13  A   That represents the address provided by the payee.

14  Q   Okay. Let me ask you, looking at that address, Sergio

15  Cruz' address as Wakefield on Exhibit 25, AVE, Panorama City;

16  is that the same address of the payee on Exhibit 23?

17  A   Yes.

18  Q   Is it the same I.D. number, the California I.D. number?

19  A   Yes.

20  Q   All right. And is there information where Miguel

21  Torres -- does he give an address, or is there information in

22  the record that -- the address given by Mr. Torres?

23  A   Yes.

24  Q   What is that?

25  A   64-5206 Kipahele.

1  Q    K-I-P-A-H-E-L-E Street?

2  A    Yes.

3  Q    Kamuela?

4  A    Yes.

5  Q    All right.  And you said the amount of this transaction

6  was?

7  A    $2,500.

8  Q    So there should be two checks for a thousand dollars and

9  one check for 500; is that the way it works?

10  A    Yes.

11  Q    Do you see those checks attached to Exhibit 25?

12  A    Yes.

13  Q    Can you tell if those were paid?

14  A    Yes, they were.

15  Q    Exhibit 26, please.  Turn to that.  What is this, please?

16  A    A detailed record of a money transfer sent July 9th, 2003.

17  Q    And who is the sender?

18  A    Larry Pagan.

19  Q    And where did the transaction originate; where did the

20  sender go to do this transaction?

21  A    Agent in Hilo, Hawaii.

22  Q    All right.  And who is the payee that's intended --

23  intended to receive the money?

24  A    Sergio Cruz.

25  Q    Same name as the previous transactions?

```
 1    A    Yes.

 2    Q    All right.  And is there a number given by Larry Pagan?

 3    A    Yes.

 4    Q    A telephone number?

 5    A    Yes.

 6    Q    What is that number?

 7    A    (808)990-7896.

 8              MR. MUEHLECK:  May I, Your Honor?

 9              THE COURT:  You may.

10    BY MR. MUEHLECK:

11    Q    Ms. Anderson, would you stand up again, please, and look

12    over here.

13    A    (Complying).

14    Q    Is this the same number?

15    A    Yes.

16    Q    Thank you.  And going down, can you tell us when the

17    transaction was initiated looking at the time?

18    A    July 9th, 2003, at 1708 p.m.

19    Q    So that's 5:08 p.m.?

20    A    Yes.

21    Q    Eastern Standard Time.  And did Mr. Cruz come in and pick

22    up that money?

23    A    Yes.

24    Q    Can you tell us when that occurred?

25    A    9:16 p.m. Eastern Time.
```

1    Q    All right.  And is there a Social Security number or

2    identification given by Mr. Pagan when he made this -- excuse

3    me, when he arranged this transaction?

4    A    Yes.

5    Q    What is that?

6    A    The Social Security number is 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.

7    Q    And a date of birth?

8    A    May 21st, 1948.

9    Q    And is there an occupation listed?

10   A    Yes.

11   Q    Please?  What is it?

12   A    Carpenter.

13   Q    All right.  And is there identification given by Mr. Cruz?

14   A    Mr. Cruz, yes.

15   Q    When he picks it up?

16   A    Yes.

17   Q    What is that identification, if you can tell us?

18   A    A California driver's license.

19   Q    Is there a number on that license?

20   A    Yes, 62, C as in Charles, 2387063.

21   Q    Okay.  And did he list a Social Security number?

22   A    Yes.

23   Q    That is, please?

24   A    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.

25   Q    And did Mr. Cruz provide an address?

```
 1   A    Yes.

 2   Q    His address for himself?

 3   A    Yes.

 4   Q    What is the address he provided?

 5   A    14500 Van Nuys Boulevard, 33, Panorama City, California.

 6   Q    Is this a different address than is on Exhibit 25 and

 7   Exhibit 24 and Exhibit 23 for Mr. Cruz?

 8   A    Yes.

 9   Q    All right.  And did Mr. Pagan, the sender, provide an

10   address?

11   A    Yes.

12   Q    Where is that, please, on the record?

13   A    It's on the bottom, it's 1770, the street is spelled

14   K-I-L-A-U --

15   Q    Kilauea?

16   A    Yes.

17   Q    U-E-A?

18   A    Yes.

19   Q    Avenue, Hilo?

20   A    Yes.

21   Q    Okay.

22        MR. MUEHLECK:  Exhibit 26 to the courtroom deputy.

23        If we may publish it at this time.

24        THE COURT:  Very well.

25        MR. MUEHLECK:  Previously given Mr. Barbee copies and
```

1    Your Honor copies.

2              Let me publish 23, 24 and 25, Your Honor, while we're

3    doing this administratively.

4              Thank you, Ms. Sai.

5    BY MR. MUEHLECK:

6    Q    On Exhibit 26 -- we're still on the same exhibit here,

7    Ms. Anderson -- this transaction you said was $3,000?

8    A    Yes.

9    Q    Okay.  Can you tell if the transaction, if the checks were

10   issued and actually cashed, negotiated?

11   A    Yes.

12   Q    How do you tell that?

13   A    The checks were issued, there's copies, and the

14   endorsement on the back proves it was paid.

15   Q    All right.  Let's look at Exhibit 27, the next exhibit,

16   please.  What's the date -- what is this exhibit, please?

17   A    A detailed record of the money transfer sent on July 11,

18   2003.

19   Q    And who is the sender?

20   A    Miguel A. Torres.

21   Q    And who is the recipient?

22   A    Sergio Fernando Cruz.

23   Q    You have a middle name here, Fernando, then?

24   A    Yes.

25   Q    All right.  And this transaction is two days -- this

```
 1    transaction Exhibit 27 is two days after the transaction in
 2    Exhibit 26?
 3    A    Yes.
 4    Q    Okay.  And what is the amount of the transaction?
 5    A    $2,000.
 6    Q    And does the sender, Mr. Torres, provide a number?
 7    A    Yes.
 8    Q    What's the number he provides?
 9    A    (808)345-0191.
10         MR. MUEHLECK:  May I, Your Honor?
11         THE COURT:  You may.
12    BY MR. MUEHLECK:
13    Q    M-I-G-U-E-L?
14    A    Yes.
15    Q    Miguel, is it?
16    A    Yes.
17    Q    Is there a middle initial?
18    A    Yes, A.
19    Q    And the last name?
20    A    Torres, T-O-R-R-E-S.
21    Q    And the number he provides is -- to Western Union is (808)
22    what?
23    A    345-0191.
24    Q    345-0191?
25    A    Yes.
```

1          MR. MUEHLECK:  Moment please, Your Honor.

2                    (Pause in the proceedings.)

3    BY MR. MUEHLECK:

4    Q    You have a hardcover white book in front of you, Ms.

5    Anderson.  If you would turn to Exhibit 6.

6          MR. MUEHLECK:  And if all the jurors could be

7    instructed to follow along on Exhibit 6, Your Honor, an

8    admitted exhibit.

9          THE COURT:  Please turn to Exhibit 6.

10         MR. MUEHLECK:  Page 16, the pages are in -- says Page

11   16 out of 28 in sort of the upper right-hand corner.  Are we on

12   the same page?

13         May I approach, Your Honor, the witness?

14         THE CLERK:  I'll get it for her.

15         MR. MUEHLECK:  Page 16 of 28, Ms. Sai.

16         THE CLERK:  Yes, she has it.

17   BY MR. MUEHLECK:

18   Q    Okay.  It should be -- it should be starting at the top,

19   calls, local air time, and then it has dates on the left-hand

20   corner of July 9th, 2003?

21   A    Yes.

22   Q    Okay.  Go down to July 11th, 2003, it goes 9th, 10th,

23   11th, and you'll see July 11th, it says Van Nuys, California.

24   A    Yes.

25   Q    You see that call?  And 9:42 a.m., eight -- (818)425-7265?

1    A    Yes.

2    Q    And it lists it is a four-minute call starting at 9:42

3    a.m.?

4    A    Yes.

5    Q    Okay.  So four minutes later, there's 9:46, a call to

6    Hilo, Hawaii.  What is the number that's called?

7    A    (808)345-0191.

8    Q    This number, Ms. Anderson (indicating)?

9    A    Yes.

10    Q    What is the date of this transaction -- I'm sorry, the

11    date of your transaction that we're talking about, Exhibit 27.

12    We can close -- we can close the book.  I'm sorry.

13    A    July 11th?

14    Q    So this call, it's the same date then we're looking at?

15    A    Yes.

16    Q    Okay.

17         MR. MUEHLECK:  I have Exhibit 27 to publish to the

18    jurors, Your Honor.  (Handing documents).

19         Thank you, Ms. Sai.

20    BY MR. MUEHLECK:

21    Q    You said this is a transaction on July 11th of 2003, where

22    the sender is?

23    A    Miguel A. Torres.

24    Q    All right.  And that's the number he gave, 345-0191?

25    A    Yes.

1  Q    And it's to Sergio Fernando Cruz?

2  A    Yes.

3  Q    Okay.  And it's in the amount of?

4  A    $2,000.

5  Q    Okay.  And did Mr. Torres provide identification

6  information?

7  A    Yes.

8  Q    And that is, what did he provide?

9  A    He provided an I.D., number A095675755.  But it does not

10  provide a state.

11  Q    Okay.  And then underneath that there's information with a

12  C2387063, slash, California?

13  A    Yes, that is the receiver's identification.

14  Q    That is Mr. Cruz' identification?

15  A    Yes.

16  Q    And then under that, it has 9214 Lake F-I-E-L Avenue,

17  Panorama City, California.

18  A    Yes.

19  Q    What is that, please?

20  A    That is the receiver's address information.

21  Q    Okay.  And then two lines down from that, you have a

22  Kamuela, Hawaii, and a 645206 Kipakele?

23  A    Yes.

24  Q    That is what information?

25  A    The address provided by the sender.

1    Q    Mr. Torres?

2    A    Yes.

3    Q    And then past that is Sergio Fernando Cruz, slash, CS,

4    slash, 8.  What is that?

