1          MR. MUEHLECK:  I believe I just explained the purpose.

2          THE COURT:  I'll allow 28.  I find it relevant, more

3   probative than giving rise to any unfair prejudice or confusion

4   or being cumulative.  Seems to tie in many things here.

5          Strike that last statement.  Instruct the jury to

6   ignore it.

7          MR. BARBEE:  Your Honor, one last comment.  I know

8   it's kind of hard to cross-examine a document, but it does

9   appear that the issue date of the license is in 1899.

10         MR. MUEHLECK:  Typo on that, that's correct.

11         MR. BARBEE:  I don't think Mr. Pagan is that old.

12         MR. MUEHLECK:  We agree, that's inaccurate, but that's

13   what --

14         THE COURT:  I'm sorry, where was that, Mr. Barbee?

15         MR. BARBEE:  On the --

16         MR. MUEHLECK:  Issue and expire date, Your Honor.

17         MR. BARBEE:  -- on the middle --

18         MR. MUEHLECK:  Front page.

19         MR. BARBEE:  -- of the front page and also?

20         MR. MUEHLECK:  And the second page.

21         MR. BARBEE:  -- on the middle of the second page, Your

22   Honor, it has an issue date of January 1st, 1899, and an

23   expiration date of 1899.

24         THE COURT:  Well, the government stipulates that that

25   is an error.

**EXHIBIT A2**

1              MR. MUEHLECK:  We agree.

2              THE COURT:  Next witness.

3              MR. MUEHLECK:  May I see the clerk, Your Honor?

4              THE COURT:  You may.

5              MR. MUEHLECK:  Thank you.

6                      (Pause in the proceedings.)

7              MR. MUEHLECK:  Request we have a sidebar, Your Honor,

8    please?

9              THE COURT:  Okay.

10                     (Bench conference on the record:)

11             MR. MUEHLECK:  Other than one document that I believe

12   is on the way to -- other than one document that I believe is

13   on the way to the courtroom from the airport, a FedEx

14   document -- I've given Mr. Barbee a copy of that -- that's the

15   State of California certified driver's license for Sergio

16   Fernando Cruz, other than that -- I have the witnesses from

17   Kentucky that I mentioned, Judge.  Other than that, we're

18   prepared to rest.

19             THE COURT:  What do you mean?  I didn't follow your

20   Kentucky witnesses.

21             MR. MUEHLECK:  Of course, those witnesses are not

22   here, Judge.  I'm getting authority for them to travel, called

23   them last night, was on the phone with them at 11 o'clock last

24   night.  I was on the phone with them this morning.  They're not

25   here, and I thought we were going to take Mr. Barbee's

1    witnesses and then --

2            THE COURT:  They're going to be here tomorrow?

3            MR. MUEHLECK:  Judge, I don't have that information

4    when I came over to the courtroom.  I had all the RACs, the

5    resident agents in charge, working on it and they were supposed

6    to call me back.  I've had my agent check out on that both with

7    his ASAC here at the DEA to make that call and people in

8    Kentucky and in San Francisco working on that.  I just don't

9    have an answer for the court.

10           My understanding is I'll have something, a better idea

11   at noontime.  But I -- you know, I stayed on this late last

12   night, Judge.  I worked on it at 5 o'clock this morning, I made

13   calls on it.  I got an agent out of bed last night in

14   Louisville, Kentucky, to answer my questions or try to assist

15   me.  It's -- they are not Department of Justice, Judge.  I

16   can't -- I can't get them here.  I have to go to another

17   department.  They're Homeland Security officers.  The local

18   people I have, they're all lined up, on the Big Island.  It's

19   the -- it's three officers.  It's three officers.

20           THE COURT:  What do you mean local people?  You're

21   going to call more local people?

22           MR. MUEHLECK:  Well, the controlled delivery was made

23   in Hawaii, Judge, on the Island of Hawaii.  They're available.

24   That's not a problem.  Remember, I said it was a controlled

25   delivery.

```
 1              THE COURT:  How many local witnesses?
 2              MR. MUEHLECK:  Three local witnesses.
 3              THE COURT:  Three?  You have three local witnesses?
 4              MR. MUEHLECK:  Yes.
 5              THE COURT:  And one fellow from Kentucky.
 6              MR. MUEHLECK:  Three -- three state officers from
 7    Hilo, they're from Hawaii County Police Department.  Three
 8    officers from -- actually I shouldn't say officers.  They are
 9    customs and border protection officers.  Well, two customs and
10    border protection officers, one BICE officer or BICE agent who
11    seized it and then sent it on, and then a BICE agent here in
12    Hawaii, who I talked to this morning, and she's all set.  So
13    that's what it is.  The problem is getting the people here from
14    the Mainland, from Louisville.
15              THE COURT:  Again, are you saying three from Kentucky?
16              MR. MUEHLECK:  Yes.
17              THE COURT:  Mr. Barbee is ready to go now?
18              MR. BARBEE:  I'm ready, Your Honor.
19              THE COURT:  So at this point I guess we have to break
20    for lunch, and then you can put on your FedEx document,
21    assuming it arrived.
22              MR. MUEHLECK:  Assuming it arrives, Your Honor.
23              THE COURT:  And proceed with Mr. Barbee's witnesses
24    this afternoon.
25              MR. BARBEE:  Yes, Your Honor.  Before I forget, I'd
```

1   like to not waive my Rule 29 judgment of acquittal motion.

2           THE COURT:  Right.

3           MR. BARBEE:  Yeah, I just don't want to waive it.

4           THE COURT:  Right.  I do have one thing I want to just

5   alert you to.

6           This is a note from one of the jurors.  I guess I

7   better read it into the record.  It's juror number 10, Mr. See,

8   in the first row.  He gave this note to the courtroom deputy.

9   He says:  "I'm working in a regulatory agency reviewing waste

10  water" --

11          MR. MUEHLECK:  He's the engineer.

12          THE COURT:  -- "waste water," something, "plans and

13  building permit applications.  Currently we are reviewing plans

14  submitted by Tamarack Pines through an engineer to upgrade the

15  existing cesspools to septic systems of the apartment

16  buildings.  I don't see this as a conflict of interest, nor is

17  it related to the case."

18          I agree with him, but I wanted to alert you both if

19  you have any problems with that.

20          MR. MUEHLECK:  Thank you for the information.  We have

21  no problem with it, Judge.

22          MR. BARBEE:  No, Your Honor, we don't have any

23  problem.  Appreciate the juror's candor.

24          THE COURT:  So we'll break now until 1:00.

25          MR. MUEHLECK:  Judge, can we have a little bit longer,

1    because I have to make some calls?

2              THE COURT:  1:30.

3              MR. MUEHLECK:  1:30, please.

4              THE COURT:  Okay.

5              MR. MUEHLECK:  Thank you.

6                        (End of bench conference.)

7              THE COURT:  We'll give you a little longer lunch hour

8    today.  We'll break now until 1:30.  Please be back at 1:30.

9          (A recess was taken from 11:50 a.m. to 1:55 p.m.)

10             THE COURT:  Mr. Muehleck.

11             MR. MUEHLECK:  I have one more exhibit, Your Honor.

12   That's Exhibit 29, would offer into evidence.

13             THE COURT:  Any objection?

14             MR. BARBEE:  No, Your Honor.

15             THE COURT:  29 is admitted.

16        (Government's Exhibit 29 was received in evidence.)

17             MR. MUEHLECK:  This is the original, Your Honor.  I've

18   given a copy to Mr. Barbee and the court.

19             Thank you.

20             A moment please, Your Honor.

21             THE COURT:  You may.

22             MR. MUEHLECK:  Your Honor, the United States rests.

23             THE COURT:  Well, I thought we were calling the

24   defense witnesses out of order now.

25             MR. MUEHLECK:  Your Honor, we don't -- no, we're going

1    to rest --

2              THE COURT:  Let's have a sidebar.

3              MR. MUEHLECK:  Yes, sir.

4              (Bench conference on, the record:)

5              THE COURT:  You're resting?

6              MR. MUEHLECK:  I can't get them here in time, Judge.

7    You know, if you give me until next week, maybe I can get them.

8    I can't get that -- I've been on the phone all the time.

9    It's -- it's a money problem.  At this short notice, I could

10   get -- I just can't get them here in time.  The local people,

11   not a problem.  The people from Kentucky, very expensive.  I've

12   been on the phone with the Director of Operations of Bureau

13   of -- border protection people in Chicago.  The head lady

14   there, she was very accommodating, but -- and she had some

15   funds that she jumped through hoops to get.  I still had

16   another officer, a BICE officer in Louisville.  They were

17   totally out of funds.  We couldn't get it -- we just couldn't

18   get it done in time, Judge.  Just couldn't put it together.

19   Thank you for the time.

20             THE COURT:  I think we do have to proceed with the

21   trial.

22             MR. MUEHLECK:  I understand.  I appreciate the court

23   giving us some opportunity to make these calls and a little bit

24   longer lunch hour.  Just couldn't do it.  Appreciate it.

25             THE COURT:  In the interest of justice, and I know

1  some of the jurors have short schedules --

2          MR. MUEHLECK:  Well, we told them it would be a short

3  schedule.  We told them it would be a short trial.

4          THE COURT:  You going to make an opening statement?

5          MR. BARBEE:  Yes, Your Honor.  Before I do that, I

6  want to make --

7          THE COURT:  You want to make a Rule 29?

8          MR. BARBEE:  Yeah, that, too, but first I move to

9  strike Exhibits, I think, 24 and 27, the -- the Torres exhibits

10  that were introduced, because I guess they were subject to

11  being tied up by these other witnesses, and these other

12  witnesses aren't going to come.  And I don't think there's any

13  tie-in to those Torres wire transfer exhibits.

14          MR. MUEHLECK:  Our response is they're tied in by who

15  the money goes to, and the fact that there are telephone calls

16  to Mr. -- from Mr. Torres -- excuse me, from the defendant to

17  Mr. Torres, and I think from Mr. Torres to the defendant.  Plus

18  it's within -- let's see, 18th, it's like within 10 days, Your

19  Honor, because the -- the wire transfer is July 11th that

20  Mr. Torres makes and the, of course, package comes out on

21  the -- the 18th, 18th, and they make the delivery on the 21st.

22          So it's all within a short period of time, and it's

23  all tied in by the telephone records and the fact that the

24  money orders go to the same person, Sergio Fernando Cruz, whose

25  telephone is calling the defendant, both in -- both in -- in

1   November repeatedly, and then we have money orders from the

2   defendant to Sergio Cruz in January and again in July.

3           THE COURT:  But you don't assert -- at least in the

4   superseding indictment, you don't assert that Torres is a

5   member of the conspiracy.

6           MR. MUEHLECK:  I don't --

7           THE COURT:  You say "persons."

8           MR. MUEHLECK:  Persons known and unknown, Your Honor,

9   yes.  I believe he is a member of the conspiracy base -- and we

10  can show a conspiracy, and, of course, the law is well aware

11  that conspiracy and association can be shown through telephone

12  calls, through contacts that way, through contacts through a

13  common person.

14          I don't have to show, I don't have to put Mr. Miguel

15  Torres into Pagan's house or in the same car or even in the

16  same village, although he does indicate that he lives in

17  Kamuela.

18          THE COURT:  What evidence do you have that Torres is a

19  bad guy or is doing anything unlawful?

20          MR. MUEHLECK:  Well, the evidence I have is that he is

21  dealing with known dope dealers, he is dealing -- excuse me,

22  his association through the defendant to Sergio Cruz, and

23  Mr. Cruz is calling the defendant repeatedly, and the defendant

24  calls him repeatedly in the month of November within two weeks

25  of the drug delivery.

1          And the defendant admits he gets a package, plus that

2    package arrives, Judge, 10 days -- the controlled delivery is

3    10 days.  Plus, we have Mr. -- we have the defendant calling an

4    (818) area code, which is Burbank, where the packages came

5    from.  He calls there for about four minutes, and he gets off

6    that phone, and he calls Mr. Miguel Torres.  And it's the same

7    day Miguel Torres sends, what is it, $2,000 up to Sergio Cruz.

8    I agree it's circumstantial, but it's very strongly

9    circumstantial.