5    A    That is the receiver's name and the beginning of the

6    sender's phone number.

7    Q    Okay.  So the phone number is just repeated on the last

8    two lines?

9    A    Yes, the last line.

10   Q    Was this transaction -- did this transaction occur?

11   A    I'm sorry?

12   Q    Well, did the checks get issued?

13   A    Yes.

14   Q    Okay.  And there would be what, two checks?

15   A    Yes.

16   Q    Are they attached?

17   A    Yes.

18   Q    Are they negotiated or show that they have been paid?

19   A    Yes.

20           MR. MUEHLECK:  A moment please, Your Honor.

21                   (Pause in the proceedings.)

22           MR. MUEHLECK:  Thank you, Your Honor.  I have no

23   further questions of the witness.

24           THE COURT:  Mr. Barbee?

25           MR. BARBEE:  Yes, Your Honor.

1                          CROSS-EXAMINATION

2    BY MR. BARBEE:

3    Q    Good morning, Ms. Anderson.

4    A    Good morning.

5    Q    Welcome to Hawaii.

6    A    Thank you.

7    Q    You testified starting yesterday that you're here in

8    response to a subpoena by the federal government, correct?

9    A    Yes.

10   Q    Do you have a copy of the subpoena with you?

11   A    The subpoena is in my bag in the back.

12   Q    Okay.

13        MR. BARBEE:  Do you have a copy of the subpoena?

14        MR. MUEHLECK:  Somewhere.

15   BY MR. BARBEE:

16   Q    While we're trying to retrieve the subpoena, do you recall

17   whether or not the subpoena asked you to bring all wire

18   transfers made by Larry Pagan?

19   A    Yes, for a certain date range.

20   Q    Okay.  And do you recall what the date range was?

21   A    It was a couple of different subpoenas, so, no, I don't

22   offhand.

23   Q    Okay.

24        MR. MUEHLECK:  (Handing document).

25   BY MR. BARBEE:

1   Q    Okay.  So the subpoena commanded you to bring all

2   documents showing money transfers made by Larry Pagan from

3   December 1st of 2002 to July of 2003, is it?

4           MR. BARBEE:  Your Honor, may I approach?

5           THE COURT:  You may.

6   BY MR. BARBEE:

7   Q    (Handing document).

8   A    That is correct.

9   Q    And the only documents that you had at Western Union of

10  any money transfers by Larry Pagan were the two exhibits that

11  you testified to in court today, correct; that would be Exhibit

12  Number 23 and Number 26?

13  A    Yes.

14  Q    And 23 would have been in January of 2003, January 30th?

15  A    Yes.

16  Q    And 26 would have been July 9th of 2003?

17  A    Yes.

18  Q    Okay.  Now, on Exhibit 23, it provides for the receiver,

19  Mr. Cruz, a street address on a Blythe Street in Panorama City,

20  correct?

21  A    For the receiver?

22  Q    Yes.

23  A    Exhibit 23?

24  Q    Excuse me, maybe I'm on the wrong one.

25           Okay.  Exhibit 23 provides a 9214 Wakefield Avenue

42

1    address for the receiver Mr. Cruz?

2    A    Yes.

3    Q    Okay.  And Exhibit Number 27 provides a 9214 Lakefiel

4    Avenue, Panorama City, for Mr. Cruz, correct?

5    A    Correct.

6    Q    So it appears possible that just could be a misspelling of

7    the word "Wakefield," correct?

8    A    Correct.

9    Q    The numbers are the same, 9214?

10   A    Yes.

11   Q    Okay.  Exhibit 23 has a California I.D. number for

12   Mr. Cruz?

13   A    Yes.

14   Q    Okay.  And then moving to 24, Exhibit 24, it has a Blythe

15   Street address in Panorama City for the receiver Mr. Cruz?

16   A    Yes.

17   Q    It has the same California identification number as in

18   Exhibit 23?

19   A    Yes.

20   Q    Okay.  And Exhibit 25, similarly, that has Mr. Cruz'

21   address?

22   A    Yes.

23   Q    And that address is the Wakefield Avenue in Panorama City?

24   A    Yes.

25   Q    The same as Number 23 and 27?

1   A    Correct.

2   Q    And it has his same California state I.D. number?

3   A    Yes.

4   Q    And Exhibit 26 has the same California I.D. number for

5   Mr. Cruz but a different address, correct?

6   A    Yes.

7   Q    And this one is a Van Nuys Boulevard address?

8   A    Correct.

9   Q    Okay.  And then lastly, I guess on Exhibit 27, it has the

10  same California identification number for Mr. Cruz and that

11  Lakefiel or Wakefield?

12  A    Yes.

13  Q    Same -- same address, same number?

14  A    Correct.

15  Q    Okay.  Now, when a sender sends money or a wire transfer,

16  I guess, or money transfer through Western Union, is there any

17  monitoring of whether the individual sending the money is alone

18  in the office where they're sending the money from or if

19  somebody is with them?

20  A    Not that I know of.

21  Q    So, for example, an entire family of people can come into

22  a Western Union outlet and be present when just one individual

23  records the information as -- as sender and as recorded as

24  sender?

25  A    Yes, that is possible.

1  Q    So there can be two or three people present when the

2  records would only reflect that the -- the information from the

3  sender?

4  A    Right.

5  Q    Okay.  And that's the person who will leave the paper

6  trail?

7  A    If you will.

8         MR. BARBEE:  I have no further questions.  Thank you.

9         MR. MUEHLECK:  No questions, Your Honor.

10        THE COURT:  Thank you.  You're excused.

11        Any reason why the witness may not be --

12        MR. MUEHLECK:  Yes, could the witness leave, please,

13 Your Honor?

14        MR. BARBEE:  Yes, Your Honor.

15        THE COURT:  The witness is permanently excused.

16                              (Witness excused)

17        THE COURT:  Next witness?

18        MR. MUEHLECK:  Tanya Tano.  Officer Tano.

19        Thank you, Ms. Anderson.

20        I'm sorry, Judge.  I didn't hear you.

21        THE COURT:  What about -- well, maybe we need a

22 sidebar.

23                    (Bench conference on the record:)

24        THE COURT:  I understand you were going to accommodate

25 Mr. Barbee's witnesses by calling them out of turn.

1          MR. MUEHLECK:  Sure.

2          MR. BARBEE:  We can call them -- I'd like to get them

3    on and off today so they can get back to the Big Island this

4    evening.  So I don't mind -- how long is Tano going to be?

5          MR. MUEHLECK:  Not long.

6          MR. BARBEE:  And then you've got your chemist people?

7          MR. MUEHLECK:  Chemist, mm-hmm.

8          MR. BARBEE:  I haven't really had a chance to meet

9    with them.  If I could maybe --

10         THE COURT:  Well, you let us know, let Mr. Muehleck

11   know.

12         MR. BARBEE:  I will, I'll let him know.  Thank you,

13   Your Honor.

14                  (End of bench conference.)

15                      TANYA TANO,

16   called as a witness by the Government, having been first duly

17   sworn, was examined and testified as follows:

18         THE CLERK:  Please be seated.

19         State your name for the record and spell your last

20   name.

21         THE WITNESS:  Tanya Tano, T-A-N-O.

22                    <u>DIRECT EXAMINATION</u>

23   BY MR. MUEHLECK:

24   Q    And how are you employed?

25   A    I'm with the Honolulu -- a detective with the Honolulu

1    Police Department, cross-deputized with Hawaii Airport Task

2    Force.

3    Q    How long have you been with the Honolulu Police

4    Department?

5    A    Almost 21 years.

6    Q    How long have you been with the task force, DEA task

7    force, as a task force officer?

8    A    I was there before, but this last round about

9    four-and-a-half years.  Total of over ten.

10    Q    You've been working with the DEA as a task force officer

11    for ten -- over ten years?

12    A    Yes.

13    Q    Where have you been assigned as a task force officer with

14    DEA?

15    A    At the airport.

16    Q    What are your duties as a task force officer at the

17    airport?

18    A    Narcotics interdiction through parcels and passengers.

19    Q    Let me ask you if you were working on December 4th of 2002

20    as a task force officer with the DEA?

21    A    Yes.

22    Q    Do you know a Task Force Officer Jack Wright?

23    A    Yes.

24    Q    And is he also a Honolulu police officer?

25    A    Yes.

1   Q    And do you know a DEA Agent Richard Jones?

2   A    Yes.

3   Q    My case agent.

4   A    Yes.

5   Q    What were you doing on December 4th of 2002, Task Force

6   Officer Tano?

7   A    We were on Big Island conducting a controlled delivery of

8   a parcel.

9   Q    Were you present during the controlled delivery?

10  A    Yes.

11  Q    You were what, surveillance officer?

12  A    Yes.

13  Q    Okay.  And were items seized during that operation on

14  December 4th?

15  A    Yes.

16  Q    And what was done with these -- those items that were

17  seized?

18  A    I processed them and I submitted them to the -- drugs to

19  the lab, the Southwest Lab, and the nondrug evidence I

20  submitted to the nondrug evidence custodian.

21       MR. MUEHLECK:  Okay.  If we could, please, could we

22  look at Exhibits 11 and 12.

23       Approach with 11 and 12.

24  BY MR. MUEHLECK:

25  Q    Can you identify those -- those items, that is Exhibit 11

1    and Exhibit 12 marked for identification?

2    A    Yes.

3    Q    How can you identify them?

4    A    By -- I filled out the front and I sealed the top.  I

5    submitted them as Exhibits 1 and 2.