10          THE COURT:  Anything more?

11          MR. BARBEE:  No, Your Honor.

12          THE COURT:  I'm going to deny the motion.  Looking at

13    Rule 403, balancing, I find the evidence is more probative than

14    giving rise to any significant adverse prejudice or unfair

15    prejudice.  Or cumulative or confusing.

16          So you're going to make your --

17          MR. BARBEE:  Yes, Your Honor.  Pursuant to Rule 29 of

18    the Federal Rules of Criminal Procedure, at this time I would

19    make a Motion for Judgment of Acquittal.  Looking at the

20    evidence in the light most favorable to the government, I don't

21    believe that they've shown a prima facie case of the elements

22    of a conspiracy and attempted possession with intent to

23    distribute for Counts 1, 2 and 3.

24          MR. MUEHLECK:  Well, of course, by the defendant's own

25    statements on Exhibit 5 and Exhibit 5A, that is the -- the

1  cassette tape or the compact disk, he admits that he's picking

2  up something and is getting a delivery to him for $300, which

3  he's going to drop off to people; that he doesn't -- doesn't

4  want to cooperate because he's afraid -- afraid of being

5  physically harmed, he's afraid he'll be killed.

6        Plus we have the other transaction earlier in

7  November -- excuse me, in December 4th of 2002, where the

8  package comes in.  At that same time, within two weeks prior to

9  that, the defendant is calling the holder of one of the cell

10 phones, Dionisio Banuelos Castaneda -- Dionisio

11 Castaneda-Banuelos, and he also gets calls from Hugo Sanchez

12 Velazquez, who were the people that -- that apparently that

13 picked up the controlled package, they had Sirchie powder on.

14 I think there's much more than a small amount of evidence.

15       The standard, of course, is in the light most

16 favorable to the United States is there evidence of conspiracy,

17 and I think there clearly is.  If the court wants me to

18 elaborate, I can clearly do that.

19       THE COURT:  I am going to deny the motion.  I find

20 that a reasonable jury can find beyond a reasonable doubt each

21 of the essential elements of each of the counts charged in the

22 superseding indictment.

23                 (End of bench conference.)

24       THE COURT:  The government has rested, and Mr. Barbee

25 will now present the defense case.

1          Mr. Barbee.

2          MR. BARBEE:  Thank you.  May it please the court,

3    counsel, and members of the jury.

4          The evidence in this case will show that Larry Pagan

5    was not knowingly a conspirator in a Mexican conspiracy to

6    possess with intent to distribute heroin back in December of

7    2002.  Based on that, he's not guilty of Count 1 of the

8    indictment.

9          The evidence will show that Larry Pagan was not

10   knowingly or did not knowingly attempt to possess with intent

11   to distribute heroin in July of 2003.  And based on that, he's

12   not guilty of Count 2.

13         The evidence will show that Larry Pagan did not

14   knowingly attempt to possess with intent to distribute cocaine

15   in July of 2003.  Based on that, he's not guilty of Count 3.

16         The evidence will show that Larry Pagan has an

17   uncommon -- is an uncommon person in these days and ages who

18   shows aloha, that he's a trusting person and that because of

19   that, he can be taken advantage of.

20         The evidence will show that in 2000, he assisted a

21   person by the name of Tito, who was stranded at the roadside by

22   Mr. Pagan's Kamuela farm.  That he had an agreement after he

23   met Tito to let Tito board at his rooster farm, at Larry

24   Pagan's rooster farm, in exchange for Tito to take care of

25   Mr. Pagan's animals; his dog, his roosters, he had about 75

1    roosters on that farm, and his peacock.

2            And that over some period of time, Tito, unbeknownst

3    to Mr. Pagan, who is now working in Hilo, and his farm is in

4    Kamuela, some hour-and-15-minute drive away, that unbeknownst

5    to Mr. Pagan, Tito, who speaks Spanish and English, starts

6    bringing in Mexican people to the farm.

7            And at some point the farm, which is actually owned by

8    Mr. Pagan's sister -- you'll meet her, Violet Diederiks -- that

9    at sometime Violet went and checked up on the farm and she saw

10   Tito there, who she thought was a nice, likable guy, had these

11   Mexican guys there staying at the farm, too.  And that she

12   became concerned and kicked them all off the property.

13           The evidence will show that at some point in time Tito

14   was using Mr. Pagan's cell phone, and that Ms. Diederiks also

15   disapproved of that and told her brother that he was being too

16   kind and too nice.

17           At the end of the case, I'll come before you again and

18   ask you to find Mr. Pagan not guilty of Counts 1, 2 and 3.

19   Thank you.

20           THE COURT:  First witness.

21           MR. BARBEE:  Yes, Your Honor, we would call Fernando

22   Salas.

23                   FERNANDO SALAS,

24   called as a witness by the Defendant, having been first duly

25   sworn, was examined and testified as follows:

 1           THE CLERK:  State your name for the record.  Spell

 2   both your first and last name.

 3           THE WITNESS:  Fernando Salas, F-E-R-N-A-N-D-O.

 4           THE CLERK:  Last name.

 5           THE WITNESS:  S-A-L-A-S.

 6           THE CLERK:  Thank you.

 7                        DIRECT EXAMINATION

 8   BY MR. BARBEE:

 9   Q    Good afternoon, Mr. Salas.

10   A    Good afternoon.

11   Q    Where do you live?

12   A    I live in the Big Island, in Honokaa.

13   Q    And how long have you lived there?

14   A    I've been there for about 28 years on Big Island.

15   Q    Okay.  And do you know a person named Larry Pagan?

16   A    Yes, I do.

17   Q    Is he present in the courtroom?

18   A    Yes.

19   Q    And could you describe him for us, point him out?

20   A    He's seated on your left-hand side.

21   Q    What color shirt does he have?

22   A    From here it looks dark green and flowers, leaves.

23   Q    Okay.  You are going to have to speak into the microphone.

24   A    Okay.

25   Q    That's okay.  Get comfortable.

1          You said he's wearing a dark green shirt with leaves?

2    A    Uh-huh.

3    Q    Okay.

4          MR. BARBEE:  Record reflect the identification of

5    Mr. Pagan?

6          THE COURT:  Record will so reflect.

7          MR. BARBEE:  Thank you, Your Honor.

8    BY MR. BARBEE:

9    Q    And how long have you known Larry Pagan?

10   A    Approximate, for about 20-something years.

11         MR. MUEHLECK:  The witness has got to lean forward.

12   I'm sorry.

13         THE WITNESS:  For about 25 years.

14   BY MR. BARBEE:

15   Q    Just -- I know you're nervous.  Just relax and try to

16   speak into the microphone so not only everybody in the court

17   can hear you but also the court reporter who's typing down what

18   you're saying.  Okay?

19   A    Okay.

20   Q    Okay.  How long have you known Larry Pagan?

21   A    I say for about more than 20 years.

22   Q    Okay.  And do you know if he resides anywhere on the Big

23   Island; does he live on the Big Island?

24   A    He lives in the Big Island.

25   Q    Do you know the neighborhood or the community?

1    A    He lives in Waimea community, and I believe he lives with

2    his sister.

3    Q    Okay.  You know you can tilt that microphone down a little

4    bit, then you don't have to lean up.  Just go like this on the

5    hinge.  On the hinge.

6    A    Got it.

7    Q    Okay.  Have you ever testified in court before?

8    A    No.

9    Q    Okay.  So he lives in the Waimea area with his sister?

10   A    Yes.

11   Q    What's his sister's name?

12   A    Sister name is Violet.

13   Q    Okay.  Do you know her last name?

14   A    No.

15   Q    Okay.  But the first name is Violet?

16   A    Yeah.

17   Q    Okay.

18   A    I know Larry's last name is Pagan.

19   Q    Okay.

20   A    But I don't know if Violet's is still Pagan or --

21   Q    Okay.  Directing your attention to the year 2002, did

22   there come a time where you were driving down the highway and

23   met somebody that was stranded on the side of the road?

24   A    Yes, I did.

25   Q    Okay.  Can you tell the jury what happened that day?

 1    A    It was a car, a small car, and the person was trying to

 2    push 'em off the road, highway road, it was broken.  And I'm

 3    not a mechanic, and every time I see somebody stranded on the

 4    side of the road, I try to help.  So I stopped and talked to

 5    the person, the car wouldn't turn or start, or anything; so we

 6    pushed it little ways out of the road.  At the same time the

 7    person spoke Spanish and English.  I speak Spanish, so we

 8    started some conversation.

 9         And then I mentioned to him the car is totally broken

10    and he has to put 'em on the side of the road far from danger

11    from the highway.

12    Q    Okay.  Let me stop you there.  And in this location on the

13    highway where you told the guy his car is totally broken, how

14    far away was Larry Pagan or Larry Pagan's residence?

15    A    I say about 50 feet maybe, it's a gate, and then you can

16    see the house up the hill and you can see roosters.

17    Q    What, if anything, did the stranded motorist observe or

18    discuss with you about besides the car?

19    A    Before he -- he say anything else, he was talking about

20    employment, starting an employment business and whatnot.  And

21    then he start talking about roosters.  And at the same time as

22    we were walking to go up across to go back to my car, I wave

23    Larry coming down, you know, I wave -- Larry was walking around

24    the farm and I wave for Larry.  And then Larry came down, and I

25    introduced him to the guy.  The guy name, he give me a name

```
 1   Tito.
 2   Q    Could you -- can you spell the name Tito as best you can?
 3   A    Best I can, T-I-T-O.
 4   Q    Okay.  Let me back up a little bit.  I forgot to ask you.
 5   How are you -- how are you employed; where do you work?
 6   A    I'm a handy person at the Honokaa Peoples Theater in
 7   Honokaa.  I am also a farmer.  I raise taro and green baby
 8   lettuce.
 9   Q    And you are a handyman at the Honokaa community theater?
10   A    I'm pretty much for a lot of the community people, on the
11   community, I do whatever.
12   Q    And that's with the theater, theatrical group; is that
13   community theater?
14   A    With the Honokaa don't have a community theater, but we
15   have a filmmakers.
16   Q    Okay.
17   A    Two twins and we already make three movies.
18   Q    What kind of movies?
19   A    Low-budget movies.
20   Q    Getting back --
21   A    The market.
22   Q    Okay.  Getting back to Mr. Pagan, you said he was waving,
23   coming down his driveway, and you introduced him to this person
24   Tito, correct?
25   A    Yes.
```

1   Q    This was in 2000, 2002?

2   A    Around there, yeah.

3   Q    Okay.  I'd like to show you what's been marked as Defense

4   Exhibit A for identification.  I believe counsel has a

5   photocopy of it.

6           MR. BARBEE:  May I approach, Your Honor?

7           THE COURT:  You may.

8   BY MR. BARBEE:

9   Q    Okay.  Ask you to look at Defendant's Exhibit A.  Do you

10  recognize what's shown in that exhibit?

11  A    Yeah, this is the guy that was in the car and that I

12  helped out pushing the car.

13  Q    And that's the guy you've identified as -- you know him as

14  Tito?

15  A    Yes, I do.

16  Q    And you introduced him to Mr. Pagan?

17  A    Yeah.

18  Q    Does there -- you recognize anything else in that exhibit;

19  does it show any area?

20  A    I see a rooster there, and this is Larry's farm, I

21  believe.

22  Q    In Kamuela?

23  A    In Kamuela, yeah.

24          MR. BARBEE:  Okay.  I'd like to also show the witness,

25  if I could, Defendant's Exhibit B for identification?

1                THE COURT:  You may.

2    BY MR. BARBEE:

3    Q    Sir, Mr. Salas, do you recognize what's shown in Exhibit B

4    for identification?

5    A    Yeah, I recognize this is the place where Larry was, the

6    date I met Tito, is the farm, chicken farm, rooster farm.

7    Q    That's Larry's rooster farm?

8    A    Yeah.

9    Q    Okay.

10                MR. BARBEE:  Your Honor, I'm going to wait to offer

11    the exhibits into evidence, and I'm finished with my direct.

12                THE COURT:  Any objection to A or B?

13                MR. MUEHLECK:  I have no objection if you want to

14    admit them now.