6    Q    Your Exhibit 1 and 2, is that the DEA exhibit you're

7    talking about?

8    A    Yes.

9    Q    Okay.  And what did you do with them when you say you

10   submitted them?

11   A    I mailed them to the DEA lab for analysis.

12   Q    And how do you do that; how do you mail them?

13   A    I seal them in this bag, I fill out the front of the form,

14   and I heat-sealed the top with a label that's tamper-proof so

15   if you tamper with it, it will show that it was opened.  And

16   then I mail it to the lab, return receipt/certified mail.

17   Q    How do you know that you sealed it and sent it to the lab?

18   A    I -- I fill in the top.  It's my name up here.  I sign it,

19   I have a witness who signs it, and I mail it.

20   Q    Does the witness sign anywhere on the item?

21   A    Yeah, they sign on the bag, yeah, they initial the top and

22   the bottom down here.

23   Q    How many occasions have you had in your ten years as a

24   task force officer with the DEA to submit suspected drug

25   evidence to a laboratory for analysis?

```
 1   A      Probably -- a lot.  Over -- over 50 to 100.

 2   Q      Okay.  And is there any paperwork that's completed when

 3   you submit an exhibit to the laboratory for analysis?

 4   A      Yes.

 5   Q      What type of paperwork is submitted?

 6   A      It's called a DEA-7.

 7   Q      Explain what a DEA-7 is, please.

 8   A      It's acquisition of evidence.  A 7 is for drug evidence,

 9   specifically.  It's documenting what the item is, where it was

10   taken, what was done with.  The chain of custody, basically, of

11   the exhibit.

12   Q      Okay.  Would you look at that hardcover white notebook on

13   your left and flip to Exhibit 13, please.  It should be

14   after -- right after Exhibit 8, should be marked Exhibit 13.

15   A      Yeah, I got it.

16   Q      Do you recognize that document?

17   A      Yes.

18   Q      How do you recognize it?

19   A      The information and my signature, my name and signature.

20   Q      And what is that document?

21   A      This is the 7 for these exhibits.

22   Q      Okay.  You're talking Exhibit 13 is the DEA-7 for Exhibits

23   11 and 12?

24   A      Yes, but -- well, I called -- it was Exhibit 1 and 2 at

25   the time, so for your 11 and 12, yes.
```

1    Q    Okay.  For the -- the sticker that's on it says Exhibit

2    Number, it's Exhibit 11 and 12, and the internal DEA number is

3    Exhibit 1 and 2?

4    A    Yes.

5              THE COURT:  Mr. Muehleck, I don't have that exhibit.

6              MR. BARBEE:  It might be behind Number 8.

7              MR. MUEHLECK:  The 13, Your Honor?  It should be right

8    after 8.  There's -- there's a gap in there, Your Honor.

9    There's some paper exhibits that are not in the hardcover

10   notebooks or some exhibits, nontangible exhibits, that are not

11   in the hardcover notebook.

12             THE CLERK:  He doesn't have that.

13             MR. MUEHLECK:  I'll get you a copy, Your Honor.

14             THE LAW CLERK:  (Handing document).

15             MR. MUEHLECK:  Then I'll get your law clerk a copy

16   during the break, Your Honor.

17             THE COURT:  Thank you.

18             MR. MUEHLECK:  Thank you.

19   BY MR. MUEHLECK:

20   Q    I'm sorry, what happens with Exhibit 13 and Exhibits 11

21   and 12, please, after you fill them out and seal everything up?

22   A    I mail them to the lab.

23   Q    Okay.

24   A    Certified mail, return receipt.

25   Q    All right.  And you said that is witnessed?

1   A   Yes.

2   Q   Okay.  Now, let me ask you if you would, please, look at

3   Exhibits 15 and 16.  I think they're on the side there.

4         MR. MUEHLECK:  Ms. Sai?

5         THE CLERK:  I'll get them.

6         MR. MUEHLECK:  Thank you.

7   BY MR. MUEHLECK:

8   Q   These are admitted exhibits all that -- the 15 and 16 are,

9   anyways.  Have you seen these before?

10   A   Yes.

11   Q   How do you know?

12   A   Because I again completed the exhibit.  I took custody of

13   this and submitted them into evidence.

14   Q   You took custody of those exhibits.  Where were you when

15   you took custody, if you recall?

16   A   I was at -- in Kamuela on the Big Island at the Tamarack

17   Pines Apartments.

18   Q   Okay.  And after you took custody, what did you do with

19   them?

20   A   I submitted them into evidence.

21   Q   What is --

22   A   I processed them.  Excuse me, I put them in the bag, I

23   seal them the same way.  This one had been opened and resealed

24   or something, because I -- I seal them, and I put my name, I

25   sign it.

1    Q    Is your seal on that exhibit?

2    A    Yes, it is.

3    Q    All right.  And that exhibit you're talking about is 15 or

4    16 that you have in your hand?

5    A    16.

6    Q    Okay.  Did you take anything out of that exhibit after you

7    seized it on December 4th of 2002?

8    A    No.

9    Q    All right.

10         THE COURT:  Mr. Muehleck, you asked if her seal was on

11    the exhibit?

12         MR. MUEHLECK:  I asked her if her signature, I

13    thought, was on the --

14    BY MR. MUEHLECK:

15    Q    Is your signature on the seal?

16    A    Yes, it is.

17    Q    Okay.  All right.  And is -- and is your date on that?

18    A    Yes, it is.

19    Q    Is there another seal on that exhibit?

20    A    Yes, it is.

21    Q    Whose -- do you recognize the signature and date there?

22    A    Looks like Jack Wright.  I'm sorry, I'm in denial, I need

23    glasses.

24    Q    Okay.  We'll withdraw the question.

25    A    I think it's Jack Wright.

1    Q    Okay.  Can you -- can you see a date when the second --

2    whether there's another seal?

3    A    Looks like March 12th or March 19, 2003.

4    Q    All right.  What is the procedure when you seal and

5    unseal -- if you have to unseal a sealed exhibit?

6    A    You have to -- when you reseal it, first of all, you

7    submit a report also, and you have to reseal it and put your

8    seal on it to reseal it.  Whoever that new person, as in this

9    case Jack Wright, probably opened it and looked at the exhibits

10   or something, and then he had to put his seal now on it.

11   Q    What do they do with the old seal?

12   A    It's kept.  It's either put in the bag, or in this case,

13   he just kept it at the top.

14   Q    Okay.  And the other exhibit, the other bag, Exhibit --

15   A    16.

16   Q    All right.  You recognize the seal on that and the

17   signatures?

18   A    Yes, I do.

19   Q    Whose are they?

20   A    Mine and Jack Wright's.

21   Q    Okay.  And when did you seal it?

22   A    I sealed it on December 4, 2002.

23   Q    All right.  And where did you -- where were you when you

24   did that?  When you processed it, I should say.

25   A    When I processed it, I was at the airport DEA task force

1    office.

2    Q    Okay.  And that was what day, if you recall?

3    A    That I processed it?

4    Q    Yes.

5    A    On the -- this one was on December 4th.

6    Q    All right.  Did you do anything to that exhibit in between

7    the time you took it and the time you sealed it, modify it or

8    delete anything from it?

9    A    No.

10    Q    And your testimony is you're not sure whose signature that

11    is, but you believe it might be Jack Wright's?

12    A    It's --

13    Q    Without your glasses.

14    A    It's written with lighter ink, but it is Task Force

15    Officer Jack Wright, and it looks like it was May 19th, instead

16    of March.

17    Q    Without your glasses?

18    A    Without my glasses.

19    Q    Thank you, Officer Tano.

20         THE COURT:  Mr. Muehleck, are you seeking to introduce

21    Exhibit 13?

22         MR. MUEHLECK:  Well, I would when -- after the

23    chemist, Your Honor.  That's the lab report.  We'll do that

24    with the next couple witnesses.  Both chemists are here, Your

25    Honor.

1          THE COURT:  Has she identified her signature on it?

2    BY MR. MUEHLECK:

3    Q    Can you identify your signature on Exhibit 13, the DEA-7,

4    please?

5    A    Yeah, that was my signature.  I did see it.

6    Q    What block, please, for the record?

7    A    17.

8          MR. MUEHLECK:  Thank you.  I have no further

9    questions, Your Honor.

10   BY MR. MUEHLECK:

11   Q    Block 17, your signature?

12   A    It's to the right of my name, yeah.

13   Q    Okay.

14         MR. MUEHLECK:  I have no further questions of the

15   witness, Your Honor.

16         THE COURT:  Very well.  Mr. Barbee?

17         MR. BARBEE:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MR. BARBEE:

20   Q    Good morning.

21   A    Good morning.

22   Q    How are you?

23   A    Good, thanks.

24   Q    Good.  Directing your attention to the two items that

25   you've discussed with Mr. Muehleck that you submitted to the

1    Southwest Regional Lab, it was basically suspected heroin,

2    correct?

3    A    Yes.

4    Q    Okay.  And those are the two packages you're holding up

5    there?

6    A    Yes.

7    Q    In addition to those two packages, did you participate in

8    a search and seizure at a Tamarack Pines Apartment complex up

9    in Kamuela?

10    A    Yes.

11    Q    Okay.  And that was with -- where Mr. Banuelos and

12    Mr. Velazquez got arrested?

13    A    Yes.

14    Q    Okay.  In addition to those two items that you have there,

15    did you also seize additional suspected drugs?

16    A    Yes.

17    Q    Okay.  You seized seven heavily taped white balls

18    containing crack cocaine?

19    A    Yes.  I don't know if it was crack, the results, but --

20    Q    Okay.  You submitted it also to the Southwestern Regional

21    Lab, correct?

22    A    Yes.

23    Q    And they sent you back a result saying what -- what the

24    item was, right?