15                MR. BARBEE:  Oh, okay.

16                Your Honor, based on no objection, I would offer

17    Defendant's A and B into evidence.

18                THE COURT:  A and B are admitted.

19      (Defendant's Exhibits A and B were received in evidence.)

20                MR. BARBEE:  Your Honor, may I publish A and B?

21                THE COURT:  You may.  Are we -- do you have

22    cross-examination, Mr. Muehleck?

23                MR. MUEHLECK:  I have some questions, I think, yes,

24    Your Honor.  We have no problems if he wants to publish or

25    whatever the court wants.

1           THE COURT:  Why don't you go ahead with your

2   publishing.

3                   (Pause in the proceedings.)

4           THE COURT:  I think they're ready to go ahead,

5   Mr. Muehleck.

6           MR. MUEHLECK:  Yes, Your Honor.

7           Could the witness have Exhibits A and B, Your Honor,

8   in front of him?

9           THE COURT:  Yes.

10          THE CLERK:  He does have it.

11          MR. MUEHLECK:  He does.  Thank you.  Thank you, Ms.

12   Sai.

13                   CROSS-EXAMINATION

14   BY MR. MUEHLECK:

15   Q    You've lived on the Big Island how long, sir?

16   A    Approximately 28 years.

17   Q    And you -- this Tito that you spoke with, did you speak

18   with him in Spanish or English, or what?

19   A    At first, he was trying to speak English to me and he

20   spoke English, and then let him know that I was

21   Spanish-speaking person.  So he spoke Spanish as well.

22   Q    Where did you learn to speak Spanish?

23   A    In South America.

24   Q    Where?

25   A    Colombia.

1    Q    Were you born there?

2    A    Yes.

3    Q    Okay.  How often did you go up to the defendant Larry

4    Pagan's farm in Exhibit B?

5    A    To be honest, I hardly ever went there.  I probably --

6    probably if I did, maybe once or twice.

7    Q    How often do you see Mr. Pagan since 2000 -- you said

8    you've known him 20 years?

9    A    Yes, I do.

10    Q    And you've seen him since 2002, since this Tito had the

11    car trouble, right?

12    A    I saw him in the store in KTA.

13    Q    Okay.  And you live how far from where he lives?

14    A    I live in Honokaa and in Kalopa, which is from Kalopa to

15    Honokaa is about 20-minutes drive, and from Honokaa to Waimea

16    is another 15-minutes drive.

17    Q    And would you -- how is it you happened to be up there

18    that day when Tito's car broke down?

19    A    Well, Larry was outside in the yard, and I was waving at

20    Larry.  And then Tito start talking about roosters, he's a

21    farmer and he's here to start a employment business or some

22    sort.  And I waved to Larry and Larry met with us.

23    Q    Is Larry a friend?

24    A    Huh?

25    Q    Is Mr. Pagan a friend?

1    A    My friend, yeah.

2    Q    Yeah.

3    A    We used to be neighbors in the past.

4    Q    When was that?

5    A    Like 20 years ago when he used to live with his dad.

6    Q    And Mr. Pagan lives at this farm?

7    A    No, I believe he lives with his sister.

8    Q    Where -- where she --

9    A    I don't know if he lives on the farm or not, to be honest.

10   Q    Where does his sister live, Violet?

11   A    Violet lives in Waimea.

12   Q    Okay.  The Tito, was he from Mexico?

13   A    He say he was from Mexico.

14   Q    Okay.  And he was coming to the Big Island for business

15   opportunities or --

16   A    I met him, he was in Mamalahoa Highway and he was heading

17   north Waimea, and I don't recall everything that he said, but I

18   do remember he said he was here to start some employment

19   business.  Some employment -- employment agency or whatnot.

20   And then after Mr. Pagan was present, he start talking about

21   roosters.

22   Q    Did you -- you introduced him to Mr. Pagan?

23   A    I introduced him to Mr. Pagan.

24   Q    Did you tell Mr. Pagan he was from Mexico?

25   A    No.

```
 1   Q    Well --
 2   A    Just say, "'Eh, this is a guy that broke down."
 3   Q    And did you see Tito after that?
 4   A    No.  Well, we -- I split up, I went.  I believe Tito went.
 5   I went.  And Larry was on his way someplace else, I don't know.
 6   Q    Okay.  You've seen Mr. Pagan, though, you say at the store
 7   at different places?
 8   A    Yes.  Basically at the supermarket.
 9   Q    Supermarket.  Which one?
10   A    Where everybody else goes in Waimea, KTA.
11   Q    All right.  And you'd see him, what, every week or every
12   couple weeks?
13   A    Oh, no.  Not that often.  I say in the last three years, I
14   probably seen him no more than couple times, four, five times.
15   Q    Did you talk to him when you'd see him?
16   A    Yes.
17   Q    Okay.  Talk to him about what's going on at the farm?
18   A    No.  Just hi, hello.  Usually he's going, I'm going.
19   Q    You believed or you knew that Tito was a drug dealer?
20   A    No.
21   Q    You know drug -- about drug dealing, don't you, Mr. Salas?
22   A    I -- I have watched plenty TV court and such, yes.
23   Q    Well, what's your date of birth, Mr. Salas?
24   A    9/13/54.
25   Q    You in fact have a felony drug distribution conviction,
```

125

1    don't you?

2    A    Yes.  Not this -- I was in a house at the wrong time, my

3    wife's house.  I was visiting.

4    Q    That was in Nebraska?

5    A    Yes.

6    Q    So you've lived other places, been other places other than

7    here for 28 years; is that correct, Mr. Salas?

8    A    I was -- I was visiting my children.  My wife was

9    relocated to go back to school, to finish school.

10   Q    And there was, what, cocaine and marijuana there?

11   A    There was that -- I was visiting and --

12   Q    And you were convicted of possession with intent to

13   distribute?

14   A    And I was convicted, yes, sir.

15   Q    So you've never testified in court, but you've been in

16   court before?

17   A    Yes, sir.

18          MR. MUEHLECK:  No further questions.

19          MR. BARBEE:  Your Honor, I just ask the court to look

20   at Rule 609 -- or, excuse me, 608 -- oh, no, excuse me, Your

21   Honor, 609.  I don't know if that line of questioning by

22   Mr. Muehleck was proper.  I ask that it be stricken.

23          MR. MUEHLECK:  There is -- there is case law that

24   supports this.  This is not a defendant, Your Honor.  This is a

25   witness.

1          MR. BARBEE:  I'd ask to know the time limit here.  I

2     believe it's a ten-year time limit.

3          MR. MUEHLECK:  There is case law that supports what I

4     am doing, Your Honor.

5          THE COURT:  Well, it's 2:30.  Let's take a break now.

6     Please be back at quarter to 3:00.

7          Don't consider this testimony at all until I rule on

8     it.

9          (At 2:30 p.m., the jury was excused, and the following

10    proceedings were held:)

11         THE COURT:  I think we better take a ten-minute break

12    now.  I forgot my reading glasses in my chambers.

13         (A recess was taken from 2:30 p.m. to 2:42 p.m.)

14         (The following proceedings were held in open court out

15    of the presence of the jury:)

16         THE COURT:  Where is Mr. Pagan?

17         MR. BARBEE:  Yes, Your Honor, he's outside.  He hasn't

18    returned to the courtroom yet.  I would ask leave of court to

19    waive his presence just for discussion of this legal issue.

20         Is Larry out there?  Tell him to come in.

21         MR. MUEHLECK:  Probably a good idea to have him here.

22         UNIDENTIFIED MALE:  He's using the restroom.  I'll get

23    him.

24         MR. BARBEE:  Okay.

25         THE COURT:  When was the conviction?

1          MR. MUEHLECK:  There's several the way I read it,

2    Judge, but I'm not offering it just under 609.  I believe there

3    are convictions for felony drugs in -- I'm sorry.  '88, several

4    in '88.  There's a January of '88 and July of '88 with sentence

5    of three years, nine months; one year, three months on one.

6          THE COURT:  Wasn't -- wasn't it more than a year?

7          MR. MUEHLECK:  Yes, it was for more than a year, Your

8    Honor.

9          THE COURT:  Oh.

10          MR. MUEHLECK:  And he was -- he was placed on parole

11    afterwards.  Parole means it was a felony.  It's possession --

12    one is possession of controlled substance with intent to

13    deliver, dash, cocaine.  Possession of marijuana with intent to

14    deliver.  Then Dangerous Drugs conviction.  And then I had

15    information from INS, manufacturing a -- manufacturing and

16    distributing a controlled substance.

17          THE COURT:  It's all in '88?

18          MR. MUEHLECK:  Yes.  A couple of them in '88.  But I'm

19    offering under more than just 609, Your Honor.  I asked about

20    knowledge.

21          THE COURT:  You asked what?

22          MR. MUEHLECK:  I asked him about his knowledge --

23          THE COURT:  I think he better wait outside.

24          MR. MUEHLECK:  Oh, the witness.  I'm sorry.  I thought

25    that was -- I didn't see the witness, Judge.

1          Our position is this:  First of all, this is not a

2     question of the defendant.  This is a question of an individual

3     that's apparently -- and in light of Mr. Barbee's opening

4     statement, that the defendant doesn't know there's drug dealing

5     going on around him, he's not a knowing participant in a

6     conspiracy, he's not a -- knowingly received or attempted to

7     receive heroin and cocaine in Counts 2 and 3, that he's in the

8     dark.

9          And then we have the presentation of this witness that

10    he's never testified before, he's nervous.  And that he

11    introduced Tito, who I believe Mr. Barbee is going to show

12    eventually became known to be a drug dealer, or is a drug

13    dealer.  The defendant spoke -- excuse me, Tito spoke with the

14    witness in Spanish.  I understood that he introduced -- his

15    testimony was he introduced this man to the defendant.

16          Subsequent to this I asked him --

17          THE COURT:  What's that?  What's the significance of

18    that?

19          MR. MUEHLECK:  I'm getting to that, Your Honor.  Then

20    I asked him if he realized, if he realized, the witness

21    realized that Tito was involved in drug dealing, if he was a

22    drug dealer, did you understand, did you realize or know -- I

23    believe that was my question -- that he was a drug dealer.  You

24    spoke to him, you talked to him in Spanish, you learned out

25    where he was from, he was from Mexico.

1         Then I asked him:  You understand about drug dealing,

2    don't you?  You know about drug dealing, you understand drug

3    dealing.  And he said:  Well, I watch plenty TV or plenty TV

4    program.

5         I believe I'm allowed to show his knowledge when he

6    says that he doesn't realize that Tito, the person he

7    introduced to the defendant, is not involved in drugs, he said.

8    That he doesn't know drugs and the only thing he knows about

9    drugs is what he gets on TV, watching TV, and that he's never

10   testified before.

11        I don't think the -- certainly the government can't

12   ask these questions of a defendant that's an old conviction or

13   something like this, but I submit to the court under the

14   presentation given by the -- by the defense in their opening

15   statement, the questions asked of this witness, the fact that

16   this witness introduced someone that he believes is just

17   someone broken down on the road and is just looking for

18   business opportunities, speaking Spanish, speaking to the

19   defendant, seeing the defendant, and then talking and

20   introducing him when he came down and waved, that I have the

21   right to ask the question to show this defendant's knowledge --

22   excuse me, this witness' knowledge, not the defendant, I asked

23   him about his knowledge of drug dealing and him realizing that

24   this witness -- or Tito, this person in Exhibit B -- Exhibit A,

25   that he realized he was a drug dealer.

1          And basically that's what Mr. Barbee has said.   That

2     Tito brought drug dealers onto the farm.   And that -- that

3     Mr. -- Mr. Pagan didn't realize this.   He was not a knowing --

4     knowingly involved.   He's an uncommon man, he's trusting, et

5     cetera, et cetera.   But I don't think this witness should be

6     allowed to sit up there and say:   You know, I only know about

7     drug dealing on TV, I just drive by there, I speak to him in

8     Spanish.   That witness should be allowed to do that.

9          Now, vis-a-vis 609, the court has the authority to

10    allow this impeachment.   But it's not just impeachment under

11    609.   It's allowing me to question his presentation of who he

12    is and what he knows and how he knows it.