25    A    They submitted it back to the case file.  The case agent.

1    Q    Okay.

2    A    Yes.

3    Q    And did it appear to be crack cocaine to you when you

4    seized it?

5    A    I don't recall.  I know it was -- it appeared to be

6    cocaine.

7    Q    Okay.  About 266 grams?

8    A    Yeah, they were individual balls totaling that in weight.

9    Q    And that was in the Tamarack Pines Apartment?

10    A    Yes.

11    Q    And then you also seized, did you not, approximately

12    46 grams total gross weight of suspected ice?

13    A    Yes.

14    Q    And you submitted that exhibit to the Southwestern

15    Regional Lab?

16    A    Yes.

17    Q    Okay.  You also seized or took possession as a custodian

18    of some currency that was found on Banuelos' person?

19    A    Yes.

20    Q    He had $4,500 cash in his pocket?

21    A    Offhand, I don't remember the exact figure.

22    Q    Is there a document that would refresh your memory?

23    A    Yeah, 7A.

24    Q    Okay.

25              MR. BARBEE:  If I could approach, Your Honor?

1            THE COURT:  You may.

2    BY MR. BARBEE:

3    Q    (Handing document).  Just direct your attention to the

4    entry for Exhibit N-1 in the middle of the page.  Does that

5    refresh your memory?

6    A    Yes, it does.

7    Q    And how much money did you seize from Banuelos?

8    A    $4,519.

9    Q    Okay.

10            MR. BARBEE:  Can I retrieve the exhibit, Your Honor?

11            I don't have any further questions, Your Honor.

12            THE COURT:  Mr. Muehleck?

13            MR. MUEHLECK:  No questions, Your Honor.

14            THE COURT:  Are you going to be introducing 11 and 12

15    through another witness?

16            MR. MUEHLECK:  Yes, Your Honor.

17            THE COURT:  Thank you.  You're excused.

18            MR. MUEHLECK:  May the witness leave the island, Your

19    Honor?  May the witness leave the island, Your Honor?

20            THE COURT:  Where is she going?

21            MR. MUEHLECK:  Well, she was Lanai yesterday, working.

22            THE COURT:  I thought you said Molokai.

23            MR. MUEHLECK:  She was in both, I believe; is that

24    correct?

25            THE WITNESS:  Lanai.

1        MR. MUEHLECK:  Lanai.

2        THE COURT:  Any problem, Mr. Barbee?

3        MR. BARBEE:  No, Your Honor.

4        THE COURT:  Witness is excused.

5        MR. MUEHLECK:  Thank you, Your Honor.

6                                    (Witness excused)

7        THE COURT:  Next?

8        MR. MUEHLECK:  Shannon DiPari, Your Honor.

9                    SHANNON DiPARI,

10   called as a witness by the Government, having been first duly

11   sworn, was examined and testified as follows:

12        THE CLERK:  Please be seated.

13        State your name for the record and spell your last

14   name, please.

15        THE WITNESS:  My name is Shannon DiPari, D-I-P-A-R-I.

16                    DIRECT EXAMINATION

17   BY MR. MUEHLECK:

18   Q    Are you employed?

19   A    Yes, I am.

20   Q    How are you employed?

21   A    I'm employed as a forensic chemist with the Drug

22   Enforcement Administration.

23   Q    How long have you been a forensic chemist with the DEA?

24   A    Almost ten years.

25   Q    And where is the laboratory, the DEA laboratory that you

1    are employed at?

2    A    San Diego, California.

3    Q    Let me ask you a little bit about your training.  What --

4    what's your training, please?

5    A    I have a Bachelor of Science in pharmacological chemistry

6    from the University of California-San Diego, and I went through

7    a nine-month in-house training program with the DEA in how to

8    analyze the controlled substances.

9    Q    And do you have -- you have training to -- and a forensic

10    chemist, what is a forensic chemist, please?  What are those

11    duties that you have?

12    A    My duties as a forensic chemist are to analyze substances

13    seized by federal, state and local agencies, to determine if

14    there is a presence of controlled substances.

15    Q    And other than your college education, you have DEA

16    education or training, ma'am?

17    A    Yes.

18    Q    And what is that, please?

19    A    It's a nine-month training program that you start when you

20    first begin the job, and there's further training throughout

21    every year.

22    Q    Have you had occasion to chemically analyze substances to

23    determine whether the substances contain a controlled either

24    narcotic or nonnarcotic controlled drug?

25    A    Yes.

1    Q    On how many times?

2    A    Approximately 3800.

3    Q    Have you testified as an expert witness in a courtroom in

4    the field of forensic -- forensic chemistry?

5    A    Yes, I have.

6    Q    Approximately how many times?

7    A    Greater than 30.

8    Q    I'm sorry?

9    A    More than 30.

10   Q    In federal court?

11   A    Federal and state, yes.

12   Q    Okay.

13        MR. MUEHLECK:  And I'm going to offer the witness as

14   an expert in the field of forensic analysis, forensic

15   chemistry, Your Honor, for the presence of controlled

16   substances.

17        MR. BARBEE:  Just a couple questions, if I may, Your

18   Honor.

19        THE COURT:  You may.

20                    VOIR DIRE EXAMINATION

21   BY MR. BARBEE:

22   Q    Good morning, Ms. DiPari.

23   A    Morning.

24   Q    You said you got your Bachelor of Science from San Diego

25   State or University of California-San Diego?

1    A    University of California-San Diego, yes.

2    Q    And what year is that?

3    A    I completed my studies in 1996.

4    Q    And how long have you been working for the DEA?

5    A    Ten years.

6    Q    Okay.  And you also had a nine-month training program?

7    A    Yes.

8    Q    What kinds of grades did you get at college?

9    A    Actually mostly As and Bs.

10   Q    Very good.  Now, you said initially -- well, let me save

11   that for cross-examination.

12        MR. BARBEE:  Your Honor, at this time we don't have

13   any objection to her being qualified in chemistry.

14        THE COURT:  Court will find the witness qualified as

15   an expert to testify in the area of chemistry.

16        MR. MUEHLECK:  Can I ask Mr. Barbee about his grades,

17   Your Honor?

18        (Laughter.)

19        MR. BARBEE:  Some good, some bad.

20                    RESUMED DIRECT EXAMINATION

21   BY MR. MUEHLECK:

22   Q    Did you have occasion to do an analysis on heroin and

23   cocaine at the request of the DEA in August 28th of 2003?

24   A    Yes.

25   Q    All right.  Let me ask you if you would look at Exhibit 7

1    and Exhibit 8 in the white notebook there, please, and

2    Exhibit 9 and 10, please.

3         MR. MUEHLECK:  Approach the witness with 9 and 10, or

4    have Ms. Sai, Your Honor?

5    BY MR. MUEHLECK:

6    Q    Have you seen Exhibits 7 and 8, the paper exhibits in the

7    hardcover notebook, Ms. DiPari?

8    A    Yes, I have.

9    Q    And where have you seen those before?

10   A    In my laboratory.

11   Q    Okay.  And what are they, please?

12   A    They are forms DEA-7s, which are reports that we

13   generate -- portions that we generate through DEA in the

14   presence of drug seizures.

15   Q    Okay.  And did they request your laboratory or the

16   laboratory where you are employed to do a particular analysis?

17   A    Yes, they did.

18   Q    And Exhibit 7, does that request an analysis of a specific

19   item for the presence of suspected heroin?

20   A    Yes.

21   Q    And if you would look, please, at exhibits -- if you

22   would, please, Exhibit 9, and tell me if you've seen that

23   exhibit?

24   A    Yes, I have.

25   Q    And how can you tell?

1    A    I can tell by the case number and exhibit number on the

2    evidence, and I can also recognize it by my signature seal at

3    the bottom.

4    Q    You have a signature on the bottom?

5    A    Yes.

6    Q    And why do you have a signature and a seal on the bottom?

7    A    We do that for our chain of custody to ensure that nobody

8    else has tampered with the evidence from the time that I have

9    analyzed it.

10    Q    Can you tell us what -- what quality or what condition the

11    Exhibit 9 was in when it was received at the laboratory?

12    A    When it was received in the laboratory, it was sealed with

13    an agent seal on the top.

14    Q    Was the seal broken or unbroken?

15    A    I did not break the agent seal.  I broke the sealed

16    portion of the bag at the bottom.

17    Q    Now, do you receive the exhibits at the laboratory for

18    analysis or does someone else at the laboratory receive them?

19    A    Someone else at the laboratory receives them.

20    Q    Can you tell if that person found the seal to be intact

21    when received?

22    A    Yes, it states here on the DEA-7.

23    Q    What line is that, please?

24    A    It's on the DEA --

25              MR. BARBEE:  Your Honor, I'm going to object to

1    hearsay as to what somebody else may or may not have done or

2    written.

3              MR. MUEHLECK:  Well, my response is, if it's filled

4    out in the normal course of duties and if this witness has

5    ability to read that exhibit, I believe she can do that.  I can

6    ask a couple foundational questions.

7              THE COURT:  Why don't you go ahead and ask them.

8              MR. MUEHLECK:  All right.

9    BY MR. MUEHLECK:

10   Q    In your -- you said you've testified about 30 times?

11   A    Yes.

12   Q    Have you seen DEA -- DEA Form 7s before?

13   A    Yes.

14   Q    Do you have occasion to interpret them on -- on previous

15   occasions?

16   A    Yes.

17   Q    How many times; many times?

18   A    Many times, yes.

19   Q    And is it on occasion do you check to see if the -- the

20   form explains whether the -- the integrity of the exhibit when

21   it is received is correct or has been tampered with; is that a

22   normal procedure for you to do?