13         And he says he lives here for 28 years, and he's known

14    Mr. Pagan for 20 years, and he just saw this guy who happened

15    to break down on the highway, talked to him in Spanish and

16    introduced him to Mr. Pagan, and he didn't realize this guy was

17    in drug dealing, involved in drug dealing.   I asked him that, I

18    asked him that question:   Did you realize -- you knew he was

19    involved, you realized that?   No.   Well, you understand about

20    drug dealing, don't you, sir?   Well, what I see on TV.

21         I don't have to take that answer.   That's not a fair

22    answer, Judge.   I agree I would not be able to ask that

23    question of a defendant.   This is not a defendant.   This is a

24    witness who's been painted a little bit differently by his own

25    answers and, of course, is presented right after the opening

```
 1   statement of this defendant, this -- this defendant Mr. Pagan
 2   doesn't know what's going on, he doesn't see what's going on.
 3   We present this guy who he says:  Oh, I just picked up this guy
 4   whose car broke down and I introduced him to Mr. Pagan, and he
 5   was just involved in business activities or looking for
 6   business opportunities.
 7           The government shouldn't have to take that answer.
 8   The government should be allowed to cross-examine him.  And I
 9   think this is fair cross, and there's case law that supports
10   that.  And I asked this question in my office very carefully
11   before I did that, and everyone agreed with me.
12           THE COURT:  What's the case law?
13           MR. MUEHLECK:  I don't have it in front of me, Your
14   Honor.  But I believe it does support it.  Because it is not --
15   it is not a defendant.  The court can find this is fair cross
16   because it goes to this person's knowledge and the basis of his
17   knowledge.  And his presentation of I just thought Tito was a
18   guy who broke down, and I was duped by Tito.  I just thought
19   Tito was a guy who broke down in his car, he was involved in
20   business opportunities, spoke to him in Spanish, introduced him
21   to Larry Pagan, who I've known for 20 years, and I've lived on
22   the Big Island for 28 years, and I'm just involved in theater
23   and a handyman.  That's not right.  The government should have
24   a right to challenge that.
25           And when he says his only knowledge of drug dealing,
```

1    Your Honor, when you read his testimony, Your Honor, this

2    witness, the government should have a right to challenge that.

3         I have the records from two sources that he has these

4    convictions.  That's fair cross.

5         THE COURT:  Mr. Barbee?

6         MR. MUEHLECK:  Thank you.

7         MR. BARBEE:  Two issues, Your Honor.  First of all,

8    the general rule appears to be that evidence that a witness

9    other than -- than the accused has been convicted of a crime

10   shall only be admitted after the trial judge, in the trial

11   judge's discretion, weighs the probative value versus risk of

12   prejudice to the defendant.  Here, there's no opportunity for

13   the court to make that determination before it was elicited

14   from the witness on the stand.

15        The case law also says that prior convictions are not

16   to be received automatically.  The trial judge may admit or

17   exclude such evidence as to all witnesses, and that's the

18   Mehrmanesc, M-E-H-R-M-A-N-E-S-C, case, 682 F.2d 1303, Ninth

19   Circuit, 1992.

20        Secondly, there's a time limit.  The language of Rule

21   609(b) is more forceful in saying that the court should be

22   advised of this beforehand to make a determination, instead of

23   having the information come out in front of a jury.

24        The ten limit -- ten-year period for staleness of

25   conviction is computed from the date of release -- from

1    confinement, which would be the latest date, either from the

2    date of conviction or a date of release from confinement.

3          Here, Mr. Muehleck's conviction is well outside the

4    ten-year time frame and outside the release from confinement

5    time frame substantially.

6          Lastly, Your Honor, the --

7          THE COURT:  Well, actually 609(b) says:  "Evidence of

8    a conviction more than 10 years old is calculated herein as not

9    admissible unless the proponent gives to the adverse party

10   sufficient advance written notice of intent to use such

11   evidence."

12         MR. BARBEE:  That was --

13         THE COURT:  "Provide adverse party with a fair

14   opportunity to contest the use of such evidence."

15         MR. BARBEE:  Yes, Your Honor, I was just going to

16   point that out to the court that there needs to be notice when

17   the proponent of the impeachment evidence wants to use it to

18   not only notify the court but to notify counsel, too.  Here

19   that was clearly violated.

20         Your Honor, based on all this, I would ask that the

21   court declare a mistrial in this matter, or at the very minimum

22   to strike -- strike the impeachment and give a curative

23   instruction to the jury that they are not to consider at all

24   the line of questioning and the answer.  It's kind of

25   unfortunate the cat's already out of the bag here, but I think

1     the least the court could do is to give an instruction to the

2     jury to disregard entirely the impeachment of Mr. Salas.

3              MR. MUEHLECK:  Government response, Your Honor?

4              THE COURT:  Yes.

5              MR. MUEHLECK:  Again, the government did not offer

6     this as just under 609.  We agree 609 has certain requirements.

7     But the government's response is, the government has a right to

8     cross-examine a witness and show his knowledge is something

9     other than what he says it is, particularly in light of his

10    responses to his knowledge of drug dealing, his presentation of

11    who Tito is, his presentation -- particularly after the opening

12    statement, the first witness after opening statement about how

13    this person is just an unknowing individual, didn't realize

14    Tito was a drug dealer, didn't realize the people on the farm

15    were drug dealers, was just an unknowing participant in these

16    things; therefore, he's not guilty of Count 1, not guilty of

17    Count 2 or Count 3.

18             But when this witness gets on here, the government is

19    not limited just to 609.  The court can make a finding under

20    403 that it's fair, and it shows his knowledge, this witness'

21    knowledge, Judge -- I'm not saying it goes to the defendant.

22    We're not arguing that.  We're not offering that.  But we're

23    saying that as to this witness, what he knew and what he talked

24    about and the way he --

25             THE COURT:  But it's for purposes of impeachment.

1    MR. MUEHLECK:  It's -- it is for purposes of

2  impeachments as to knowledge, Your Honor.  The fact that he did

3  these things and was involved in drug dealing, it doesn't have

4  to be a conviction.  We don't have to show a conviction.

5    THE COURT:  Well, then you're seeking to admit it

6  under 404(b).

7    MR. MUEHLECK:  Yes, it can be admitted under --

8    THE COURT:  You didn't give any notice of that.

9    MR. MUEHLECK:  I don't have to give notice if the --

10  if the argument is, Your Honor, that he presents himself as

11  someone who is just a handyman, who's lived here his entire

12  life, that he spoke to his guy, and that he's -- when I ask

13  him -- if he had said, Your Honor:  Well, yeah, I had a

14  problem, I know about drug dealing a long time ago.

15    But he doesn't say that.  What he presents, his answer

16  is:  I see -- I've seen it on plenty TV -- plenty court or

17  court TV.  That's his answer.  And I'd ask the court to please

18  look at his testimony before the court rules.  Because it's not

19  simply an issue of, well, I didn't give someone notice.  This

20  is not an issue of 609.  This is not a conviction under 609.

21    This shows his knowledge of drug dealing when he --

22  when I asked him if he realized this guy was involved in drug

23  dealing, Tito, and he said:  No, I -- I don't.  I said:  Well,

24  you know about drug dealing, don't you?  He said:  Well, I've

25  seen it on TV.

1    That's his answer.  The government isn't stuck with

2    the answer.  We're not just talking 609.  609 or the conviction

3    shows that he was involved in drug dealing, he does know about

4    drug dealing.  His answer should be:  Well, yeah, I do know

5    about drug dealing.

6    In fact, sir, you know -- the point is we're not stuck

7    with an answer.  We don't have to take that answer.  That's not

8    fair.  It's not fair.  And we're not under 609.  I didn't offer

9    it under 609.  I'm offering it to show that his knowledge of

10    drug dealing is something more than what he said.  And that the

11    conviction shows that he did do drug dealing.  He was involved

12    in drug dealing, but the conviction is just a 609 rule.  He was

13    involved in drug dealing.  He knows about drug dealing.

14    Therefore, when I ask him:  Well, you knew about Tito

15    being in drug dealing, you do realize that?  No, I didn't.

16    Look at those questions, please, Your Honor.  Look at the line

17    of questioning I had.  I asked him:  In fact, you have a

18    conviction for drug dealing.  So he did know about drug dealing

19    other than court TV.  That's why it's relevant.

20    We didn't say, you know, therefore he was Mr. Pagan's

21    friend because he was a drug dealer.  We're not saying that at

22    all.  But the way he painted himself and the answers to my

23    questions are misleading until I get the right to question him

24    about his knowledge and his actual involvement with drug

25    dealing.  He knows about drug dealing from a personal

1  relationship, not from TV.  He wants to present it that he's

2  never testified, he only knows about drug dealing from TV, he

3  doesn't realize Tito was a drug dealer.  I mean Mr. Barbee

4  presented Tito as being one of these guys on the farm who's a

5  drug dealer and the defendant didn't realize it.  The defendant

6  was a trusting guy.

7          THE COURT:  That's a different issue.

8          MR. MUEHLECK:  So it's not a mistrial and it's fair

9  cross.  A limiting instruction perhaps, but it's fair

10 cross-examination based on my questions.

11          THE COURT:  What's the limiting instruction?

12          MR. MUEHLECK:  Well, it doesn't -- it could say you

13 must not consider this as to Mr. Pagan's character.  That would

14 be a limiting instruction.  But I submit it's fair cross.  And

15 if Mr. Barbee wants to propose an instruction, that's fine,

16 I'll listen to that.  But that is not just offered as 609.

17          MR. BARBEE:  May I respond briefly, Your Honor?

18          THE COURT:  You may.

19          MR. BARBEE:  Yes, Your Honor, the problem is that Rule

20 609 clearly covers this squarely, this issue of prior

21 conviction of a witness.  This is right on point.  Rule 609 in

22 the federal --

23          THE COURT:  I'm not sure -- I'm not sure that's

24 entirely correct, Mr. Barbee, because Mr. Salas -- is that his

25 name, Salas?

1          MR. MUEHLECK:  Yes.

2          THE COURT:  -- stated that he didn't know anything

3    about drug dealing except what he watched on TV.  And

4    apparently that's an out and out lie.

5          MR. BARBEE:  It may or may not be.  He indicated that

6    the circumstance --

7          THE COURT:  He was convicted of dealing in drugs.  So

8    he --

9          MR. BARBEE:  I think his testimony --

10          THE COURT:  -- he knows about drug dealing.

11          MR. BARBEE:  Sorry to interrupt the court.

12          THE COURT:  Go ahead.

13          MR. BARBEE:  He indicated that he was present where --

14    and was arrested in a house when the police raided it, and he

15    was convicted.  He did not admit that he was involved in drug

16    dealing.

17          THE COURT:  What are his convictions again,

18    Mr. Muehleck?

19          MR. MUEHLECK:  The way I read the convictions, there

20    are two incidents of felony convictions.  I got this

21    information off a NCIC printout and both from Immigration and

22    Naturalization Service.  Immigration and Naturalization Service

23    says that he is a convicted drug -- has a drug -- felony drug

24    conviction.

25          And they gave us information that it was -- it looks

1    like a possession, slash, control -- possession -- excuse me,

2    possession of a controlled substance with intent to deliver and

3    then Dangerous Drugs, guilty.  And then manufacture and

4    distribute a controlled substance, Your Honor.  It appears to

5    be three separate charges, two separate occasions.  They're

6    months apart.  They're seven months apart.  And he served time

7    in prison.  He was -- he was -- my understanding he was

8    incarcerated at Lincoln and then was paroled.

9         MR. BARBEE:  May I respond, Your Honor?

10        THE COURT:  The manufactured and distribution

11   conviction, that's a felony?

12        MR. MUEHLECK:  Yes.

13        THE COURT:  Yes, Mr. Barbee?

14        MR. BARBEE:  Yes, Your Honor.  For the record, I'd

15   like Mr. Muehleck to offer whatever document he has into the

16   record so that it's reviewable.  I'd like to know what the

17   dates of the conviction are.  I'd like to know when

18   Mr. Muehleck got this information.

19        This rule was established, especially the provision

20   about notice to counsel and the court, to allow the court to

21   exercise its sound discretion in determining whether or not to

22   admit these highly prejudicial matters.  And by circumventing

23   the rule in this case, Mr. Muehleck's accomplished by fiat what

24   should have been raised to the court outside the presence of

25   the jury.