23   A    Yes, when I actually receive the DEA-7, I -- I get the

24   evidence out of the vault from the evidence technician, and

25   before I will itself receive it, I ensure that the DEA-7

1    information of what it states is the presence of what I see

2    from -- on the evidence itself.

3    Q    Okay.  And exhibit -- looking at Exhibit 7, can you tell

4    if Exhibit 9, the actual suspected compound, was intact and the

5    seal was intact when it was received?

6         MR. BARBEE:  Your Honor, again, he's eliciting

7    information from a document that's not in evidence, and this

8    witness is being asked to testify to things outside of her

9    personal knowledge as to entries that another person has made.

10   That's clearly hearsay.

11        I don't think, you know, Exhibit 7 or 8 should be

12   admitted.  She's qualified as an expert forensic chemist.  She

13   can testify as to her analysis, but I don't think she should

14   testify as to the contents of a document that's not received in

15   evidence.

16        MR. MUEHLECK:  She -- first of all, she was asked if

17   she could tell if the seal was broken or unbroken, and the

18   answer would be either yes or no, I can tell.  She was not

19   asked to read from a document in evidence.  So that objection,

20   I submit, is not well taken.

21        The other point is, I believe since she's been there

22   for ten years and she's been doing -- I forget how many

23   thousands of analyses, and that she can read an exhibit and she

24   said it's her normal procedure to read these paper documents

25   before she proceeds.

1              So I think as a business record -- or as a person

2     who's familiar with the documents, who does this every time,

3     and certainly she can answer my question whether she can tell

4     looking at the exhibit, whether -- whether she can tell if it

5     was yes or no, not -- not whether it was sealed or wasn't

6     sealed, but if she can tell looking at the exhibit the

7     integrity of the seal.

8              THE COURT:  Well, you already asked her that, right?

9              MR. MUEHLECK:  Well, she wasn't allowed to answer.

10             THE COURT:  I'll allow the answer.

11    BY MR. MUEHLECK:

12    Q    Can you tell looking at Exhibit 7 what the integrity of

13    the seal was, yes or no?

14    A    Yes.

15    Q    All right.  Now, you said that you look at Exhibit --

16    Exhibit 7s how often?

17    A    There's a 7 for every exhibit that I analyze.  So 3800

18    times.

19    Q    You've done that 3800 times?

20    A    Yes.

21    Q    And in your normal course of duties, do you have to read

22    Exhibit 7s?

23    A    Yes.

24    Q    And Exhibit 7s, before they come to you, are they filled

25    out by persons at the DEA laboratory?

1    A    Yes.

2    Q    And are those person --

3         MR. BARBEE:  Your Honor, again, she's testifying as to

4    hearsay that other people had filled this form out.  She

5    doesn't know, she wasn't --

6         MR. MUEHLECK:  She hasn't identified that yet.

7         MR. BARBEE:  Can I finish my objection, please.

8         She wasn't present when these things were filled out.

9    They are filled out by somebody else.

10        MR. MUEHLECK:  A business record doesn't require

11   someone to be present when the entries are made; just that she

12   understands the entries, the entries are made in the normal

13   course of business, they're relied upon in the normal course of

14   business, the person has the duty to make those entries.

15        THE COURT:  Why don't you ask her if they are relied

16   on in the normal course.

17   BY MR. MUEHLECK:

18   Q    Do you rely on these entries in the normal course of

19   business?

20   A    Yes, I do.

21   Q    And how long have you been at the lab?

22   A    Ten years.

23   Q    And do other people rely on entries on DEA-7s in their

24   normal course of business at the laboratories?

25   A    Yes, they do.

1    Q    And are the entries on DEA-7s made by employees at the DEA

2    laboratory in San Diego with the duty to make those entries?

3    A    Some of them, yes.

4    Q    Okay.  And as to exhibit -- excuse me, as to block 22,

5    would someone have a duty to make an entry in that block?

6    A    Yes.

7    Q    How often would someone have a duty to make an entry in a

8    block 22 pertaining to an exhibit that came into the

9    laboratory?

10   A    Every time an exhibit comes.

11   Q    And every time you look at an exhibit for analysis, do you

12   look at exhibit or block 22 on Exhibit 7 or the DEA Form 7?

13   A    Yes, I do.

14        MR. MUEHLECK:  Fair question I submit at this point,

15   Your Honor, plenty of foundation.

16        THE COURT:  And would she have proceeded with her

17   testing if the document -- the DEA-7 had not been properly

18   filled in as showing that the seal had not been broken?

19   BY MR. MUEHLECK:

20   Q    Does it show that the seal had not been broken?

21   A    Yes, it does.

22   Q    Which means what was the integrity of the substance, the

23   suspected substance, when it got to the laboratory?

24   A    Intact.

25   Q    Okay.  Now, as --

1          THE COURT:  Would she have proceeded with her testing

2     if it had not shown that?

3     BY MR. MUEHLECK:

4     Q    Okay.  Would you have proceeded with an analysis had the

5     seal been marked as broken and the integrity questioned?

6     A    No.

7     Q    What would you have done?

8     A    I would have contacted the person who had submitted the 7

9     and contacted the evidence technicians in the vault to

10    determine the actual state of the evidence as it stands.

11    Q    And no analysis would have been performed at that point?

12    A    Not --

13         MR. BARBEE:  Your Honor, I am going to object to

14    leading questions, leading the witness.

15         THE COURT:  Rephrase your question.

16    BY MR. MUEHLECK:

17    Q    And what would have -- then if -- if this had been broken,

18    the seal, would an analysis have been performed?

19    A    Not until the information had been rectified.

20    Q    Okay.  Was an analysis done on Exhibit 9?

21    A    Yes.

22    Q    Who did the analysis?

23    A    I did.

24    Q    Please explain the analysis.

25    A    The analysis contains several portions.  I first

1    determined the weight of the substance, and then I performed a

2    chemical analysis to determine the identification of the

3    substance.  I then performed a quantitative analysis to

4    determine the purity of the identification of the substance.

5    Q    Could you explain that briefly?

6    A    Yes.  What we do is I take a weighed portion of the sample

7    and I dissolve it into an alcohol and I introduce it into a

8    instrument, and the instrument will then give me a response of

9    how much of the substance is present in that solution.

10           I compare that to a weighed standard that I know.  So,

11    for instance, if the instrument had given me a standard area

12    count of 1,000 and it had given me an area count of 500 for the

13    sample, I would then conclude that it was 50 percent.

14    Q    And did your analysis continue of this exhibit, Exhibit 9?

15    A    Once that portion of the quantitation has been complete, I

16    obtain a weight after I've completed my analysis, seal the

17    evidence and return it to the vault.

18           THE COURT:  I think we better break at this time.

19           MR. MUEHLECK:  Break, Your Honor?  All right.

20           THE COURT:  Please be back at ten of.

21       (A recess was taken from 10:37 a.m. to 11:01 a.m.)

22           THE COURT:  Please proceed, Mr. Muehleck.

23           MR. MUEHLECK:  Yes, Your Honor.

24    BY MR. MUEHLECK:

25    Q    Ms. DiPari, you were talking about the examination you had

1    conducted on Exhibit 9, the suspected controlled substance.

2    Could you tell us a little bit about the instruments that were

3    used or the exact testing that was done?

4    A    Once I've obtained the weight of the substance, the next

5    thing I do is I do what's known as a presumptive screen using a

6    gas chromatographic instrument, which is the same instrument

7    that is used in doing the quantitation.

8         What it will do is, I introduce the sample into the

9    instrument and it will separate out the components.  If there's

10   two components, three components, it will give me two or three

11   different peaks.  And those peaks are always related to a time

12   of the amount of time it takes to get out of the instrument.

13   That time will always be the same for each type of substance

14   depending on the system that I use.  So if I use the same

15   system, I can compare that to a standard and get a presumptive

16   idea of what the substance is.

17        Once I have determined that, then I went to an

18   infrared spectrophotometer, which is an instrument in which you

19   shine infrared light through the sample, and every single

20   chemical in the world absorbs that light in a different way.

21   The light is absorbed depending on the structure of the

22   chemical; so every chemical will produce a different pattern.

23   It's a pattern of wavy lines and those wavy lines are

24   identifiable by comparing it to a standard.  And every

25   component will make the -- every chemical will make a different

1   pattern.  So I can positively identify a substance by the

2   pattern that it makes using that instrument.

3   Q    Each -- I'm sorry, go ahead.

4   A    The third technique I used is known as a mass

5   spectrometer, which is -- it's attached to the gas

6   chromatograph, so it will separate out every component.  Once

7   the component has been separated out, it gets introduced into

8   the mass spectrometer, which bombards the chemical with

9   electrons and it breaks those chemical up into a bunch of

10   different pieces.  It's also dependent upon the structure, the

11   chemical will always break into the same pieces.

12        The instrument then counts those pieces and weighs

13   each piece and produces a pattern of lines depending on how

14   much of the pieces were present and what the weight is.  That

15   also is something that is completely dependent upon the

16   structure, and so every chemical will produce a different

17   pattern of those peaks.  And I can then compare those to a

18   standard to get a positive identification.

19   Q    Using these three different -- these three different

20   instruments you mentioned, the gas chromatograph, the

21   infrared -- what would you call it?

22   A    Spectrophotometer.

23   Q    All right.  And the mass spectrometer?

24   A    Yes.

25   Q    Are those three instruments state-of-the-art equipment?

1    A    Yes.

2    Q    And are they used outside, if you're aware, outside the

3    field of forensic -- forensic chemistry?

4    A    Yes.

5    Q    Okay.  And you said that the analysis of compounds

6    gives -- that the reaction of these instruments is different

7    for specific compounds or a specific reaction -- a different

8    reaction for each compound?

9    A    Yes.

10   Q    A very specific reaction for each compound?

11   A    Yes.

12   Q    So if you put aspirin in it, it will react differently if

13   you put marijuana in it?