1          There's a case, U.S. v. Solomon, 686 F.2d 863 from the

2     Eleventh Circuit that says the prohibition against the use of

3     stale convictions older than 10 years, it strongly presumed

4     against admitting these stale convictions.  I'm not avoiding

5     Mr. Muehleck's argument about this not being covered by 609,

6     but I clearly disagree with him, because I think 609 does set

7     the parameters for notice to counsel and the court.  The court

8     gets an opportunity to see if the conviction is more probative

9     than prejudicial, especially in light of the presumption

10    against admission of a witness' felony convictions older than

11    10 years.

12         So I would like on the record the nature of the

13    alleged convictions, the dates of the alleged convictions, and

14    when Mr. Muehleck was -- knew of these convictions and chose

15    not to notify the court or counsel.

16         THE COURT:  Well, in view of the language in 609 and

17    under 403, the fact that these convictions were more than

18    10 years ago and no notice was given, even though this is for

19    impeachment, I recognize that Mr. Muehleck did ask the witness

20    whether he had any knowledge about drug dealing and the witness

21    responded only what he knew from watching TV, whereas he had

22    been convicted some 20 years ago or more.

23         Under 403, I'm going to rule that this is inadmissible

24    and that it would be significantly prejudicial to the

25    defendant, as well as under 609.  The probative value would be

141

1    outweighed by substantial adverse, unfair impact on the

2    defendant.  Again, it was more than 10 years ago, no notice has

3    been given.  And I don't think that the probative value is

4    questionable, given this witness' testimony and the fact that

5    this occurred so long ago.

6            So I will strike the reference to his convictions.

7            We'll take a break and let the jury come back in.

8            (A recess was taken from 3:05 p.m. to 3:15 p.m.)

9            (The following proceedings were held in open court in

10   the presence of the jury:)

11           THE COURT:  Before we broke, I instructed you not to

12   consider the testimony about or the statements about Mr. Salas'

13   prior conviction, and I'm continuing that ruling on a permanent

14   basis now.  You are not to consider that at all.  Put that

15   entirely out of your minds as though you never heard it.  Can

16   you all do that?  Anyone who cannot?

17           (No response).

18           THE COURT:  Thank you.  Please proceed.

19           MR. MUEHLECK:  No questions.

20           MR. BARBEE:  No redirect, Your Honor.

21           THE COURT:  Thank you.  You're excused.  You may step

22   down.

23           THE WITNESS:  Thank you.

24                                      (Witness excused)

25           THE COURT:  Next witness?

1          MR. BARBEE:  I'd like to call Violet Diederiks.

2                        VIOLET DIEDERIKS,

3     called as a witness by the Defendant, having been first duly

4     sworn, was examined and testified as follows:

5          THE CLERK:  Thank you.  Please be seated.

6          State your name for the record and spell your last

7     name, please.

8          THE WITNESS:  I'm Violet Diederiks.  My last name is

9     D-I-E-D-E-R-I-K-S.

10                       DIRECT EXAMINATION

11    BY MR. BARBEE:

12    Q    Good afternoon, Mrs. Diederiks.

13    A    Good afternoon.

14    Q    Do you know a person named Larry Pagan?

15    A    Yes, I do.

16    Q    And who is he to you?

17    A    He's my brother.

18    Q    Are you older or younger than him?

19    A    He's the baby of the house.

20    Q    Okay.  And where do you live?

21    A    Nani Waimea, Kamuela.

22    Q    Is that on the Big Island?

23    A    Yes, it is.

24    Q    Do you own property on the Big Island?

25    A    Yes, I do.

1    Q    Could you tell the jury, describe what property you own in

2    Waimea-Kamuela area.

3    A    Nani Waimea, I have three properties.  Where Larry lives,

4    I have that property.

5    Q    Okay.  Could you speak into the microphone?

6    A    And I have one where Larry lives that's not really mine,

7    but I have the lease and I have it for, like, 42 years already.

8    And I have another place in Nani -- Ahualoa.

9    Q    And directing your attention to the year 2000 and also

10   2003, did you have a property where your brother Larry resided

11   at?

12   A    Yes, I did.

13   Q    Okay.

14   A    I still do.

15   Q    I'd like to direct your attention to an exhibit that

16   should be in front of you on the table there, Exhibit B, I

17   believe it is.

18   A    Yes.

19   Q    And do you recognize what's shown in that exhibit?

20   A    That's the house where my brother lives.  That's the farm.

21   Q    And what you're describing as a farm and where your

22   brother lives, that's your brother Larry?

23   A    Yes.

24   Q    And is that property you owned in 2002 and 2003?

25   A    Yes, and I still have it.

1  Q    Okay.  And could you describe the property?

2  A    It's -- it's a pasture and there's a house over there.

3  It's 43 acres.  And I have the other pasture leased it out, and

4  my brother has about 4 acres.  And he raised -- that's where he

5  lives and he raise his birds, and that's where I raise my

6  family, also.

7  Q    What kind of birds does your brother raise there?

8  A    Roosters and hens.

9  Q    And how many roosters did he have there in the 2002-2003

10  time frame?

11  A    I'm not that quite sure, but I think about 75.

12  Q    He have any other animals there?

13  A    He has a dog and a visitor, a peacock, that made -- made

14  my brother's place his home.

15  Q    Okay.  What type of person is your brother?

16  A    He's a very honest and helpful person.  You know, I don't

17  believe he would ever do anything wrong, and in a way he's very

18  kind and like to help people, but that's how we were brought

19  up.  My mother always told us if you see somebody that need

20  help, help them.  In turn, you some day might be helped, also.

21  And that's how we was brought up.

22  Q    Okay.  Directing your attention to the year 2000 or so,

23  did there come a time where your brother Larry was away from

24  the farm and had to work somewhere else on the Big Island?

25  A    Yes.  He worked in Hilo.

1    Q    And how far away is Hilo from the Kamuela farm?

2    A    It's about an hour and 15 minutes or hour-and-a-half --

3    hour-and-a-half from where the farm is.

4    Q    And how often would Larry come from his work in Hilo back

5    to the farm?

6    A    He would come once or twice a week to bring the feed for

7    the birds.

8    Q    Did there come a time in 2002 or thereabouts where you

9    became aware that Larry had somebody watching his animals on

10    the Kamuela farm?

11    A    Yes.  I used to go up and visit the farm and see how the

12    birds were.  And he had somebody taking care of them.  And they

13    would take care the birds and then they would live there for

14    free because they were helping him.

15    Q    Okay.  And do you remember the name of the person that

16    Larry had up there watching his animals?

17    A    Tito.

18    Q    I direct -- Tito, T-I-T-O?

19    A    I don't know how you spell it.  I just know it's Tito.

20    Q    Okay.  Do you -- could you look at Defendant's Exhibit A

21    for -- in evidence?

22    A    This is him.

23    Q    Do you recognize what's shown in that exhibit?

24    A    Yes.  That's Tito with one of my brother's birds.

25    Q    Okay.  Did there -- well, let me ask you about Tito.  How

1    did Tito seem to you?

2    A    He was a nice person, friendly, and when I walked around

3    the farm and stuff, it looked like he was really taking care of

4    the birds and the farm.  And I liked him.  He was humble, you

5    know, and he was honest.  If I would ask him something, he

6    would tell me.  And I --

7    Q    He spoke English?

8    A    Yes.

9    Q    Did there -- did you ever see a time or personally get

10   knowledge that Tito would use your brother's cellular

11   telephone?

12   A    Yeah, that's -- that's why I told my brother you cannot

13   let people your phone and stuff because you don't know what

14   they going to do with it.  Because I would call him on the

15   cell, and then it wasn't him, it was Tito on the phone.  So

16   that's when I told him you need to get your phone back and

17   don't lend it to anybody.

18   Q    Are you -- you are the older sister, correct?

19   A    Yes, I am.

20   Q    Did there come a time -- sometime after Tito was boarding

21   at the farm while Larry was down in Hilo working, did there

22   come a time where you visited the farm and got angry?

23   A    Yes.  I went up to the farm one day to visit and see what

24   was going on, and Tito was there and there was some other

25   Mexicans there.  And I got really angry and I said, "Tito, it's

1    supposed to be only you here and nobody else." I said, "That

2    was the bargain you made with my brother, that you would take

3    care the birds for him and only you would be here." I said,

4    "But as of now, I want them out of here." I said, "I don't

5    want no Mexicans up on my farm."

6    Q    Okay. And --

7    A    And they left.

8    Q    They left after you ordered --

9    A    Yes, yes.

10   Q    -- ordered them off the property?

11   A    Yes.

12   Q    And how many Mexicans appeared to be present with Tito at

13   the farm at the time you confronted Tito and scolded him and

14   kicked him off the property?

15   A    I wasn't sure if there was three or four of them, because

16   I was upset.

17        MR. BARBEE:  I'd like the witness to be handed, if I

18   could, exhibit -- she has them?  Okay.  Thank you.

19   BY MR. BARBEE:

20   Q    You have in front of you, I believe, an exhibit that's

21   marked 20.  If you could take a look at that exhibit.

22        Mrs. Diederiks, looking at that Exhibit Number 20,

23   does that appear to you to be one of the Mexicans that was

24   present when you scolded Tito and kicked him off the farm?

25   A    I couldn't be sure, but it sure -- he resembles.

1   Q    He resembles?

2   A    Yes, one of them.

3   Q    How about number -- Exhibit Number 21, does that appear to

4   be somebody --

5   A    Yeah.

6   Q    Well, let me finish the question.  Does that appear to be

7   somebody --

8   A    I remember.  I remember.

9   Q    -- that appears familiar to you as being one of the

10  Mexicans --

11  A    Yes.

12  Q    -- that was present with Tito when you confronted him,

13  scolded him and kicked them off the property?

14  A    Yes, I remember because he had the mustache.

15  Q    The mustache.  Okay.  Did there come a time where you

16  became aware that your brother would assist Tito and/or -- and

17  his Mexican friends in obtaining transportation or buying cars?

18  A    No.

19  Q    Okay.  Did there come a time where you became aware that

20  your brother was --

21         MR. MUEHLECK:  I'm going to object to the leading

22  nature of the questions.

23         THE COURT:  Sustained.

24  BY MR. BARBEE:

25  Q    Did there come anytime where your brother would send money

1    for the Mexicans?

2            MR. MUEHLECK:  Again, objection, leading nature of the

3    questions.

4            MR. BARBEE:  I'll rephrase, Your Honor.

5    BY MR. BARBEE:

6    Q    Ma'am, did there come a time where your brother did other

7    favors for -- for Tito and the Mexicans that you became aware

8    of?

9    A    No.

10   Q    Okay.

11           MR. BARBEE:  I'll pass the witness, Your Honor.

12           THE COURT:  Mr. Muehleck.

13           MR. MUEHLECK:  Sidebar, please, Your Honor?

14               (Bench conference on the record:)

15           MR. MUEHLECK:  I think if the court listens to this

16   witness' testimony, you'll see that she's brought out the

17   general character -- her opinion of the general character of

18   the defendant:  I don't think he could do anything wrong,

19   that's not the way we were brought up.  I think that's opened

20   the door for me to be allowed to ask the questions if she's

21   aware that her brother does have a felony conviction within

22   10 years.  I started to get up and stop her, but I couldn't

23   stop her.  You notice she was answering the questions a little

24   bit before Mr. Barbee finished -- finished asking the question.

25               You know, this is -- this is not right, they can bring

1    that up.  I should have a right to cross-examine her about she

2    knows that he has got a felony conviction, not necessarily

3    saying it's for drugs but certainly saying he does, despite the

4    fact that he was brought up the way she says, despite the fact

5    that her personal belief that I don't think he can do anything

6    wrong, that that's the way we were brought up, I should be able

7    to question her.

8             That's why I'm going to a sidebar, Your Honor.  That's

9    a fair question.  That conviction is within 10 years.  Felony

10   convictions.  In fact, there are two of them in 10 years, in

11   '92, within 10 years of this -- the date of this offense.

12             THE COURT:   '92?

13             MR. MUEHLECK:  Judge, excuse me, the convictions are

14   '92, he's charged with offenses in 2002.  That's within

15   10 years that's -- that's applicable to the rule.  That's okay

16   under the rule.  Based upon them bringing up general good

17   character, I should be allowed to ask that question.  I started

18   to get up and tried to object, but I couldn't stop her.