14   A    Yes.

15   Q    Or cocaine in it?

16   A    Yes.

17   Q    All right.  And let me ask you, based upon the analyses

18   that was conducted on Exhibit 9, using these three procedures,

19   did you form an opinion as to what the chemical composition is

20   of Exhibit 9?

21   A    Yes, I did.

22   Q    What is that opinion?

23   A    It's heroin hydrochloride.

24   Q    And the weight of that particular substance, Exhibit 9?

25   A    It weighed 174.4 grams.

```
 1   Q    And you said it was heroin hydrochloride?

 2   A    Yes.

 3   Q    Is there a -- is there a percentage strength?

 4   A    Yes.

 5   Q    Explain that, please, if you would.

 6   A    The percentage strength for the sample was 47 percent.

 7   That is the quantitation technique that I explained previously

 8   using the gas chromatograph and comparing it to a weighed

 9   standard.

10   Q    So the amount of pure drug in that sample, Exhibit 9 -- or

11   in Exhibit 9 would be what?

12   A    Are you asking in grams?

13   Q    Yes.

14            THE WITNESS:  May I refer to my notes?

15            THE COURT:  You may.

16            THE WITNESS:  Thank you.  It calculates out to

17   82.0 grams.

18   BY MR. MUEHLECK:

19   Q    Did you prepare a report of your analysis and your

20   findings?

21   A    Yes, I did.

22   Q    And is that in front of you?

23   A    Yes.

24   Q    What exhibit number is that?

25   A    Um --
```

1    Q    It's in the hardcover book?

2    A    It's in the hardcover book.

3    Q    And the exhibit number?

4    A    It's Exhibit Number 7.

5    Q    All right.  And how do you know it is your report?

6    A    It has my signature and the date at the bottom, along with

7    the case number and exhibit number coinciding to this sample.

8    Q    Do you recognize any other signatures on it?

9    A    Yes, I do.

10   Q    Whose signature do you recognize?

11   A    The bottom signature is that of my laboratory director.

12   Q    Okay.  And when was your analysis completed and the report

13   completed?

14   A    August 28th, 2003.

15   Q    And what portion of the report is filled out by yourself?

16   A    The bottom portion, from Box 25 down.

17   Q    All right.  And the portion from exhibit -- excuse me,

18   from Line 19 -- block 19 through block 24 is completed by who,

19   if you know?

20   A    The evidence technicians in our laboratory and the agents

21   dropping the evidence off.

22        MR. MUEHLECK:  Offer Exhibit 7 -- excuse me, offer

23   Exhibit 9 into evidence, Your Honor.

24        MR. BARBEE:  No objection.

25        THE COURT:  9 is admitted.

1          (Government's Exhibit 9 was received in evidence.)

2          MR. MUEHLECK:  Offer Exhibit 7, the report into

3     evidence, Your Honor.

4          MR. BARBEE:  Objection, Your Honor.  Contains hearsay

5     information that the witness did not fill out.  She just

6     indicated from block 25 down is her information she put on the

7     form.  Everything above it is stuff that she didn't put in

8     there.

9          MR. MUEHLECK:  Well, prior to that -- my submission is

10    prior to that the testimony was filled out by Agent Wright, and

11    subsequent to that, 19 through 24, it's submitted -- filled out

12    by the laboratory, and she indicates she can read that

13    material.

14         THE COURT:  I'll admit 7.

15         (Government's Exhibit 7 was received in evidence.)

16    BY MR. MUEHLECK:

17    Q    Now, would you look at Exhibit 10, please, the plastic

18    exhibit, please.  And take a look at that, and tell me if

19    you've seen that exhibit before.

20    A    Yes, I have.

21    Q    Where have you seen that before, ma'am, or how can you

22    tell you've seen it before?

23    A    I recognize it by the case number and exhibit number

24    filled in the box, and my signature at the bottom.

25    Q    Did you see that on or about the same time that you saw

1    Exhibit 9?

2    A    Yes, the same day.

3    Q    All right.  And did you do an analysis -- and how -- and

4    did you do an analysis of Exhibit 10?

5    A    Yes, I did.

6    Q    And did you prepare a report on Exhibit 10?

7    A    Yes, I did.

8    Q    Is that report in the book, if you recognize it?

9    A    Yes, it is.

10    Q    What number exhibit is that, please?

11    A    It's Exhibit Number 8.

12    Q    And how do you recognize it?

13    A    I recognize it by the case number, exhibit number and my

14    signature.

15    Q    Please tell us how you proceeded to examine Exhibit 10,

16    please, or how you did your analysis.

17    A    I obtained the weight of the substance, and then I began

18    the chemical analysis using the gas chromatograph and infrared

19    spectrophotometer.

20    Q    Okay.  And I should ask you the same question:  Can you

21    tell, looking at Exhibit 8, what the integrity was of the

22    package, the Exhibit 10 was when it was received at the

23    laboratory?

24        MR. BARBEE:  Objection.  Hearsay.  It's offered for

25    the truth of the matter and it's beyond the witness' personal

1    knowledge.

2              MR. MUEHLECK:  Let me ask some foundational questions,

3    Your Honor.

4              THE COURT:  You may.

5    BY MR. MUEHLECK:

6    Q    Looking at Exhibit 10, would you have done an analysis if

7    the -- it had been unsealed or the seal had been broken when it

8    was obtained?

9    A    No.

10   Q    Okay.  Do you know if -- when Exhibit 10 or like exhibits

11   are received at the laboratory, if there's a duty by the

12   receiving people to make an entry on DEA-7s noting whether the

13   seal is broken or unbroken?

14   A    Yes.

15   Q    And do they have such a duty to make an entry?

16   A    Yes.

17   Q    Are those entries made by persons in the normal course of

18   business at the DEA laboratory in San Diego?

19   A    Yes.

20   Q    Are they relied upon by people like you in the normal

21   course of operation at the San Diego laboratory?

22   A    Yes.

23   Q    And is the -- is the entry concerning the -- the integrity

24   of the seal made at the same time that the -- the actual

25   exhibit comes into the laboratory?

1    A    Yes.

2              MR. BARBEE:  Objection, Your Honor.  It's beyond the

3    witness' personal knowledge.  She didn't witness somebody seal

4    it or sign that it was sealed.

5              THE COURT:  I'll overrule the objection.

6    BY MR. MUEHLECK:

7    Q    Do you recognize any signatures on -- on Exhibit 8,

8    please, besides yourselves -- besides your own?

9    A    Yes.

10   Q    Whose do you recognize?

11   A    I recognize the signature of my lab director at the

12   bottom.

13   Q    Any other signatures?

14   A    Yes, I do.  I recognize the signature of Orlynn Perez, our

15   evidence technician.

16   Q    What is -- do you know what his job is as an evidence

17   technician?

18   A    Yes.

19   Q    What is his job?

20   A    She is responsible for bringing all of the evidence into

21   our laboratory, taking it in, filling out the forms of the

22   DEA-7, putting the evidence into our computer system and filing

23   it into our vault until I'm ready to take the evidence out.

24   Q    Would she be responsible for filling out blocks 9 through

25   24?

1    A    Yes.

2    Q    Please tell us about your examination of Exhibit 10,

3    please, Ms. DiPari.

4    A    Exhibit 10 I analyzed using the gas chromatographic

5    technique to get a presumptive idea of what the sample was, and

6    then after that I used an infrared spectrophotometer to

7    identify positively the substance.

8    Q    And is that -- did you follow the same procedure as to the

9    other exhibit, Exhibit 9?

10    A    Everything except for the mass spectrometer I did not use

11    on this sample.

12    Q    Why not?

13    A    The sample was pure enough I did not need to use a

14    secondary technique.

15    Q    Okay.  And based upon the analysis you did, did you form

16    an opinion as to what Exhibit 10 is?

17    A    Yes, I did.

18    Q    What's that opinion?

19    A    That it is cocaine hydrochloride.

20    Q    And could you tell us the net weight of the cocaine

21    hydrochloride?

22    A    25.0 grams.

23    Q    And can you tell us what strength or purity it is?

24    A    It was 86 percent.

25    Q    And could you tell us the amount of pure drug?

1    A    If I refer to Exhibit 8.

2    Q    I think the court will let you.  You can ask the court.

3          THE COURT:  You may.

4          THE WITNESS:  Thank you.

5          21.5 grams.

6    BY MR. MUEHLECK:

7    Q    All right.  And the analysis was completed, you said,

8    about the same time as your analysis on the other exhibit?

9    A    Yes, August 28th, 2003.

10   Q    And did you fill in Exhibit 8 reporting this analysis in

11   your results?

12   A    Yes, I did.

13   Q    Did you sign it?

14   A    Yes.

15   Q    And who else signed it?

16   A    My laboratory director.

17         MR. MUEHLECK:  I'm going to offer Exhibit 10 and

18   Exhibit 8 into evidence, Your Honor.

19         MR. BARBEE:  No objection to 10.  Objection to Number

20   8, contains hearsay information, lack of personal knowledge as

21   to this witness as to the entries made on the document above

22   Paragraph 25, and it's offered for the proof of the matter.

23         THE COURT:  We've had other witnesses testify as to

24   what's above that, haven't we, Mr. Muehleck?

25         MR. MUEHLECK:  Yes, Your Honor.

1         THE COURT:  I'll admit 10 and 8.

2    (Government's Exhibits 8 and 10 were received in evidence.)

3    BY MR. MUEHLECK:

4    Q    You found this to be what?  Exhibit 8?

5    A    The drug?

6    Q    Yes.

7    A    Cocaine hydrochloride.

8    Q    Okay.  The previous drug was heroin.  Do you know if that

9    is a schedule controlled substance, heroin?