19             Read her testimony, please, Your Honor.  She's allowed

20   general law-abiding character is what she's talking about.  She

21   is about general good character, I don't think he can do

22   anything wrong.

23             MR. BARBEE:  I certainly didn't try to elicit that.  I

24   thought she was going to say he was a hardworking guy, but she

25   did say that -- but she did -- I think the court has a couple

1  options here.  It could, you know, tell the jury to disregard

2  that testimony like it did the prior.  I don't think it

3  necessarily opens the door for Mr. Muehleck to ask about her

4  brother's convictions.  She didn't have any convictions.  I

5  mean if he wanted to ask her, try to impeach her with her --

6  any prior conviction she might have, but I don't think he can

7  back-door in her brother's convictions through this witness.

8        THE COURT:  What is it that -- I have down in my notes

9  he's honest.

10        MR. MUEHLECK:  Right.

11        THE COURT:  Likes to help others.

12        MR. MUEHLECK:  Mm-hmm.

13        THE COURT:  Apparently she said something to the

14  effect that the way that he was brought up, he could do nothing

15  wrong.

16        MR. MUEHLECK:  Right.

17        MR. BARBEE:  Yeah, I didn't really get that, Your

18  Honor, but as far as her statement about the honesty and stuff,

19  I don't know that that would be -- a felony drug conviction

20  would impeach him for dishonesty.  That's just a generic --

21  felony wouldn't do that.  Maybe a theft or some dishonest

22  conviction, but Mr. Muehleck saying he's got drug convictions,

23  that doesn't go to dishonesty.

24        MR. MUEHLECK:  I'm not going to ask if he got a drug

25  conviction.  I'm going to say:  Aren't you aware he does have a

1   felony conviction?  That's fair cross-examination.  When she

2   says I don't think he could do anything wrong, that's not the

3   way he was brought up, he was honest, he was hardworking,

4   that's general good character and good character for

5   law-abiding, obeying the rules.

6           MR. BARBEE:  I don't think, again, Your Honor, it

7   opens the door, but I think the court could instruct the jury

8   to disregard the witness' comments as to whether or not her

9   brother was raised to be law-abiding and he could never do

10  anything wrong, strike that and tell them to disregard that.

11          THE COURT:  Under 403, I am going to do as Mr. Barbee

12  suggests, and I will instruct the jury to strike any testimony

13  to the effect that he was brought up in such a way that he

14  couldn't do anything wrong.  I don't remember her saying

15  law-abiding.

16          MR. MUEHLECK:  No, she didn't say law-abiding.  Said

17  he couldn't do anything wrong, that's the way we were brought

18  up.

19          THE COURT:  I find under 403, the probative value is

20  substantially outweighed by unfair prejudice.  I don't think it

21  was elicited by counsel or -- or, rather, volunteered by a

22  loving sister.

23          MR. BARBEE:  Yes, Your Honor.

24                  (End of bench conference.)

25          THE COURT:  Got some more testimony to strike.

1          In this case this witness stated that she felt that

2   her -- the way her brother had been brought up that he could

3   not do anything wrong.  And I'm striking that testimony.  So

4   you are not to consider that testimony.

5          Mr. Muehleck?

6          MR. MUEHLECK:  Moment please, Your Honor?

7          May I from here, Your Honor?

8          THE COURT:  You may.

9                        CROSS-EXAMINATION

10  BY MR. MUEHLECK:

11  Q    Ms. Diederiks, did you ask these people to leave because

12  you believed they were drug dealers, Mexican drug dealers?

13  A    No, I just hear lot of stories and I didn't want any

14  Mexicans on my property.  I don't know if they was dealing with

15  drugs or anything like that.  I just didn't want them on my

16  property.

17          MR. MUEHLECK:  No further questions, Your Honor.

18          MR. BARBEE:  No redirect, Your Honor.

19          THE COURT:  Thank you.  You may step down.  Any reason

20  why she shouldn't be excused?  Mr. Muehleck?

21          MR. MUEHLECK:  Not from the government.

22          THE COURT:  So you are excused.

23          THE WITNESS:  Thank you.

24                                        (Witness excused)

25          THE COURT:  Next witness?

1          MR. BARBEE:  Yes, Your Honor.  Check my list here

2     again.  I'd like to call Natalie Pagan.

3                         NATALIE PAGAN,

4     called as a witness by the Defendant, having been first duly

5     sworn, was examined and testified as follows:

6          THE CLERK:  Thank you.  Please be seated.

7          State your name for the record and spell your last

8     name.

9          THE WITNESS:  Natalie P-A-G-A-N.

10                      DIRECT EXAMINATION

11    BY MR. BARBEE:

12    Q    Do you know a -- good afternoon.

13    A    Good afternoon.

14    Q    Do you know a person named Larry Pagan?

15    A    Yes, that's my father.

16    Q    And is he present here in the courtroom?

17    A    Yes, he is.

18    Q    Directing your attention to -- well, first of all, how old

19    are you?

20    A    17.

21    Q    And are you a student?

22    A    Yes, I am.

23    Q    Where do you go to school?

24    A    Waiakea High School.

25    Q    Where is that?

1    A    On the Big Island in Hilo.

2    Q    Okay.  And were you asked to come down here, given a

3    subpoena to come down here today?

4    A    Yes.

5    Q    Okay.  Like to direct your attention to the year 2003,

6    two years ago in July, the month of July.  Did there come a

7    time in July where the police raided the residence which you

8    were living at?

9    A    Yes.

10   Q    Who do you live there with?

11   A    My grandma, my aunty and my two brothers.

12   Q    And at the time in July, was your grandma living there

13   still?

14   A    Yes, and she still does.

15   Q    And both of your brothers, did they live there in July of

16   2003?

17   A    Yes, they did.

18   Q    Do you know if your father was working -- what side of the

19   island your father was working at in July of 2003?

20   A    I know he was working -- I think -- I don't know if it was

21   in Waimea.  I really don't know.

22   Q    Okay.

23   A    Yeah.

24   Q    Does your father and did your father in 2003 have a

25   girlfriend?

1    A    Yes.

2    Q    What's her name?

3    A    Lillian Salinas.

4    Q    Is she -- Lillian Salinas?

5    A    Yeah, but she goes by Boxie, like a nickname.

6    Q    Okay.  And in July of 2003, where was your dad's

7    girlfriend?

8    A    She was in the Mainland, in Mexico.

9    Q    In Mexico?

10   A    Yes.

11   Q    And did your father or -- strike that.  In July of 2003,

12   when the police raided your grandma's house where you were

13   staying, could you tell the jury what happened that afternoon?

14   A    I had -- I came back from summer school, and my grandma,

15   my brother and I went to do grocery shopping.  We came home and

16   a FedEx car came in the driveway and then a box came.  So I

17   signed for it, and then I just -- I went to the bathroom -- I

18   signed for it because my dad was expecting a letter, but I

19   figure since his girlfriend was in the Mainland, that she was

20   expect -- you know girls, they buy gifts and stuff.  So I

21   figured, you know, she's sending, like, gifts and stuff from

22   the Mainland.

23        So I just signed for the box and I went in my room.

24   And then I put it in there, and then I went to the bathroom.

25   And my brother was in the bathroom and my grandma was in the

```
 1    living room.  And I heard the dogs barking.  So I looked out my
 2    window, and I saw a guy outside, so...
 3              MR. MUEHLECK:  I'm going to object to the running
 4    commentary.
 5              MR. BARBEE:  Yes.
 6              MR. MUEHLECK:  Ask question and answers be used.
 7              MR. BARBEE:  Yes.
 8              THE COURT:  Sustained.
 9    BY MR. BARBEE:
10    Q    Instead of giving the whole story all at the same time, we
11    have a court reporter that's writing down everything you say.
12    A    Okay.
13    Q    So we're going to break it up a little bit, okay?
14    A    Okay.
15    Q    Okay.  After the Federal Express guy gave you the package,
16    you said that you went to the bathroom?
17    A    Yes.
18    Q    Okay.  Where was your grandmother, if you know?
19    A    Well, I thought she was in the living room.  So, I walked
20    outside to go tell her that there was a guy standing outside
21    and --
22    Q    Okay.  Okay.  Wait.
23    A    Okay.  Sorry.  So sorry.
24    Q    You heard the dogs barking while you were in the bathroom,
25    right?
```

1    A    Mm-hmm.

2    Q    Okay.  You have to say yes or no.

3    A    Yes.

4    Q    And then what did you do?

5    A    So I got scared.  So I walked outside to go tell my

6    grandma, and the next thing you know there's about seven guys

7    with masks on, heavy duty equipment like the bulletproof vests

8    that said "police" -- I think it said "police" on it, and they

9    were standing at me pointing guns at me.  So, I put my hands

10   up, and I said:  What's going on?

11         MR. MUEHLECK:  Same objection, Mr. Barbee.

12   BY MR. BARBEE:

13   Q    Okay.  Just -- we'll just go a little slower, okay?

14   A    Okay.

15   Q    Have you ever testified before?

16   A    No.

17   Q    Okay.  We'll just go a little slower.

18   A    Okay.  Sorry.

19   Q    So these guys came in with the police and the armor, and

20   you said they were pointing guns at you.  Could you describe

21   how that -- how that was, how they were pointing guns at you?

22   A    Like they were just pointing guns at me.

23   Q    What kind of guns?

24   A    Black guns.  I don't know.  It was just guns like regular

25   guns that you see secure -- policemen and security wearing over

1    here.

2    Q    Okay.  Were they the long rifle guns?

3    A    No.

4    Q    The short --

5    A    Mm-hmm.

6    Q    -- pistol handguns.  And you said they were pointing guns

7    at you.  How many guns do you think were pointed at you?

8    A    I would say about maybe six or seven.  That's why I put my

9    hands up because, you know, I was like, "Whoa, what's going

10   on," because they're pointing guns at me, so I was like, okay.

11   Q    Okay.  And after you had the guns pointed at you, do you

12   know where your brother and grandmother were?

13   A    No.  But when they pulled me outside, that's when I saw my

14   grandma and my brother.

15   Q    Okay.  When they -- so after they pointed the guns at you,

16   they pulled you outside?

17   A    One of the guys grabbed me and pulled me outside with

18   everybody else.

19   Q    And everybody else is who?

20   A    The other policemen or whoever those guys were.

21   Q    Did the police appear to search your grandmother's house?

22   A    Yes, they left us outside and they were just searching

23   downstairs and all around the house.

24   Q    And do you know if the police had ordered your brother to

25   lay down on the ground or anything like that?

1    A    I'm not sure.

2    Q    Okay.  Did the police question you?

3    A    Yes, they did.

4    Q    And did they make you do anything?

5    A    They made me call my dad.  And -- well, to me it was like

6    they were pressuring me to say that my dad was going to receive

7    a box.

8    Q    And to your knowledge, was your dad to receive a box?

9    A    He was supposed to receive a letter, but instead of a

10   letter, a box came.

11         MR. MUEHLECK:  I'm going to object, without foundation

12   at this point.  Also may call for hearsay, but...

13         THE COURT:  I think you better develop that, Mr.

14   Barbee.

15         MR. BARBEE:  Thank -- thank you, Your Honor.

16   BY MR. BARBEE:

17   Q    At the time the box came, you were telling the --

18         THE COURT:  At this point I'll sustain Mr. Muehleck's

19   objection.

20         MR. BARBEE:  Thank you, Your Honor.

21   BY MR. BARBEE:

22   Q    At this point you -- well, earlier you testified that when

23   the box arrived in the FedEx that you thought maybe it was your

24   dad's girlfriend sending you something from the Mainland or

25   Mexico?

1    A    Yes.

2    Q    Okay.  Had you also -- not what anybody told you but were

3    you aware that something might -- a letter might also perhaps

4    be coming?

5         MR. MUEHLECK:  Again, objection, without foundation.

6         THE COURT:  Sustained.

7         MR. BARBEE:  Thank you, Your Honor.

8         THE WITNESS:  Yes.

9    BY MR. BARBEE:

10    Q    Okay.  When the judge says sustained --

11    A    Oh, sorry.

12    Q    -- you got to wait for the judge.  That's okay.

13    A    Sorry.

14    Q    Let me actually -- actually just move on here.  Did there

15    come a time where you felt that you needed to change clothes to

16    get more comfortable?