10   A    Yes, it is.

11   Q    What schedule, please?

12   A    It is a Schedule I.

13   Q    And cocaine, is that a schedule controlled substance?

14   A    Yes, it is.

15   Q    What schedule, please?

16   A    Schedule II.

17   Q    And how -- how are drugs scheduled?  Can you give us a

18   little bit of information on that, just briefly?

19   A    Sure.  The federal government analyzes the sample,

20   determines what kind of effects the drug will have on the human

21   body and what kind of uses the drugs will have on the human

22   body, determining the addictive ability of those substances and

23   their medical uses will level them into Schedules I, II, III,

24   IV and V.

25        Schedule I is a substance that has no medical use and

1   is highly addictive to the body.  Schedule II is where it's

2   highly addictive but has a medical use, and as you go down to

3   III and IV and V is the lower amounts of addictability of that

4   substance with the medical use.

5   Q    Thank you.

6            MR. MUEHLECK:  A moment please, Your Honor?

7            Pass the witness.  Thank you.

8            THE COURT:  Mr. Barbee.

9            MR. BARBEE:  Thank you, Your Honor.

10                       CROSS-EXAMINATION

11  BY MR. BARBEE:

12  Q    Ms. DiPari, you indicated that with regard to Government's

13  Exhibits Number 7 and 8, I believe, that Orlynn Perez was

14  responsible to fill in blocks 9 through 24; is that correct?

15  A    No, not 9 through 24.  Blocks 19 through 24.

16           MR. MUEHLECK:  I think the question was 19 through 24

17  as I asked, Judge.

18  BY MR. BARBEE:

19  Q    Okay.  Thank you for clarifying that.

20           MR. BARBEE:  No further questions.

21           MR. MUEHLECK:  May the witness be -- may the witness

22  be excused, Your Honor, to leave the district?

23           THE COURT:  Yes.

24           I take it you have no objection, Mr. Barbee?

25           MR. BARBEE:  No objection.

1                                    (Witness excused)

2              MR. MUEHLECK:  Call our next witness, Your Honor?

3              THE COURT:  Please.

4              MR. MUEHLECK:  John Ryan, Your Honor.

5                          JOHN RYAN,

6    called as a witness by the Government, having been first duly

7    sworn, was examined and testified as follows:

8              THE CLERK:  Please be seated.

9              State your name for the record and spell your last

10   name, please.

11             THE WITNESS:  John Ryan, R-Y-A-N.

12                       DIRECT EXAMINATION

13   BY MR. MUEHLECK:

14   Q    Are you employed, sir?

15   A    Yes, I am.

16   Q    Where?

17   A    At the Drug Enforcement Administration, Southwest

18   Laboratory in Vista, California.

19   Q    And is that near San Diego?

20   A    Yes, it is.

21   Q    What's your employment position there?

22   A    I'm a forensic chemist.

23   Q    What are your duties as a forensic chemist?

24   A    Chief duty is to analyze evidence submitted for the

25   presence of controlled substances.

1   Q    How long have you been a forensic chemist at the

2   laboratory in San Diego, California?

3   A    15-plus years.

4   Q    Let me ask you a little bit about your education,

5   Mr. Ryan.  Where did you -- do you have a formal education in a

6   particular field?

7   A    Yes, I do.  I have a Bachelor of Science degree in

8   chemistry from Northern Arizona University in Flagstaff,

9   Arizona.

10   Q    When?

11   A    When?

12   Q    When did you graduate, sir?

13   A    1989.

14   Q    Do okay?

15   A    Yes, I did.

16   Q    There may be some follow-up questions on that.

17            At the DEA regional laboratory, have you had

18   occasion -- excuse me, the DEA San Diego laboratory, have you

19   had occasion to analyze substances for the presence of

20   controlled chemicals, controlled substances?

21   A    Yes, I have.

22   Q    On a few occasions or can you give us an idea how many?

23   A    Several thousand occasions.

24   Q    Have you had occasion to testify as a -- in court as a

25   witness for -- in the field of forensic chemistry?

1    A    Yes, I have.

2    Q    And in particular, for the -- on how many occasions?

3    A    Somewhere between 50 and 100.

4    Q    In U.S. District Court?

5    A    Yes.

6    Q    Where?

7    A    In California and Arizona, in Louisiana and New York.

8    Q    Ever testify in a state court?

9    A    Yes, I have.  States of Arizona and California.

10   Q    Okay.  You ever been called to give an expert opinion in

11   those areas as to the presence of a controlled substance or the

12   detection of a controlled substance?

13   A    Yes, I have.

14        MR. MUEHLECK:  I'd like to offer the witness, Your

15   Honor, if we could, please, Mr. Ryan as an expert in the field

16   of forensic chemistry for the determination of controlled

17   substances.

18        MR. BARBEE:  No objection.

19        THE COURT:  Court finds the witness qualified as an

20   expert to testify in the area of forensic chemistry regarding

21   controlled substances.

22   BY MR. MUEHLECK:

23   Q    Now, sir --

24        MR. MUEHLECK:  11 and 12 to the witness, please, Your

25   Honor?

1           THE COURT:  You may.

2    BY MR. MUEHLECK:

3    Q    Have you ever seen what's been marked as Exhibits 11 and

4    12, sir?

5    A    Yes, I have.

6    Q    How can you tell?

7    A    Because I've got my initials all over it, as well as the

8    signature on the seal indicating I had analyzed it.

9    Q    On both exhibits?

10   A    Yes.

11   Q    Okay.  Did you do an analysis of the substances in Exhibit

12   11 and Exhibit 12?

13   A    Yes, I did.

14   Q    Can you tell us when you did that?

15   A    I concluded the analysis on December 26, 2002.

16   Q    Would you look in the hardcover white notebook on your

17   left, go to an Exhibit 13.  It's a paper document.  It should

18   be right after Exhibit 8.

19   A    Found it.

20   Q    Okay.  Have you seen that document before, Exhibit 13?

21   A    Yes, I have.

22   Q    How do you know?

23   A    Because I signed it on the bottom as my report.

24   Q    That's a report of what?

25   A    Of a laboratory analysis.

1   Q    Of which exhibits?

2   A    Of both exhibits -- well, court exhibits 11 and 12.

3   Q    Thank you.  Would you tell us what analysis you performed

4   on Exhibits 11 and Exhibits 12, please?

5   A    After -- after weighing it, using a balance, I performed a

6   gas chromatographic test, a mass spectrometry test and infrared

7   spectrophotometry and silver nitrate.

8   Q    Okay.  And let me ask you as to exhibits in 11 and 12, and

9   in particular now the paper report, Exhibit 13, could you tell

10  us looking at the report, just yes or no, whether you're able

11  to tell us looking at the report if the exhibits in 11 and 12

12  were in an intact seal or an intact position and container when

13  they were received at the laboratory?

14  A    Yes, I can.

15  Q    Okay.  Now, let me ask you, and are there blocks on

16  Exhibit 13 that allow us -- you to make that determination?

17  A    Yes, there is.

18  Q    Okay.  What blocks?

19  A    Be block 22.

20  Q    And do you recognize any printing or any signatures on

21  that document, Exhibit 13?

22  A    Yes, I do.

23  Q    What signature do you recognize?

24  A    Kristin Froetscher.

25  Q    How do you -- who is that person?

1   A    She was an evidence technician at our laboratory.

2   Q    And at that time could you tell us what her duties were?

3   A    Basically her duties were to receive and log and then

4   secure the evidence until the chemist gets it, and then take it

5   back from the chemist to secure it until it's needed for either

6   court or returned to the agency.

7   Q    Was the seal on the exhibit, Exhibit 11 and 12, intact

8   when you did the analysis?

9   A    Yes, it was.

10  Q    If it had not been intact, would you have done the

11  analysis?

12  A    Circumstance depending, maybe yes, maybe no; however, I

13  would have definitely made a note or -- and contacted the agent

14  about it.

15  Q    Okay.  Did you make such a note or contact the agent in

16  this case?

17  A    No, I didn't.

18  Q    All right.  And do you rely upon these entries in

19  exhibit -- excuse me, block 12 on Exhibit 13 before you proceed

20  with an analysis?

21  A    In addition to checking it on my own, yes.

22  Q    Is Kristin Froetscher under a duty to make that entry on

23  block 12?

24  A    Yes, it is.

25  Q    And a duty to sign it?

1    A    Yes.

2    Q    And would she do that contemporaneous with her receipt of

3    the exhibit into the laboratory?

4    A    Yes, she would.

5              THE COURT:  You mentioned block 12.

6              MR. MUEHLECK:  I'm sorry.

7    BY MR. MUEHLECK:

8    Q    Block 22?

9    A    22.

10   Q    Is it block 22, sir?

11   A    Block 22, yes.

12   Q    I'm sorry.  Would she be under a duty to make that entry

13   in exhibit -- excuse me, on Exhibit 13 in block 22?

14   A    Yes, she would.

15   Q    And you said you would rely on that partially?

16   A    Partially as well as checking it myself, yes.

17   Q    And she has -- okay.  And this record is kept at the

18   laboratory?

19   A    Yes, it is.

20   Q    All right.  Now, please, you mentioned three particular

21   instrumentations you used to take a look at and analyze

22   Exhibits 11 and 12.  You did that on both Exhibits 11 and 12?

23   A    Yes.

24   Q    All right.  And is that state-of-the-art equipment that

25   you were using?

1   A    Yes, it is.

2   Q    Did you form an opinion based upon your analysis and your

3   training and experience what is in Exhibit 11, the plastic bag?

4   A    Yes, I did.

5   Q    What is -- what is your opinion of the chemical

6   composition of that -- of that substance?