17    A    Yes.

18    Q    And could you tell the jury about that?

19    A    We were all in my grandma's room together, my brother and

20    my grandma and I, and three -- I guess the DEA agents, and I

21    asked them if I could go change my clothes because I wasn't

22    comfortable with what I was wearing.  And they said yeah, but a

23    guy followed me into my room, and when -- while I was changing,

24    he was watching me change, and I felt violated and very

25    uncomfortable.  Because he was watching me and -- yeah.

1   Q    Okay.  You testified about the police making you call your

2   father.  Did you call your father?

3   A    Yes, I did.

4   Q    And did the police instruct you on what to say to your

5   father?

6   A    Yes.

7   Q    What did they tell you to tell your father?

8   A    They took me out of the room and they sat me down, and

9   they said:  Call your father and tell him that a package, or

10  whatever, came.  I don't know exactly what they said, but they

11  told me to call my dad.

12  Q    Okay.  And did it appear that the police wanted your

13  father to come down to the residence and pick up the package?

14  A    Yes.

15  Q    Okay.  And how long did the police stay -- let's break

16  that up.

17       From the time that the -- you heard the dogs barking

18  and you saw the police outside, from the time they left, how

19  long -- how much time had passed?

20  A    Maybe about three or four hours.

21  Q    And how much time had passed from the time you heard the

22  dogs barking and the police came until when they made you call

23  your dad?

24  A    I'm not sure.  Maybe an hour-and-a-half or so.

25  Q    Okay.  And did the police later come back to the residence

1    after they left after the three-plus hours?

2    A    Yes.

3    Q    And could you describe that?

4    A    They came back and they -- well, I was in my room talking

5    on the phone, and then a green 4Runner came into my driveway, I

6    looked out the window and this guy rolled down his window --

7        MR. MUEHLECK:  I'm going to object again to the

8    commentary.  I don't mind question and answer, Judge, but...

9        THE COURT:  Yes, let's keep your answers short --

10        THE WITNESS:  Sorry.

11        THE COURT:  -- in response to Mr. Barbee's questions.

12        MR. BARBEE:  Thank you, Your Honor.

13    BY MR. BARBEE:

14    Q    So after the police left the first time after three and

15    some -- three hours and some time, they came back in a green

16    4Runner?

17    A    Yes.

18    Q    Okay.  And where did they -- where did you notice them

19    driving the 4Runner?

20    A    You mean which way did they come from or --

21    Q    Or where -- did they come in front of the house or --

22    A    They came in front of the house.

23    Q    Okay.  And how many police officers came the second time?

24    A    Two.

25    Q    And did they ask you any questions or come up to the door

1    of the house?

2    A    They talked to me from my window.

3    Q    Okay.  And what, if anything, did they -- did they say?

4    A    They said if my dad stopped by, and I said yes.  And they

5    said:  Did you tell him that we were here?  And I said:  Yes.

6    And they said:  Well, what's your phone number because we're

7    going to tap your phone.  So I gave them my house number.

8    Q    Okay.  And you indicated that your dad had come by.  When

9    he came by, what kind of demeanor did he have?

10   A    He just stopped by, told us hi.

11   Q    Did you tell them that -- that the police had raided the

12   house and watched you undress?

13   A    I didn't tell him about them undressing me, but I told him

14   that he was there.

15   Q    Did he appear to be upset?

16   A    No.  He just asked why, and then he just talked to my

17   brother and I -- my two brothers and I, and left.  Because my

18   little brother came home already.

19   Q    Okay.

20          MR. BARBEE:  If I could have a minute, Your Honor?

21          THE COURT:  You may.

22               (Pause in the proceedings.)

23   BY MR. BARBEE:

24   Q    When your dad arrived, did he ask you if you had the

25   letter -- well, let me back up.

1          Did the police -- when the police had you call your

2    dad, did you tell him that a package arrived or that a letter

3    arrived?

4    A    I told him that a package arrived and not a letter.

5    Q    Okay.  And why -- well, let me back up again.

6          When he -- when your dad came that evening, did he ask

7    for a package or a letter?

8    A    He said --

9          MR. MUEHLECK:  Objection, because we're calling for

10   hearsay at this point, Your Honor.

11         THE COURT:  Appears to be hearsay.

12         MR. BARBEE:  Yes, Your Honor.  Let me ask it this way.

13   BY MR. BARBEE:

14   Q    Were you expecting -- while your father's girlfriend was

15   on the Mainland and in Mexico, were you expecting a package or

16   a letter?

17   A    A letter.

18         MR. MUEHLECK:  Objection, without -- objection.

19   Without foundation, calls for hearsay.

20         THE COURT:  I think you'll have to lay a foundation.

21         MR. BARBEE:  It was her state of mind of what she was

22   expecting, Your Honor.

23         MR. MUEHLECK:  My same question is:  What is the basis

24   of the state of mind or the foundation for that if it's not

25   what somebody has told 'em.  That's hearsay.  Objection.

1          MR. BARBEE:  Well, it's not offered for the truth of

2     the matter, Your Honor.  It's offered for her state of mind.

3          MR. MUEHLECK:  Her state of mind and what she's

4     expecting is irrelevant.

5          THE COURT:  Why don't you ask her whether they had

6     received any letters from Mexico.

7     BY MR. BARBEE:

8     Q    Had you yet received -- had you received any letters from

9     Mexico from Mrs. -- Ms. Salinas?

10    A    No, because she just went up there.

11    Q    Okay.

12         MR. BARBEE:  No further questions, Your Honor.

13                    <u>CROSS-EXAMINATION</u>

14    BY MR. MUEHLECK:

15    Q    Ms. Pagan, my name is Tom Muehleck.  I'm with the U.S.

16    Attorney's office.

17         The phone number at your residence was 959-7896?

18    A    Yes, sir.

19    Q    You told your father the police had come to the residence?

20    A    Yes.

21    Q    You told him they had searched the residence?

22    A    No.

23    Q    You didn't tell him that?

24    A    No, I just told him that they were there.

25    Q    Did you tell him how many police came?

1   A    No.  Because I didn't know, there were too many to count.

2   Q    Had they ever come to the residence before like that, that

3   many police?

4   A    No.

5   Q    Wasn't that sort of upsetting?

6   A    Yes.

7   Q    You have a cell phone?

8   A    Yes, I do.

9   Q    What's your cell phone number?

10  A    990-0434.

11  Q    What was your cell phone number in 2003?

12  A    I didn't have one back then.

13  Q    Okay.  Your father had one, right?

14  A    Yes.

15  Q    All right.  And he was living in Waimea at that time in

16  2003, correct?

17  A    Yes.

18  Q    He had been living over there for quite sometime, hadn't

19  he, with Lillian?

20  A    Yes.  I don't know with -- they were off and on.

21  Q    Off and on?  Hadn't he been living out of the -- out of

22  the Hilo address for quite sometime?

23  A    Yes.

24  Q    He had not been living with you and Ms. Nagata, had he?

25  A    He had never lived with us.

1             MR. MUEHLECK:  Moment please, Your Honor?

2             THE COURT:  You may.

3                       (Pause in the proceedings.)

4    BY MR. MUEHLECK:

5    Q    You said the police watched you undress in a room?

6    A    Yes.

7    Q    What were you wearing that you went in that you felt

8    uncomfortable that you had to undress, Ms. Pagan?

9    A    I don't remember.

10   Q    You don't remember this?

11   A    No, it was -- probably long pants and a shirt, because it

12   was a hot day and that's what I wear to school.  So I wanted to

13   change to something cooler, like shorts and a spaghetti strap.

14   Q    Was it uncomfortable for you to have the police officer in

15   the room when you undressed?

16   A    Yes.

17   Q    Why didn't you simply wear that shirt and trousers the

18   rest of the afternoon then?

19   A    Because I was uncomfortable with what I was wearing.

20   Q    Couldn't you go outside?  Didn't they allow you outside --

21   A    They didn't allow me anywhere without -- without a

22   policeman there, and I figured he was going to turn around and

23   face the other way.

24   Q    And he didn't, so you continued to undress?

25   A    Yes.

1  Q    Did you complain to Mrs. Nagata about that?

2  A    I told her.

3  Q    Did you complain to anybody in the police department about

4  that?

5  A    No, I didn't.

6  Q    How long has Ms. Nagata lived in Hilo?

7  A    It's a good question.  I don't know.

8        MR. MUEHLECK:  No further questions, Your Honor.

9  Thank you.

10        THE COURT:  Mr. Barbee, anything more?

11        MR. BARBEE:  Yes, just a very brief redirect.

12                    REDIRECT EXAMINATION

13  BY MR. BARBEE:

14  Q    Natalie, did -- does your -- do you have an Aunty Rosita?

15  A    Yes, I do.

16  Q    And is that your dad's sister?

17  A    Yes, she is.

18  Q    And where did she live in 2003?

19  A    1771 Kilauea Avenue, I think.

20  Q    Is that in Hilo?

21  A    Yes, it is.

22  Q    Was your dad staying with your -- if you know, was your

23  dad staying with his sister Rosita during July of 2003?

24  A    He might have because he was -- I think at that -- he may

25  have been working -- I could be wrong, but he was working at

1    KTA --

2              MR. MUEHLECK:  I would object.  This is speculation at

3    this point.  Could be and may have.  I object to the form.

4              THE COURT:  Sounds like speculation.

5              MR. BARBEE:  I think it goes to weight, Your Honor,

6    instead of admissibility.

7              MR. MUEHLECK:  We're guessing, Judge.

8              THE COURT:  If she knows of her own personal

9    knowledge, not if she's guessing.

10              THE WITNESS:  Okay.

11    BY MR. BARBEE:

12    Q    Do you -- do you know if he was staying with your aunty or

13    not?

14    A    Well, at one time he was going back and forth to Waimea

15    because he worked at KTA.  So that could have been the time.

16    Q    What is KTA?

17    A    KTA?  Waimea.  In Waimea.  As a shelf stocker.

18              MR. MUEHLECK:  A store, Mr. Barbee.

19              MR. BARBEE:  Okay.  Okay.  No further questions, Your

20    Honor.

21              THE COURT:  Anything more, Mr. Muehleck?

22              MR. MUEHLECK:  Yes.

23                        RECROSS-EXAMINATION

24    BY MR. MUEHLECK:

25    Q    Do you know a Sherry Pagan?

1    A    No, I don't.

2                 MR. MUEHLECK:  Okay.  Thank you.

3                 THE COURT:  Mr. Barbee?

4                 MR. BARBEE:  No redirect, Your Honor.

5                 THE COURT:  Thank you.  You're excused.

6                 THE WITNESS:  Thank you.

7                 THE COURT:  Going to try to fit in another witness,

8    Mr. Barbee?

9                 MR. BARBEE:  Up to the court, Your Honor.

10                THE COURT:  Let's proceed.  Who is the witness?

11                MR. BARBEE:  I'm going to look and see which one can

12   be quick, Your Honor.  I guess we'll try with Jovy Sayles.

13   Jovy Sayles.

14                            JOVY SAYLES,

15   called as a witness by the Defendant, having been first duly

16   sworn, was examined and testified as follows:

17                THE CLERK:  Thank you.  State your name for the record

18   and spell your last name, please.