7   A    I found Exhibit 11 contained heroin hydrochloride.

8   Q    And can you give us a net weight?

9   A    Yes.  It was 292 point --

10  Q    I'm sorry, net weight.

11  A    265.0 grams.

12  Q    265 grams?

13  A    Yes.

14  Q    All right.  And is there -- did you determine the purity

15  of that?

16  A    Yes, I did.

17  Q    What is the purity of the heroin hydrochloride you found?

18  A    Found to be 52 percent pure.

19  Q    Which would give us an amount of pure drug of how much?

20  A    Little over 130, hundred and -- somewhere between 130 and

21  150 -- hang on -- 137.8 grams, more specifically.

22  Q    Okay.  And did you make an entry on -- on Exhibit 13

23  recording that analysis and results?

24  A    Yes, I did.

25  Q    All right.  What exhibit did you call that, what I call --

```
 1    what I call Exhibit 11, what is it called on your nomenclature?
 2    A    It was Exhibit 1.
 3    Q    All right.  And did you look at Exhibit 12, also?
 4    A    Yes, I did.
 5    Q    Under the same procedures?
 6    A    Yes.
 7    Q    And did you form an opinion based upon your experience and
 8    training and analysis on what the chemical composition of that
 9    Exhibit 12 was?
10    A    Yes, I did.
11    Q    What is your opinion?
12    A    My opinion is Exhibit 12 also contained heroin
13    hydrochloride.
14    Q    And how much heroin hydrochloride net weight, sir?
15    A    262.5 grams.
16    Q    And did you do an analysis of the purity?
17    A    Yes, I did.
18    Q    What did you find?
19    A    I found it also was 52 percent pure.
20    Q    Giving us how much pure drug in your analysis?
21    A    136.5 grams.
22    Q    And what exhibit did or what nomenclature did they put on
23    this drug in the laboratory, Exhibit Number 2?
24    A    Exhibit Number 2, yes.
25    Q    All right.  And did you record all these results on
```

```
 1    Exhibit 13?

 2    A    Yes, I did.

 3    Q    Did you sign it?

 4    A    Yes, I did.

 5    Q    Do you recognize any other signatures?

 6    A    There's a signature of my laboratory director, also.

 7    Q    And when was the report completed, sir?

 8    A    On the 26th of December.

 9    Q    Of?

10    A    December of 2002.

11              MR. MUEHLECK:  One moment, please, Your Honor.

12              Well, I'm going to offer both exhibits, Your Honor;

13    that is Exhibits 11 and 12, and then Exhibit 13, the report

14    into evidence.

15              MR. BARBEE:  My notes say 11 and 12 are in.  No?

16              MR. MUEHLECK:  No.

17              MR. BARBEE:  Oh, okay.

18              MR. MUEHLECK:  Not by my notes or by the clerk.

19              MR. BARBEE:  No objection to 11 and 12.

20              13, Your Honor, we do object.  We'd ask for some voir

21    dire.

22              THE COURT:  You may.

23                        VOIR DIRE EXAMINATION

24    BY MR. BARBEE:

25    Q    Good morning, Mr. Ryan.
```

```
 1   A     Morning.

 2   Q     Directing your attention to Exhibit Number 13.  Direct

 3   your attention to block number 1.  Did you fill in that form?

 4   A     No, I didn't.

 5   Q     Do you have any personal knowledge as to who filled in

 6   that block?

 7   A     No, I don't.

 8   Q     Directing your attention to blocks 2A and 2B, did you fill

 9   in those blocks?

10   A     No, I didn't.

11   Q     Do you have any personal information as to who filled

12   those blocks in?

13   A     No, I don't.

14   Q     Directing your attention to block 3, did you fill that

15   block in?

16   A     No, I didn't.

17   Q     Do you have any personal knowledge as to who filled that

18   block in?

19   A     No, I don't.

20   Q     Directing your attention to 4A and 4B, did you fill those

21   blocks in?

22   A     No.

23   Q     Do you have any personal knowledge as to who filled those

24   blocks in?

25   A     No.
```

1    Q    Directing your attention to block 5, did you fill that
2    block in?
3    A    No.
4    Q    Do you have any personal knowledge as to who filled block
5    5 in?
6    A    No.
7    Q    Directing your attention to block number 6A and B, did you
8    fill those blocks in?
9    A    No.
10    Q    Directing your attention to block 7, did you fill that
11    block in?
12    A    No.
13    Q    Do you have any personal knowledge as to who filled that
14    block in?
15    A    No, I don't.
16    Q    Directing your attention to block 8, did you fill that
17    block in?
18    A    No.
19    Q    Do you have any personal knowledge as to who filled block
20    number 8 in?
21    A    No, I don't.
22    Q    Directing your attention to blocks number 9, 10, 11, 12,
23    13, 14 and 15, did you fill those blocks in?
24    A    No, I didn't.
25    Q    Do you have any personal knowledge as to who filled those

1    blocks in?

2    A    No, I don't.

3    Q    Directing your attention to block number 16, did you fill

4    that block in?

5    A    No, I didn't.

6    Q    Do you have any personal knowledge as to who filled that

7    block in?

8    A    No, I do not.

9    Q    Directing your attention to blocks number 17 and 18, did

10   you fill those blocks in?

11   A    No, I didn't.

12   Q    Do you have any personal knowledge as to who filled those

13   blocks in?

14   A    No, I don't.

15        MR. BARBEE:  Your Honor, we would object to the

16   admission of Number 13 on the same grounds as we objected to 7

17   and 8, that it contains hearsay information.  This witness has

18   no personal knowledge as to the contents of this exhibit, at

19   least above Paragraph 25 -- or block 25.

20        THE COURT:  Mr. Muehleck?

21        MR. MUEHLECK:  Government's response is Ms. Tanya

22   Tano, Officer Tanya Tano, identified this exhibit.  Said she

23   submitted it, she filled it out, she prepared it and explained

24   what it was.

25        THE COURT:  Just as the other Exhibit 8, I believe it

1    was.  7 and 8, Jack Wright testified as to the top half of

2    the --

3              MR. MUEHLECK:  Right.  Correct, Your Honor.

4              THE COURT:  -- of the report having filled that out.

5    Tanya Tano testified as to blocks 1 to 18, and this witness has

6    testified as to blocks 19 to 37 -- or 38 -- 9, I should say.

7              Court will admit 13.

8         (Government's Exhibit 13 was received in evidence.)

9              MR. MUEHLECK:  I didn't hear the court's ruling on the

10   admission of 11 and 12.  I offered it.  I believe Mr. Barbee

11   said he had no objection.

12             THE COURT:  I admitted 11 and 12.

13             MR. MUEHLECK:  Thank you.

14      (Government's Exhibits 11 and 12 were received in evidence.)

15             MR. MUEHLECK:  I have no questions of the witness,

16   Your Honor.

17             THE COURT:  Any cross-examination?

18             MR. BARBEE:  No, Your Honor.

19             THE COURT:  Thank you.  You're excused.

20             MR. MUEHLECK:  May the witness leave the district,

21   Your Honor?

22             THE COURT:  You may leave the district.

23             MR. BARBEE:  No objection, Your Honor.  No objection.

24                                    (Witness excused)

25             MR. MUEHLECK:  I have a document to present for Your

1    Honor, copy already to Mr. Barbee.  Copy for the court.

2              United States would offer Exhibit 28, Your Honor.

3              THE COURT:  Any objection, Mr. Barbee?

4              MR. BARBEE:  Yes, Your Honor.  Just a minor objection,

5    really.  The exhibit appears to be cumulative in that it

6    contains duplicative information, and on page --

7              THE COURT:  I'm sorry, I can't hear you.

8              MR. BARBEE:  The exhibit appears to be cumulative,

9    Your Honor, in that it has duplication of information on Page 1

10   and 2.  Appears the address has a change.

11             Also on Page 3, Your Honor, at the middle of the page,

12   there appears to be an entry that possibly, you know, kind of

13   manini, it could be a little small objection to that.  I direct

14   the court's attention to the middle of Page 3, where it refers

15   to some sort of violation or something.

16             THE COURT:  Refers to what?

17             MR. BARBEE:  Some sort of violation.

18             MR. MUEHLECK:  Traffic violation.  Just says

19   "possible."

20             MR. BARBEE:  Well, what's the purpose?

21             MR. MUEHLECK:  I'll be happy to tell what the purpose

22   is, if the court wishes to hear.  Purpose is to identify the

23   defendant through a City and County document which shows

24   different addresses, which are all pertinent to the wire

25   transfers, Exhibits 23 and 26.  And shows date of birth and

1   identifying information.

2          If Mr. Barbee wants to stipulate that the defendant

3   had different addresses, as Exhibits 23 and 26 seem to indicate

4   at various times, and different -- and the same date of birth

5   and the same number, that's acceptable to the United States.

6   We don't need Exhibit 28, but this is one way of showing it.

7          MR. BARBEE:  Yes, Your Honor, if -- if I have a

8   driver's license with one address and five years later I move

9   and have a second address, that's fine.  But I don't want there

10  to be an implication that he has duplicate licenses.

11         MR. MUEHLECK:  It's not a duplicate license.

12         MR. BARBEE:  Thank you.

13         MR. MUEHLECK:  It doesn't indicate a duplicate, just

14  shows he could have lost one and had another one issued.

15         MR. BARBEE:  Or he could have had one and it expired,

16  and he got another one.

17         MR. MUEHLECK:  That's correct.  The government submits

18  there is nothing there that implies anything wrong.

19         MR. BARBEE:  Okay.  Well, that's my objection.

20         THE COURT:  You want the traffic violation redacted?

21         MR. MUEHLECK:  We can take the third page out.

22         THE COURT:  Does that make you happy, Mr. Barbee?

23         MR. MUEHLECK:  Careful, Judge, don't ask that.

24         MR. BARBEE:  I don't know what the purpose of putting

25  it in there in the first place was.