19                THE WITNESS:  Jovy K. Lee Sayles, S-A-Y-L-E-S.

20                          DIRECT EXAMINATION

21   BY MR. BARBEE:

22   Q    Good afternoon, Mr. Sayles.

23   A    Good afternoon.

24   Q    You ever testified before?

25   A    No.  None.

```
 1   Q    Okay.  Main thing is just to listen to the questions,
 2   speak into the microphone so the jury and the judge and counsel
 3   can hear you, okay?
 4   A    Okay.
 5   Q    Do you know Larry Pagan?
 6   A    Yes.  He's --
 7   Q    I'm sorry.
 8   A    He's a co-worker with me, yeah, and a good friend.
 9   Q    Is he here in the courtroom?
10   A    Yes, he is.
11   Q    Could you point to him and describe what he's wearing?
12   A    He's wearing the black aloha shirt with the white and
13   green flowery print.
14   Q    Okay.  And you said he's a co-worker of yours.  Where do
15   you -- where do you work?
16   A    I work for Gold Coast Roofing on the Kona side of the Big
17   Island.
18   Q    And how long have you been working for Gold Coast Roofing?
19   A    I've been employed with Gold Coast just about eight,
20   eight years now.
21   Q    And how long has Mr. Pagan been working with them?
22   A    Well, Mr. Pagan been there, I say, about three years or
23   so.
24   Q    Okay.  And do you frequently work with him, I mean you --
25   A    Yes.
```

1    Q    -- work with him pretty much weekly?

2    A    Yes, I work with him a lot.  I'm running one of the jobs

3    down in Kukio, so, yeah, we work -- we work together a lot.

4    Q    And what type of work do you guys do?

5    A    We do copper roofing.  We do a lot of the million-dollar

6    homes down on Kukio side and stuff on the Kona side.

7    Q    Like Tiger Woods homes?

8    A    Yes, exactly.

9    Q    And does -- do you know Mr. Pagan by any other name?

10   A    Well, I met him as Smokey.  So, that's kind of like a

11   nickname we got for him, you know.

12   Q    Okay.  And what type of worker is Mr. Pagan?

13   A    He -- to me, he's a hard worker.  Team player, you know.

14   He uses his own truck and stuff to haul in material.  You know,

15   he does what's right for the company.  He's a good worker.

16   Team player.

17   Q    Does there come occasions where -- or occasions or times

18   where you co-workers play practical jokes on each other?

19   A    Always.

20   Q    And you ever played any practical jokes on Mr. Pagan?

21   A    Always, sir.  Always.  It's just -- it's our way of just

22   killing time and killing the monotony of work.

23   Q    And what type of jokes have you played on Mr. Pagan?

24   A    Well, I would crank call him some days, like if I'm late

25   for work, because I come from the Hilo side and he's closer to

174

1   work on Waimea, so if I'm late, I call him up, "Hey, boss

2   changed the roofs today.  We're going to a different job

3   today," you know.

4            And then he will meet me at the other job, and because

5   I'm late, I want somebody else late with me; so then we will be

6   late together, you know, and stuff like that.  And he will meet

7   me there and I'll get yelled at and stuff.  I feel better, he's

8   going to work late with me, you know.

9   Q    Do you ever call him pretending to be somebody else?

10  A    Well, yeah, few times we claim to be officers and stuff,

11  you know.  And it's me and my other co-friends sitting next to

12  each other just rapping, you know.  "Hey, Mr. Pagan, this is

13  officer, you know, so and so.  We need you to come down to the

14  police station.  We got some papers here for you to sign," you

15  know.

16           And sometimes he -- he recognize my voice, but

17  sometimes he wouldn't, you know.  He'd catch on and, "Oh, no,

18  no, no, Jovy, this is you," you know, but sometimes he

19  wouldn't, you know, and then he'd ask my foreman Frank, who is

20  my good friend, "Hey, I got to go down to the police station

21  and stuff, you know.  And which, you know, you got the phone

22  call obviously.  We was only playing, blah, blah, blah.

23  Q    Let me stop you there.  He seems to be the type of person

24  that you -- you enjoy playing these practical jokes on?

25  A    I would say, yeah, because I always do it.

```
 1              MR. BARBEE:  No further questions.
 2                      CROSS-EXAMINATION
 3    BY MR. MUEHLECK:
 4    Q    Mr. Sayles, I'm Tom Muehleck with the U.S. Attorney's
 5    Office.
 6    A    Hello.
 7    Q    You got a cell phone on you?
 8    A    No, sir.  It's in the --
 9    Q    Yeah, you dropped it down below, right?
10    A    Yeah -- yes, sir, it's in the --
11    Q    But you got a holster, right?
12    A    Yeah, I got my holster with me, yes, sir.
13    Q    Okay.  When you -- did you have a cell phone in 2003?
14    A    Yes, I had one.
15    Q    Okay.  Is that what you would call Mr. Pagan on?
16    A    I would call him -- oh, I'd use -- I'd use co-workers'
17    phone, I'd use mine, but mine, yeah, mine.
18    Q    Would you call him on his cell phone?
19    A    I would call him on his cell phone.
20    Q    Did you ever joke with him like there's been an automobile
21    accident, one of your kids is hurt, you got to go back --
22    A    Oh, never --
23    Q    -- I'm Officer -- I'm Officer Smith, I'm Officer
24    Kealoha --
25    A    Oh, yeah, but --
```

1    Q    Let me finish, please.

2    A    Sure.

3    Q    Do you ever joke saying:  I'm Officer Kealoha, one of your

4    children has been hurt, you got to get back to Hilo?

5    A    No, I never played with his children or family, no.

6    Q    You were never serious when you were joking with him about

7    something serious that happened --

8    A    Well --

9    Q    -- is that correct?

10    A    -- never serious, it was always a joke for us, you know.

11    Q    I understand.  My question is:  When you joke with him and

12    say:  Could you please come down, I'm Officer Smith, please

13    come down to the police station, we've got some papers to sign,

14    something like that?

15    A    Yeah.  Yes.

16    Q    And when you call him, these calls would be, what, short

17    calls on cell phone?

18    A    Oh, yeah, short call.

19    Q    What does your cell phone bill run, may I ask?

20    A    My cell phone bill?

21    Q    Yes, sir.

22    A    It runs $69 a month for no overage, but then I got a

23    overage every month.  It's through my company.  And I pay for

24    another $60 in overage, so I pay one-something a month.  And

25    it's a Nextel.

1    Q    Cell phone bills can be expensive, correct?

2    A    Yes, sir, it can.

3    Q    And those calls to Mr. Pagan when you are joking with him,

4    they'd be short calls?

5    A    Short calls.

6    Q    Not 20-minute calls?

7    A    One or two minutes, three minutes.  Sometimes we talk, you

8    know.

9    Q    You'd get his goat, so to speak, you'd fun with him and

10    then you'd meet him someplace else at the wrong jobsite just to

11    have fun with him?

12    A    Well, yeah, I'm late.  I'm there already.  He meets me,

13    then we go to the job.  You know, I'm sorry, playing around.

14    Q    You lived in Hilo, sir?

15    A    Yes, sir, I live in Hilo.

16    Q    He lived on the other side of the island?

17    A    He lives in Waimea, yes.  That's on my way to work.

18    Q    What was your cell phone number back then, sir?  If you

19    can recall, 2003.

20    A    I just recently changed my phone calls because I have been

21    having some calls from an estranged woman, you know, so I

22    recently changed my phone number.  But that's basically what --

23    my cell number is 960-3245.

24    Q    You had a different number back then?

25    A    Yeah, but it was through the company.  It was always a

1    company phone.

2    Q    Mr. Pagan did not have a company phone, did he?

3    A    No, he had his own.  I would call him on his own number.

4    Q    You remember what his, Mr. Pagan's number was at that

5    time, 2003?

6    A    I can't remember, but I know his new cell phone number.

7    Q    No, I'm asking 2003.

8    A    No, I can't remember.

9    Q    Was it this 990-7896?

10   A    It could have been.  I could be mistaken.  I can't

11   remember that far.

12   Q    You ever listen -- did you ever listen to a tape-recorded

13   call of Mr. Pagan?

14   A    No, I never heard him on tape.

15        MR. MUEHLECK:  No further questions.  Thank you, sir.

16        THE WITNESS:  Thank you.

17        MR. BARBEE:  No redirect, Your Honor.

18        THE COURT:  Thank you.  You're excused.

19        THE WITNESS:  Thank you.

20                                    (Witness excused)

21        THE COURT:  Well, I think we better break for the day.

22   Please be back at 9 o'clock.

23        I want to meet with counsel.

24        (At 4:04 p.m., the jury was excused, and the following

25   proceedings were held:)

1          THE COURT:  How much longer do you think you'll be

2    with your case, Mr. Barbee?

3          MR. BARBEE:  Your Honor, I believe I just have one or

4    two more witnesses, Mr. Torres and Ms. Salinas.  And then

5    Mr. Pagan is going to continue considering whether or not he's

6    going to testify tomorrow.  But, you know, assuming that

7    Mr. Pagan does not testify, I probably would need, you know,

8    maybe another hour approximately, and if Mr. Pagan does

9    testify, then however -- my direct of him would probably be

10   pretty short.

11         THE COURT:  Is that Miguel Torres?

12         MR. BARBEE:  No, sir.  It's Frank Torres.

13         THE COURT:  Oh, that Torres.  And the second one I

14   didn't get the name.

15         MR. BARBEE:  Lillian Salinas.

16         THE COURT:  Oh, that's the girlfriend?

17         MR. BARBEE:  That's right.

18         THE COURT:  And, Mr. Muehleck, how long do you think

19   your final argument will be -- well, first of all, do you think

20   you're going to have any rebuttal, or maybe it's too early?

21         MR. MUEHLECK:  I don't know, Judge.  I have to talk to

22   my agent about that.  We haven't really discussed that, sir.  I

23   don't think it would be long certainly.

24         THE COURT:  I'm just wondering if we are going to be

25   able to get through final argument and instructions tomorrow.

1          MR. MUEHLECK:  I would hope so, Your Honor.

2          THE COURT:  How long do you think your -- your final

3     argument will be?

4          MR. MUEHLECK:  I haven't put it together, sir.  I

5     don't know.

6          THE COURT:  10 minutes?

7          MR. MUEHLECK:  I don't think that's a good estimate,

8     Your Honor, no.  No, I don't think that's accurate.  You can

9     always wish for that, as I told Mr. Barbee once, but I don't

10    think -- I've never said anything in 10 minutes, Judge, that I

11    couldn't say in 15.

12         THE COURT:  I'm just speaking on behalf of the jury.

13         MR. MUEHLECK:  Oh, all right, sir.

14         THE COURT:  And how about you, Mr. Barbee, can you do

15    any better than Mr. Muehleck?

16         MR. BARBEE:  Oh, I'll try, Your Honor.  I think my

17    opening statement was a lot briefer than his, so it'll probably

18    be the same on closing.

19         THE COURT:  Now, we handed out a packet of the jury

20    instructions to you.  Are those agreeable with you?

21         MR. MUEHLECK:  Yes, Your Honor.

22         MR. BARBEE:  Yes, Your Honor.  I did review those

23    yesterday evening and they look agreeable.

24         THE COURT:  And do you want the instructions given

25    before or after your argument?

1          MR. BARBEE:  On behalf of the defense, we'd defer to

2     the court.  Whatever the court prefers.

3          THE COURT:  Well, I defer to you people.

4          MR. MUEHLECK:  Doesn't -- doesn't really matter to us,

5     Judge.  I mean we make reference to them either way if you give

6     them -- we understand what the court is going to give, of

7     course.  We refer to them whether you give them before or

8     after.  That's the way I've always done.

9          MR. BARBEE:  Yeah, usually -- I guess my experience

10    generally is they're given after.  So I don't have any strong

11    request that it be either way.

12         THE COURT:  All right.  We'll give them afterwards

13    then.  So the jury will be more alert during your arguments.

14         Any -- any objection to having my law clerk read the

15    instructions to the jury?  I will instruct the jury that they

16    are to take it as though I am giving the instructions, but my

17    voice tends to give out.

18         MR. MUEHLECK:  No objection, Your Honor.

19         MR. BARBEE:  No objection.

20         THE COURT:  Thank you.  Anything else we should

21    instruct -- we should consider at this point?

22         MR. MUEHLECK:  Not -- not --

23         THE COURT:  Okay.  We'll see you at 9 o'clock tomorrow

24    morning then.

25         (The proceedings recessed at 4:08 p.m., August 25, 2005.)

1            COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA TANDO FAZIO, Official Court Reporter,

4    United States District Court, District of Hawaii, Honolulu,

5    Hawaii, do hereby certify that the foregoing pages numbered 1

6    through 181 is a correct transcript of the proceedings had in

7    connection with the above-entitled matter.

8          DATED at Honolulu, Hawaii, December 22, 2005.

9

10

11                          CYNTHIA TANDO FAZIO, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25