```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3                                 )
      UNITED STATES OF AMERICA,    )   CR 04-00054 ACK
 4                                 )
                 Plaintiff,        )   Honolulu, Hawaii
 5         vs.                     )   January 13, 2006
                                   )   9:00 A.M.
 6    LARRY PAGAN,                 )
                                   )
 7               Defendant.        )
                                   )
 8    _____)

 9

10             TRANSCRIPT OF JURY TRIAL (DAY 4)
                BEFORE THE HONORABLE ALAN C. KAY
11               UNITED STATES DISTRICT JUDGE

12    APPEARANCES:

13    For the Government:        THOMAS MUEHLECK
                                 Office of the U.S. Attorney
14                               PJKK Federal Bldg.
                                 300 Ala Moana Blvd. Ste. 6100
15                               Honolulu, HI 96850

16    For the Defendant:         RUSTAM A. BARBEE
                                 Century Sq.
17                               1188 Bishop St., Ste. 2606
                                 Honolulu, HI 96813
18
      Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
19                               United States District Court
                                 300 Ala Moana Blvd. Ste. C285
20                               Honolulu, HI 96850
                                 (808) 534-0667
21

22

23

24
      Proceedings recorded by machine shorthand, transcript
25    produced with computer-aided transcription (CAT).
```

EXHIBIT _B_

1                              <u>INDEX</u>

2

3     **EXAMINATION**

4     **Witness Name**                                                **Page**

5     Hazel Awong

6          Direct By Mr. Muehleck   .................................. 4

7          Cross By Mr. Barbee      .................................. 9

8     Fernando Salas

9          Direct By Mr. Barbee     ..................................15

10         Voir Dire By Mr. Muehleck    ..............................19

11         Direct By Mr. Barbee     ..................................20

12         Cross By Mr. Muehleck    ..................................21

13    Violet Diederiks

14         Direct By Mr. Barbee     ..................................32

15         Cross By Mr. Muehleck    ..................................37

16         Re-Direct By Mr. Barbee  ..................................40

17         Re-Cross By Mr. Muehleck     ..............................42

18    Frank Torres

19         Direct By Mr. Barbee     ..................................43

20         Cross By Mr. Muehleck    ..................................45

21    Natalie Pagan

22         Direct By Mr. Barbee     ..................................48

23         Cross By Mr. Muehleck    ..................................55

24

25

1    **EXHIBITS**

2    **Exhibit**                                         **Page**

3    14 Entered into Evidence                            9

4    A Entered into Evidence                             18

5    B, C Entered into Evidence                          19

6    38 Marked for Identification                        39

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   FRIDAY, JANUARY 13, 2006              9:06 O'CLOCK A.M.

 2             THE CLERK:  Criminal Number 04-00054ACK, United

 3   States of America versus Larry Pagan.

 4             MR. MUEHLECK:  Tom Muehleck and D.E.A. Agent

 5   Rich Jones for the United States.  Good morning, Your

 6   Honor.

 7             CASE AGENT:  Good morning.

 8             THE COURT:  Good morning.

 9             MR. BARBEE:  If it please the court, Larry Pagan

10   with counsel Rustam Barbee present in court.

11             THE COURT:  Good morning.  Good morning, ladies

12   and gentlemen of the jury.

13             Please proceed, Mr. Muehleck.

14             MR. MUEHLECK:  Call Hazel Awong, please.

15        (Witness sworn.)

16             THE CLERK:  Please be seated.  Please state your

17   name.

18             THE WITNESS:  Hazel Awong.

19             THE CLERK:  And spell your last name.

20             THE WITNESS:  A-w-o-n-g.

21                      DIRECT EXAMINATION

22   BY MR. MUEHLECK:

23   Q    Miss Awong, are you employed?

24   A    Yes.

25   Q    Where -- or how are you employed?  Where?
```

```
 1   A     In Hilo.

 2   Q     Doing what?

 3   A     Cafeteria.

 4   Q     Okay.  Working in the cafeteria in a school in Hilo?

 5   A     Yes.

 6   Q     And on December 4th of 2002, a couple of years ago,

 7   where were you living?

 8   A     I was living in Kamuela, Tamarack Pines.

 9   Q     And what -- where in Tamarack Pines?  That's an

10   apartment, is it?

11   A     Yes.

12   Q     Okay.  Did you have an apartment -- is that a

13   multiple level --

14   A     Two story.

15   Q     Two story.  Okay.  And what -- what level did you

16   live on?

17   A     On the bottom.

18   Q     Did something happen on December 4th of 2002 at your

19   place?

20   A     Yes.

21   Q     What happened?

22   A     I was in my living room, and I heard some trumping

23   noise.

24   Q     You heard some what noise?

25   A     Loud sounds in -- on the upstairs.  And I thought it
```

1    was the old man with the oxygen tank; so I ran to my

2    back --

3    Q    What did you think about the old man with the oxygen

4    tank?

5    A    I thought he fell.  So I ran to the patio, and I

6    looked outside, and there was all this police with guns,

7    saying, "Get down.  Get down."

8    Q    Who were they saying that to?

9    A    I don't know.  I didn't see the person.

10    Q    You didn't see anybody?

11    A    No.  There was only one person in -- in the patio.

12    Q    There was a person in your patio?

13    A    Yes.

14    Q    Did you live there alone at that time?

15    A    Yes.

16    Q    Describe the person in the patio.

17    A    Well, he was -- he looks like Mexican.

18    Q    Okay.

19    A    And he was sitting in the corner of my patio on a

20    rock, and --

21    Q    What did you see?

22    A    I saw him playing with the gravel (indicating).

23    So -- but when I -- when he saw me, he said to, "Shhh.

24    Don't say nothing."

25    Q    So the witness --

1              MR. MUEHLECK:  The record should reflect the

2    witness put her finger up to the mouth as if to say what,

3    "Shhh."

4              THE WITNESS:  "Don't say nothing."

5              THE COURT:  The record will so reflect.

6    BY MR. MUEHLECK:

7    Q    What happened then, Miss Awong?

8    A    So then the officers, I guess they saw me look, you

9    know, that way, and they looked over the fence and they

10   saw him.

11   Q    Now, you said the officers had guns?

12   A    Yes.

13   Q    What were they doing with the guns?

14   A    Pointing to someone that was hanging on the patio.

15   Q    Where in relationship to your apartment was this

16   patio?

17   A    It's right above mine.

18   Q    Above your patio?

19   A    Yes.  On the deck.

20   Q    So then you said the officers looked over and could

21   see.  Was there a fence there or something?

22   A    Yes, there's fence.

23   Q    How tall is the fence?

24   A    About five feet, yeah.

25   Q    Then what happened?

1    A    And then they looked over, and they took the guy out.

2    Q    Did they handcuff him?

3    A    Yeah.  They -- first, they said, "Get out" with the

4    guns, and then they told --

5    Q    They what, pointed guns at him?

6    A    Yeah, to get out.  Then he went out.  But there was a

7    person still up on the deck, saying, "Come down.  Come

8    down."

9    Q    The police said that?

10   A    Yes.  And then finally they got him down.  And after

11   that there was an officer that came in my house.

12   Q    A police officer?

13   A    Yes.

14   Q    What did he do?

15   A    He wanted to see my patio and -- because they took

16   the guy out.  And he asked me if there was -- if I saw him

17   digging anything on the ground.  I said, "No, I didn't

18   see, but I saw him playing with the gravel."

19   Q    Okay.

20   A    So he said, "Do you mind if I go and look where he

21   was sitting?"  I said, "Yeah."  So he went, and he

22   found -- he dug in the gravel --

23   Q    The officer did?

24   A    Yes.  And there was a cell phone.

25   Q    Was that your cell phone?

 1   A    No.

 2   Q    Was there anybody living at your residence that had a

 3   cell phone back there?

 4   A    No.

 5        MR. MUEHLECK:  Approach the witness with exhibit

 6   14, Your Honor.

 7        THE COURT:  You may.

 8        THE WITNESS:  Looks like a small phone like

 9   this.

10   BY MR. MUEHLECK:

11   Q    Exhibit 14, Miss Awong, is that yours?

12   A    No.

13        THE WITNESS:  Offer 14 into evidence.

14        MR. BARBEE:  No objection.

15        THE COURT:  14's admitted.

16        MR. MUEHLECK:  A moment, please, Your Honor.

17        Pass the witness.

18        MR. BARBEE:  Yes, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. BARBEE:

21   Q    Good morning, Mrs. Awong.

22   A    Good morning.

23   Q    Back in December 2002 you lived at the Tamarack

24   Pines --

25   A    Yes.

1    Q    -- complex; correct?

2    A    Yes.

3    Q    And had you ever seen this man, Mr. Pagan, ever at

4    that apartment complex?

5    A    Not.  But I've seen him around town, but I've never

6    seen him there.

7    Q    Okay.  You've seen him around town in your

8    community --

9    A    Yeah.

10   Q    -- but you've never seen him at your apartment

11   complex?

12   A    (Shakes head.)  No.

13              MR. BARBEE:  No further questioning.

14              THE COURT:  Any redirect?

15              MR. MUEHLECK:  No, Your Honor.

16              THE COURT:  Thank you.  You're excused.

17              MR. MUEHLECK:  May I speak with the courtroom

18   deputy, Your Honor?

19              THE COURT:  You may.

20              MR. MUEHLECK:  Thank you, Miss Awong.

21              THE WITNESS:  You're welcome.

22        (Witness excused.)

23        (Counsel and courtroom manager conferring.)

24              MR. MUEHLECK:  Agent Jones.

25              One moment, Your Honor.

1         (Counsel and case agent conferring.)

2              MR. MUEHLECK:  Your Honor, the United States

3    rests.

4              THE COURT:  All right.  I'll meet with counsel

5    at sidebar.

6         (At sidebar on the record:)

7              MR. BARBEE:  Yes, Your Honor.  At this time the

8    defense would request the court for judgment of acquittal

9    pursuant to Rule 29 of the Federal Rules of Criminal

10   Procedure.  We believe that, looking at the evidence in

11   the light most favorable to the government, that they have

12   failed to prove the elements of their case or present a

13   prima facie case.

14             THE COURT:  Mr. Muehleck.

15             MR. MUEHLECK:  Government's response is, in the

16   light most favorable to the United States, we have proven

17   the case very much so of conspiracy between this

18   individual and other individuals as to count 1 and

19   attempted possession of heroin as to count 2 and attempted

20   possession of cocaine as to count 3.  I think it's very

21   clear these things were coming for him.  He admitted this

22   package was coming for him.  By his own admission, he was

23   getting this package for $300 to take it to someplace

24   else.

25             THE COURT:  Well, I'm going to deny the motion.

1    I find that the government has established the evidence to

2    the point that the reasonable juror could find each of the

3    essential elements having been established beyond a

4    reasonable doubt.

5        (In open court on the record:)

6             THE COURT:  Mr. Barbee.

7             MR. BARBEE:  Yes, Your Honor.

8             May it please the court, counsel, and ladies and

9    gentlemen of the jury.  It's now the time for the defense

10   to put on its case.  They don't have to put on a case, but

11   I have elected to go ahead and put on a case.

12            The evidence in this case will show that Larry

13   Pagan did not knowingly participate in a Mexican drug

14   conspiracy to possess with intent to distribute heroin in

15   November of 2002 through July 2003, and that he is,

16   therefore, not guilty of count 1 of the indictment.

17            The evidence will show that Larry Pagan did not

18   knowingly attempt to possess with intent to distribute

19   heroin in July of 2003, and that he is, therefore, not

20   guilty of count 2 of the indictment.

21            The evidence will show that Larry Pagan did not

22   knowingly attempt to possess with intent to distribute

23   cocaine in July of 2003, and that he is, therefore, not

24   guilty of count 3 of the indictment.

25            The evidence will show that Larry Pagan is a

1    naive, trusting person, born and raised on the Big Island

2    here in Hawai'i, and that he's the type of person that's

3    easily taken advantage of.

4          The evidence will show that in some time of 2002

5    Mr. Pagan was working in Hilo doing construction,

6    carpentry-type work, which is his trade.  That he resided

7    at the same time he was working in Hilo on a farm in a

8    rural area near Kamuela.

9          That he was introduced to a person who had been

10   stranded on the roadside, and that he entered into an

11   agreement with this person for this person to watch over

12   Mr. Pagan's farm and his animals, his dog, his chickens,

13   his peacock, at the farm, to feed the animals and take

14   care of the animals, while Mr. Pagan was in Hilo working.

15   And that Mr. Pagan would come home to the farm once or

16   twice a week when he wasn't working.  But it's about an

17   hour and 15 minutes compute between the farm and where

18   Mr. Pagan was working in Hilo.

19         That during this time period where this person,

20   who the evidence will show his name is Tito, that during

21   this time Tito, in addition to taking care of Mr. Pagan's

22   animals, also had other individuals, unbeknownst to

23   Mr. Pagan, over to the farm in Kamuela.

24         The evidence will show that Mr. Pagan also in

25   showing so much aloha to people, trying to help them out,

1    also would lend his phone to Tito.  And the evidence will

2    show that a Mrs. Diederiks, Mr. Pagan's sister, older

3    sister, confronted Mr. Pagan and told him, "Hey, you

4    cannot be lending your phone, you cannot be trusting these

5    people blindly."

6            And that she also came to the farm -- which,

7    actually, she's the lessee of this farm, and she let's

8    Mr. Pagan stay at her farm.  That she came to the farm,

9    and she thought Tito was all right, but she saw some other

10   people that appeared to be Mexican people there with Tito

11   when Larry wasn't there.  And that she got upset and she

12   kicked them off the property.

13           So at the end of the case, I'll be coming before

14   you again.  I'll be asking you to render your unanimous

15   verdicts as to count 1, not guilty; as to count 2, not

16   guilty; as to count 3, not guilty.

17           Thank you very much.

18           THE COURT:  Thank you.  And your first witness,

19   Mr. Barbee?

20           MR. BARBEE:  Yes.  If I may, Your Honor.

21           THE COURT:  You may.

22           MR. BARBEE:  Your Honor, the defense calls

23   Fernando Salas to testify in this matter.

24           THE CLERK:  Please raise your right hand.

25           (Witness sworn.)

1              THE CLERK:  Please be seated.

2              THE WITNESS:  Thank you.

3              THE CLERK:  Please state your name and spell

4    your last name.

5              THE WITNESS:  S-A-L-A-S.  First name is

6    Fernando.

7                    <u>DIRECT EXAMINATION</u>

8    BY MR. BARBEE:

9    Q    Mr. Salas, do you know Mr. Pagan -- a Mr. Pagan?

10   A    Yes, I do.

11   Q    And is he here in the courtroom?

12   A    Yes, he is.

13   Q    Could you describe him by telling us what he's

14   wearing and where he's seated.

15   A    He's seated on your right -- on my right-hand side

16   (pointing) on the table.  He's dressed with a yellow shirt

17   with a blue color I can see.

18   Q    And how long have you known Mr. Pagan?

19   A    Around 30 years, 28, something like that.

20   Q    And where do you live?

21   A    I live in Hamakua Coast and Honoka'a.

22   Q    On the Big Island?

23   A    On the Big Island.

24   Q    And what do you do for a living?

25             THE COURT:  Excuse me.  I just want to mention

1    for the record that Mr. Salas has identified the

2    defendant.

3            MR. BARBEE:  Thank you, Your Honor.

4    Q    And what do you do for a living?

5    A    I'm currently employed by the company name Robert

6    Baughman.  And other than that, I'm a handy person as

7    self-employed.

8    Q    And what -- your employer, what do you do for your

9    employer?  What type of work do you do?

10   A    Right now I'm doing forming, carpentry forming for

11   concrete.

12   Q    Okay.  And you indicated -- how long have you resided

13   on the Big Island?

14   A    30 years.

15   Q    30 years?

16   A    (Nods head.)

17   Q    Directing your attention to -- well, let me -- do you

18   know where Mr. Pagan resides?  Where does he live?

19   A    He lives in Waimea.

20   Q    And what type of residence does he live at?

21   A    He lives in a farm.  He was on the farm when I met

22   him.  And he still lives in a farm in Waimea.

23   Q    Directing your attention now to the year 2002, did

24   there come a time where you assisted a stranded motorist?

25   A    Yes.

1    Q    Could you tell us what happened with assisting this

2    person.

3    A    I was traveling on Highway 19, and there was a person

4    pushing a car, obstructing traffic, and I was coming along

5    and helped him.  He was insistent on getting the car

6    started.  I troubleshooted the car -- I'm also an auto

7    mechanic -- and help him push the car.  And on the course

8    of troubleshooting the car and talking to him --

9    Q    Okay.  Let me stop you right there.  Where -- where

10   was his car -- where was this person pushing the car in

11   relation to Mr. Pagan's farm?

12   A    I can say about a hundred feet from a gate that is

13   Mr. Pagan farm.  And we push the car.  And, apparently, he

14   spoke English and Spanish.  We talk in Spanish.

15   Q    Where are you originally from?

16   A    I'm originally from Columbia, South America.

17   Q    And you speak Spanish.

18   A    And I speak Spanish.

19   Q    And this individual who was stranded, he spoke

20   English and Spanish?

21   A    Yes, he -- he spoke better Spanish than English but.

22   Q    Okay.  And --

23           MR. BARBEE:  If I could approach, Your Honor,

24   the witness with a couple of exhibits.

25           THE COURT:  You may.

1  BY MR. BARBEE:

2  Q    Mr. Salas, I'd ask you to look at all three exhibits,

3  and first directing your attention to exhibit A, as in

4  Adam.

5  A    (Witness indicating.)

6  Q    Do you recognize who or what is depicted in that

7  exhibit?

8  A    This is the guy that was stranded on the side of the

9  road named -- by name Tito.

10  Q    Tito?

11  A    Uh-huh.

12        MR. BARBEE:  Your Honor, we'd offer exhibit A

13  into evidence.

14        MR. MUEHLECK:  No objection.

15        THE COURT:  A is admitted.

16  BY MR. BARBEE:

17  Q    I'd ask you now to look at exhibit B.  Do you

18  recognize what's depicted in that exhibit?

19  A    I recognize the house.

20  Q    And whose house or what house do you recognize that

21  as being?

22  A    This is Larry -- Mr. Larry Pagan.

23  Q    Is that the house you've referred to as the farm?

24  A    Right.

25  Q    And how about exhibit C?

1    A    It's look like the same place.

2    Q    Mr. Pagan's farm?

3    A    Yes.

4         MR. BARBEE:  Your Honor, we'd offer B and C into

5    evidence at this time.

6         MR. MUEHLECK:  Could I ask a couple of voir-dire

7    questions, Your Honor?

8         THE COURT:  You may.

9                   VOIR DIRE EXAMINATION

10   BY MR. MUEHLECK:

11   Q    Have you been there before, where B is?

12   A    Not that I remember.  If I not mistaken, I been there

13   before, but I not sure if prior to his acquaintance with

14   Mr. Tito.

15   Q    Okay.  But you've been there before.

16   A    Yes, I have.

17   Q    How many times?

18   A    I say about three times.

19   Q    Okay.

20        THE COURT:  Any objection?

21        MR. MUEHLECK:  No, Your Honor.

22        THE COURT:  B and C are admitted.

23        MR. BARBEE:  Your Honor, could I publish A, B,

24   and C to the jury at this time?

25        THE COURT:  You may.

1          (Exhibits published to the jury.)

2                    DIRECT EXAMINATION (Resumed)

3    BY MR. BARBEE:

4    Q    Mr. Salas, after you assisted Tito in pushing his

5    vehicle -- his disabled vehicle to the side of the road,

6    did -- can you tell us whether or not you saw Mr. Pagan.

7    A    Yes.  Then Mr. Tito spoke about different things:

8    about starting a business, finding a job, employment

9    agency business.  And then Mr. Larry coming down up, and

10   we say hi.  He came into us, and he was introduced to

11   Tito.  And then I left.

12   Q    Okay.  So after pushing the car to the side of the

13   road Mr. Pagan came down --

14   A    Right.

15   Q    -- from the farm, you waved to him, and Mr. Pagan was

16   introduced to Tito.

17   A    Right.

18   Q    And Tito had talked about getting employment and

19   things like that.

20   A    Yeah.  He start -- he talk about starting his own

21   employment agency.

22   Q    And after Mr. Pagan was introduced to Tito, you then

23   left the area.

24   A    Yes.  I did.

25   Q    And when you left, was Mr. Pagan talking with Tito?

1    A    I assume they stayed and talked.  I not sure what

2    happened then.  I just left.  I was in a hurry.

3    Q    Okay.

4         MR. BARBEE:  No further questions of this

5    witness, Your Honor.

6         THE COURT:  Mr. Muehleck.

7                    CROSS-EXAMINATION

8    BY MR. MUEHLECK:

9    Q    You were speaking Spanish with Tito?

10   A    Yes, sir.

11   Q    Did he tell you he was from Mexico?

12   A    Yes.

13   Q    And you said he was talking about starting an

14   employment business?

15   A    Yes.

16   Q    And you were with him what, half an hour, 20 minutes

17   or so?

18   A    I say about 15 minutes.  His car was not going

19   anywhere.  It was electrical.  The overcharge was foaming.

20   Q    You knew talking to Tito that he was involved in drug

21   dealing?

22   A    No, sir.

23   Q    You yourself have -- know about drug dealing, don't

24   you?

25   A    I was around in the past.  In an incident.

```
1   Q    You were around in the past in an incident, sir?

2   A    I was arrested.

3   Q    For what, drug dealing?

4   A    No, sir.

5   Q    Weren't you convicted of manufacturing and

6   distributing cocaine?

7   A    I was convicted, but I was not manufacturing or

8   distributing.

9        MR. BARBEE:  Your Honor, I'm sorry to interrupt,

10  but I believe that this is improper cross and --

11       THE COURT:  Let's have a sidebar.

12       (At sidebar on the record:)

13       MR. MUEHLECK:  I have given Mr. Barbee notice

14  through my letter last week that I would -- I have given

15  Mr. Barbee notice in writing last week that, if this

16  defendant was called as a witness, potentially I would go

17  into Rule 609 and ask him about his conviction.  He has

18  said he was involved or there was an incident.  It is more

19  than an incident, Your Honor.  He was convicted, and he

20  admitted he was convicted before, the previous case.  Here

21  he'd just like to say --

22       THE COURT:  1988.

23       MR. MUEHLECK:  He said he was around.  It was

24  '88, but there was -- I believe it was actually '90, Your

25  Honor.  I think it was '90.
```

1          THE COURT:  It came out in the last trial as

2     1988.

3          MR. MUEHLECK:  The point I have is I filed --

4     I've given Mr. Barbee a chance to do something about this,

5     to block this, to raise this.  He has not.  My

6     cross-examination of this witness is fair.  He has said it

7     was just an incident where he was around.  He was much

8     more than around.  He was convicted of this, Your Honor.

9     That's fair cross-examination, based upon his answers.

10          MR. BARBEE:  Your Honor, this is law of the

11     case.  The court ruled against Mr. Muehleck at the last

12     trial, said this was uninadmissible, struck it, told the

13     jury to disregard it entirely.  It's older than 10 years.

14     And Mr. Muehleck, if he wanted to get the court to change

15     its mind from last -- last proceeding, he could have done

16     so, but he chose not to.  Again, he's springing it on the

17     court and on the defense, and it's improper.

18          The court ruled last time it's inadmissible.

19     I'd ask that the court instruct the jury they're to

20     disregard this testimony entirely.  And, alternatively, I

21     think, you know, perhaps a mistrial might be in order.

22          MR. MUEHLECK:  Rule 609 says, if I give the

23     defendant notice of this -- first of all, it's not of the

24     defendant.  It's a witness.  I've given him notice of

25     this.  The court ruled last time he didn't have notice, it

1    was not fair because he didn't have notice, and there was

2    no -- and the balancing was off based upon that.

3        Here we've gone into the same situation where he

4    said he was around something, there was an incident where

5    he was around.  He's clearly not just around, Your Honor.

6    He was convicted of this, and it's not something --

7        THE COURT:  Well, I mean that was something you

8    deliberately brought up.  It wasn't something that came in

9    otherwise.

10        MR. MUEHLECK:  Well, we've started out here,

11    Your Honor, saying that, you know, the defendant is a

12    trustworthy guy, is naive.  Here's a man that we believe

13    we have a right to question his credibility and question

14    his answers.  His answer about being involved in drugs was

15    he was around some incident.

16        Then it was -- he finally said, well, he was

17    something -- he finally said -- I think he said he was

18    arrested, but he didn't admit what it was until I asked

19    him.

20        Now, I've given the defense notice of this under

21    the rule.  I followed the rule.  The defense was aware I

22    was going to go into this.  I sent this to them last week,

23    Friday, Your Honor, by fax, detailing what it is, as my

24    exhibit shows.  This is not a mistrial.  This is fair

25    cross-examination.

1          I've not referred to the defendant.  It's as to

2     this fella and what he realized.  He has a knowledge of

3     Tito being involved, I submit, more than just some, you

4     know, employment opportunities and a guy from Mexico.  He

5     spoke Spanish with him, and this jury has a right to know

6     about the cross-examination and this man's background.

7     That's relevant.

8          He was not just around an incident; he was

9     convicted for possessing -- excuse me.  Distributing and

10    manufacturing cocaine and marijuana that was in his wife's

11    house.  He has said he's lived here for 30 years.  His

12    wife was in Nebraska.  He hasn't lived here for 30 years,

13    or, if he has, he has two residences because he was back

14    at that place, and he was convicted of that and served

15    time in a penitentiary in Nebraska for that.  This is fair

16    cross-examination.

17         MR. BARBEE:  If the court can give me a moment,

18    I can get the transcript from the last proceeding.

19         MR. MUEHLECK:  Certainly.  Fine.

20         MR. BARBEE:  I think the court ruled clearly

21    against Mr. Muehleck on the same -- very same arguments.

22         THE COURT:  I am going to rule under 609 and

23    403, balancing the factors, balancing the probative value,

24    it's unfair prejudice, that this conviction is more than

25    10 years old.  This witness was simply called to establish

1    that he had met Mr. Tito on the road and they had a

2    conversation, and Mr. Pagan joined the conversation.  It

3    had nothing to do with any background other than that.

4         And I'm going to disallow this under 609 and

5    402.  I find that it's substantially more prejudicial --

6    unfairly prejudicial than giving any probative value,

7    being that old.  And I'm going --

8         MR. MUEHLECK:  Does the court -- Your Honor,

9    does the court find that Mr. Barbee did have notice of

10   this through my letter?

11        THE COURT:  Pardon me?

12        MR. MUEHLECK:  Does the court find that

13   Mr. Barbee did have notice of this through the letter I

14   faxed to him?

15        THE COURT:  I think he admits it.

16        MR. BARBEE:  Yes, Your Honor.  I had notice even

17   from the last proceeding.

18        THE COURT:  Pardon me?

19        MR. BARBEE:  I had notice even from the last

20   proceeding what he did the same thing last time.

21        THE COURT:  It requires written notice.

22        MR. MUEHLECK:  But I did require -- this is a

23   written notice.

24        THE COURT:  No, I understand.

25        MR. MUEHLECK:  Okay.

```
 1              (In open court on the record:)

 2              THE COURT:  The court is going to strike any

 3    reference to Mr. Salas having been arrested or convicted

 4    dealing in drugs or manufacturing drugs, and I'm

 5    instructing the jury to disregard that, don't consider

 6    that at all as ever having -- as your ever having heard

 7    about it.  You're to totally disregard that.

 8              Please proceed, Mr. Barbee.

 9              MR. MUEHLECK:  Mr. Muehleck, Your Honor.

10    Q    Mr. Salas, do you have a cell phone?

11              THE COURT:  Oh, I'm sorry.

12    BY MR. MUEHLECK:

13    Q    Do you have a cell phone, sir?

14    A    I use my friend one's, my girlfriend one.  I don't

15    have one.

16    Q    When -- when is the last time you saw the defendant,

17    Mr. Pagan?

18    A    Last time.  He's been Kona side on the jobsite as a

19    roofer.  I'm on the company Robert Baughman on Kuki'o and

20    in Hapuna Prince.  The same time the company -- the

21    roofing company has come to that Hapuna Prince.

22    Q    You saw him through the job, you mean through

23    employment?

24    A    I saw him on the jobsite.

25    Q    When was the last time you talked to him?  That was
```

```
 1   the last time?

 2   A    Last time I talked to him was this morning.

 3   Q    Well, prior to that.

 4   A    Prior to that, last week.

 5   Q    Where?

 6   A    On the jobsite.

 7   Q    Okay.  And prior to last week, when was the last

 8   time?

 9   A    (Shakes head.)

10   Q    You're shaking your head.  You don't remember or

11   what?

12   A    I seen him couple times, but I not sure exactly when.

13   Q    What was the girlfriend's cell phone you used?

14   What's that number?

15           MR. BARBEE:  Your Honor, I'm going to object.

16   It's way beyond the scope of the direct examination.

17           MR. MUEHLECK:  I think it's fair.  When he's

18   seen and how long he's known him, Your Honor, and how

19   often they have contact.

20           MR. BARBEE:  What has his cell phone got to do

21   with anything?

22           THE COURT:  I'll allow this one question, but it

23   does seem like you're stretching the scope, Mr. Muehleck.

24   BY MR. MUEHLECK:

25   Q    What's that cell phone number of your girlfriend that
```

```
 1   you use, please.

 2   A     It's 987-0663.

 3   Q     987 --

 4   A     -- 0663.

 5   Q     7663?

 6   A     Zero.

 7   Q     Zero --

 8   A     (Nods head.)

 9   Q     -- 663.

10   A     Right.

11   Q     987-0663?

12   A     Uh-huh.

13   Q     And did you see Tito up there after you dropped him

14   off?  Did you ever go by and see Tito there?

15   A     No, sir.

16   Q     So you don't know if Tito was there after that or

17   not?

18   A     No, sir.

19             MR. MUEHLECK:  Moment, please, Your Honor.

20             No further questions.

21             MR. BARBEE:  No redirect, Your Honor.

22             THE COURT:  Thank you.  You're excused.

23             MR. BARBEE:  Our next witness -- you're excused,

24   Mr. Salas.

25             THE WITNESS:  Thank you.
```

1              MR. BARBEE:  Thank you.

2         (Witness excused.)

3              MR. BARBEE:  Our next witness, Your Honor, would

4    be Violet Diederiks.

5              MR. MUEHLECK:  May we have a sidebar first, Your

6    Honor, please?

7              THE COURT:  All right.

8         (At sidebar on the record:)

9              MR. MUEHLECK:  Could I have my agent come

10   forward, too, Judge?

11             THE COURT:  Huh?

12             MR. MUEHLECK:  Could I have my agent come

13   forward here, Judge?

14             THE COURT:  Why?

15             MR. MUEHLECK:  He said -- he said that Miss

16   Awong was at the cafeteria this morning and saw juror

17   number 11 having breakfast with the next witness,

18   believes --

19             THE COURT:  Juror number 11?

20             MR. MUEHLECK:  Juror number 11 having breakfast

21   with the next witness.  And that's what Hazel Awong, our

22   witness, told the agent.  That's why -- he talked to her.

23   I don't know.  I wanted to have him come forward and tell

24   us what this is.  I sent him outside the room to make sure

25   it was correct.

1            THE COURT:  Have him come forward later.

2            MR. MUEHLECK:  All right.  Miss Awong said that

3  juror number 11, she believes, is related to Mr. Barbee's

4  client's sister or knows of her, and they had breakfast

5  together or something like that.  They had breakfast

6  together in the cafeteria.

7            THE COURT:  Today?

8            MR. MUEHLECK:  Do you know that?

9            MR. BARBEE:  I know that you are totally

10  mistaken.  There's a witness that somewhat resembles juror

11  11, who is a defense witness, that was having breakfast

12  with Mrs. Diederiks.

13            MR. MUEHLECK:  Is that sure?

14            MR. BARBEE:  Yes.

15            MR. MUEHLECK:  That's why I wanted --

16            MR. BARBEE:  Mrs. Salinas appears physically

17  similar to juror number 11, but they're not the same

18  people.

19            MR. MUEHLECK:  Okay.  That's fine.  You saw them

20  together?  You were there?

21            MR. BARBEE:  Yes.

22            MR. MUEHLECK:  Okay.  That's fine.  I'll accept

23  that.

24            THE COURT:  Okay.

25            MR. MUEHLECK:  Thank you.

1          THE COURT:  I'm following along with my notes

2    from the last trial on this what I reviewed then.  And I

3    reviewed my ruling on Mr. Salas' 609 and 403 last night

4    and earlier today, and I've also reviewed the testimony of

5    Miss Diederiks and Natalie.  So let's proceed.

6          MR. MUEHLECK:  Thank you.

7      (In open court on the record:)

8          THE COURT:  Please proceed, Mr. Barbee.

9          MR. BARBEE:  Thank you, Your Honor.

10          Again, the defense calls Violet Diederiks.

11          THE CLERK:  Please raise your right hand.

12      (Witness sworn.)

13          THE CLERK:  Please be seated.  Please state your

14    name and spell your last name.

15          THE WITNESS:  I'm Violet Diederiks, and my last

16    name is spelled D-i-e-d-e-r-i-k-s.

17                    <u>DIRECT EXAMINATION</u>

18    BY MR. BARBEE:

19    Q    Good morning, Mrs. Diederiks.

20    A    Good morning.

21    Q    Do you know Mr. Larry Pagan?

22    A    Yes.  He's my baby brother.

23    Q    And do you know where he lives?

24    A    Yes.  He lives on my property.

25    Q    And in 2002, 2003 did he live on your property?

1    A    Yes.

2    Q    Where is your property?

3    A    In Kamuela.

4    Q    I'd ask you to look at exhibits in front of you B and

5    C.  Do you recognize what's shown --

6    A    Yes.  That's the place.

7    Q    And now directing your attention to the year 2002 and

8    2003, did there come a time where your brother was working

9    in Hilo?

10   A    Yes.

11   Q    And did you become aware of a person living on your

12   property that your brother lived at?

13   A    Yes.  My brother told me about it, and I used to go

14   up and check, make sure that things was running smooth.

15   Q    And why was -- did your brother have a person living

16   at his -- at your farm in Kamuela?

17        MR. MUEHLECK:  Well, I'm going to object if it

18   calls for hearsay.  At least without foundation at this

19   point.

20        MR. BARBEE:  I can build some more foundation.

21   Q    Did you personally meet the individual who was

22   residing at the Kamuela farm?

23   A    Yes.

24   Q    And did he have a name?

25   A    Tito.

1   Q    Tito?

2   A    (Nods head.)

3   Q    I'd ask you to look at exhibit A, which is in

4   evidence now, and indicate if you recognize who or what is

5   shown in exhibit A.

6   A    That's Tito.

7   Q    And when you saw and met Tito, where did you see --

8   where did you see him?

9   A    I met him at the farm because I used to go up and

10  check.

11  Q    And why would you go up and check?

12  A    Just to make sure that if he was the only one staying

13  there while my brother was gone and to make sure that he

14  was taking care of the things that he supposed to be

15  taking cared of.

16  Q    What was he supposed to be taking care of?

17  A    Feed the animals --

18        MR. MUEHLECK:  I'm going to object here, unless

19  there's more foundation.  If it's calling for hearsay what

20  the brother said, instructions, then that's hearsay.  If

21  she knows of her own personal knowledge, then that's fine,

22  Your Honor.  But without more foundation how does she

23  know?

24        THE WITNESS:  Can I say something, please?

25        MR. BARBEE:  No, you cannot.  Just wait for

1    Judge Kay.  I appreciate it.  Thanks.

2               THE COURT:  Well, please proceed, Mr. Barbee.

3               MR. BARBEE:  Thank you.

4               THE COURT:  I don't want hearsay, though.

5               MR. BARBEE:  Yes, Your Honor.

6    Q    Were you personally aware of what Tito was supposed

7    to be doing at the farm or what his duties were?

8    A    Of course, I was.

9    Q    Was it your farm?

10   A    Yes.

11   Q    Okay.  What was his duties supposed to be?

12   A    His duty was to take care of the chickens, make sure

13   that they get fed because you have to feed them.

14   Otherwise, they going to die; right?

15   Q    And your brother at this time was in Hilo.

16   A    He was working in Hilo.  So he knew Tito, and he

17   asked Tito if Tito would -- hearsay.

18               MR. MUEHLECK:  Objection.

19               MR. BARBEE:  Hold on.

20               MR. MUEHLECK:  Yes, my objection is hearsay,

21   Your Honor.

22               THE COURT:  I'll sustain the objection.

23   BY MR. BARBEE:

24   Q    Okay.  Let's move on.  Did there come a time when on

25   one of your trips to the farm to check on the farm that

1    you became upset with something?

2    A    I went -- I went up one day to check, and then there

3    wasn't only Tito.  There was another guy there.  And I

4    told Tito, "Tito, you're supposed to be here by yourself.

5    Nobody else is supposed to be here.  And that was how it

6    was supposed to be done."  And he said, "Oh, okay."

7            So I just let it go.  And then I went back again

8    to check, and then there was Tito and there were a few

9    other more.  So I told Tito, "You have to get out of

10   here."

11   Q    Okay.  So you came up to the farm, and Tito had other

12   people there at the farm --

13   A    Yes.

14   Q    -- with him.  And you eventually kicked -- kicked him

15   off the property.

16   A    Yes.  I told them they had to get off of my property.

17   Q    Okay.  Did there come a time also during this same

18   time frame, 2002, 2003, where you attempted to contact

19   your brother through his cellular phone number?

20   A    Yes.

21   Q    And could you tell the jury if anything strange

22   happened.

23   A    I called my brother's phone, and Tito answered.  So I

24   said, "Tito, what are you doing with my brother's phone?"

25   He said, "Oh, Larry loan it to me because I don't have a

1    phone."  I said, "Well, you need to give back my phone --

2    the phone to my brother because you're not paying for the

3    bill.  That phone belongs to him."

4    Q    Can you tell us if this is something -- tell us if

5    your brother is a generous person.

6    A    I think at times he's a little bit too generous, but

7    that -- that was how we was raised; right?  To help people

8    when they need help.  That's how my parents raised us.

9    And sometime he is too kind-hearted; so he has to learn

10   and not be as kind as he wants to be.

11   Q    Okay.  Thank you.

12        MR. BARBEE:  I have no further questions.  Thank

13   you.

14        THE COURT:  Mr. Muehleck.

15        MR. MUEHLECK:  Yes, please, Your Honor.

16                    CROSS-EXAMINATION

17   BY MR. MUEHLECK:

18   Q    Miss Diederiks, your brother have a girlfriend?

19   A    I guess so.

20   Q    Her name was Lillian Salinas?

21   A    Uh-huh.

22   Q    You said you contacted -- you called and Tito

23   answered the phone?

24   A    Uh-huh.

25   Q    When was this, please?

1    A    Gee, it's been a long time.  I really don't know

2    exactly the date or the time.

3    Q    Did you call what, from your residence when you --

4    Tito answered the phone?

5    A    Yes.

6    Q    And you lived in Nani Waimea?

7    A    Uh-huh.

8    Q    And this happened how many times that Tito answered

9    the phone?

10   A    I think about two times.  I'm not too sure.

11   Q    Do you have a cell phone?

12   A    Yes, I do.

13   Q    What was your cell phone number at that time 2002,

14   2003?

15   A    989-5008.  It's been like that for the past three

16   years.

17   Q    Okay.  989 --

18   A    -- 5008.

19   Q    5008.  And you believe it was your residence that you

20   called and Tito answered the phone.

21   A    I'm pretty sure.

22        MR. MUEHLECK:  A moment, please, Your Honor.

23        38.  I think so.  Next in order 38, Miss Miwa.

24        THE CLERK:  Okay.  Just a second.

25        MR. MUEHLECK:  I think so.  I have 38.

```
 1              THE CLERK:  38.

 2              MR. MUEHLECK:  38 to Mr. Barbee.

 3              Approach the witness, Your Honor?

 4              THE COURT:  You may.

 5    BY MR. MUEHLECK:

 6    Q    Would you look at 38, please, ma'am.  Is that Lillian

 7    Salinas?

 8    A    Yes, it is.

 9    Q    And her middle name is Momi'ala?

10    A    I really don't know.

11    Q    But that's the picture that you're looking at is

12    Lillian Salinas?

13    A    Uh-huh.

14    Q    And your residence phone number, ma'am, that you

15    think that you called to your brother's cell phone and

16    Tito answered, what was that residence phone number in

17    2002 or 2003?

18    A    885-4889.

19    Q    885 --

20    A    -- 4889.

21    Q    4889.  Did your brother have more than one cell

22    phone?

23    A    No.

24    Q    Did he change numbers?

25    A    I don't remember.
```

1    Q    Why is it you didn't want other people up at the

2    property?  At the farm?

3    A    Because I don't want any strangers up there because I

4    have the lease, and I don't want to be responsible for

5    anything that goes around.  So that's why I put all of

6    them out of my property.

7    Q    And who gave Tito the instructions on what work to

8    do?

9    A    Now, if I answer that, that's hearsay.

10   Q    Well, I guess my question is you didn't give the

11   instructions, did you, to Tito?

12   A    No.

13   Q    So you really don't have any personal knowledge of

14   what Tito's instructions were, do you, ma'am.

15   A    I know more, but then, like I said, that's hearsay.

16           MR. MUEHLECK:  I'll retrieve the exhibit, Your

17   Honor.  I don't have any more questions of Miss Diederiks.

18           THE COURT:  Any redirect?

19           MR. BARBEE:  Just very briefly.

20                     REDIRECT EXAMINATION

21   BY MR. BARBEE:

22   Q    Mrs. Diederiks, your brother's girlfriend Lillian,

23   does she have a nickname?

24   A    We call her Boxy, but sometime I call her Foxy.

25   Q    Foxy or Boxy.

1    A    They call her Boxy.

2    Q    And in 2002 or -- excuse me.  In 2003 do you know

3    whether or not she had made a trip to Mexico?

4    A    She --

5         MR. MUEHLECK:  Objection.  Without foundation at

6    this point.

7         THE WITNESS:  Check the airline tickets.

8         MR. BARBEE:  I'm asking if she knows, Your

9    Honor.

10        MR. MUEHLECK:  Well, it may ask for hearsay,

11   then, if we're going to get into what someone was told.

12        THE WITNESS:  Well, that can be easily

13   corrected.

14        THE COURT:  Just a minute.

15        MR. BARBEE:  Hold off.  Hold off.

16        THE COURT:  She knows of her own personal

17   knowledge.

18        MR. MUEHLECK:  Well, without having hearsay, and

19   there's no foundation at this point.  That's my objection.

20        THE COURT:  Better lay a foundation, Mr. Barbee.

21        MR. BARBEE:  Well, I guess it would be hearsay,

22   Your Honor; so I'll withdraw the question.

23        Thank you, Mrs. Diederiks.

24        THE WITNESS:  You're welcome.

25        MR. MUEHLECK:  One follow-up, if I might, Your

1    Honor, one question.

2              THE COURT:  All right.

3                    RECROSS-EXAMINATION

4    BY MR. MUEHLECK:

5    Q    When did you kick Tito off the property?

6    A    It's been such a long time.  I mean, I don't exactly

7    remember what month, what day, what time.

8    Q    What year?

9    A    Even that I don't remember.  And I'm being honest.  I

10   don't remember.

11             MR. MUEHLECK:  I have nothing further, Your

12   Honor.

13             THE COURT:  Mr. Barbee.

14             MR. BARBEE:  No further questions of this

15   witness, Your Honor.

16             THE COURT:  Thank you.  You're excused.

17       (Witness excused.)

18             THE COURT:  Next witness.

19             MR. BARBEE:  Yes, Your Honor.  We'll call Frank

20   Torres.

21             THE CLERK:  Please raise your right hand.

22       (Witness sworn.)

23             THE CLERK:  Please be seated.  Please state your

24   name and spell your last name.

25             THE WITNESS:  Frank Torres, T-o-r-r-e-s.

```
 1                    DIRECT EXAMINATION

 2   BY MR. MUEHLECK:

 3   Q    Good morning, Mr. Torres.

 4   A    Good morning.

 5   Q    Do you know Mr. Larry Pagan?

 6   A    Yes.

 7   Q    Is he present here today?

 8   A    Yes.

 9   Q    Could you describe him.

10   A    He's the gentleman in the side of you (indicating) in

11   the back.

12   Q    What is he wearing?  What type of clothes is he --

13   A    He has a shirt with cars on it.

14            MR. BARBEE:  Your Honor, may the record reflect

15   that Mr. Torres has identified Mr. Pagan.

16            THE COURT:  The record will so reflect.

17   BY MR. BARBEE:

18   Q    And how do you know Mr. Pagan?

19   A    He's my uncle.

20   Q    And do you know -- where do you work?

21   A    I'm the supervisor for Gold Coast Roofing.

22   Q    Gold Coast Roofing?

23   A    (Nods head.)

24   Q    And where is that located?

25   A    Kailua-Kona.
```

```
 1   Q    On the Big Island?

 2   A    On the Big Island.

 3   Q    And do you know if Mr. Pagan is employed?

 4   A    Yes, he is.

 5   Q    Where does he work?

 6   A    With Gold Coast Roofing.

 7             MR. MUEHLECK:  Could I have a time frame, Your

 8   Honor.

 9             MR. BARBEE:  Presently.  Presently.

10   Q    And where does he work presently?

11   A    He's working for Gold Coast Roofing.

12   Q    And what does he do?

13   A    He does everything that he has to do for the company.

14   Q    What types of --

15   A    We do roofing, waterproofing, carpentry, whatever

16   needs to be done.  Deliveries.

17   Q    And what is his -- if you know, what is his trade or

18   skill?  What does he do generally for a living?

19   A    Right now he's a roofer.  He also went to college to

20   be a carpenter.  He does carpentry.

21   Q    And how long have you known Mr. Pagan?

22   A    I'm 48 years old; so 48 years.

23   Q    And what type of person is he in terms of being a

24   trusting person or a skeptical person?

25   A    He comes to work every day.  He's dependable.  He's a
```

1    good worker.  Sick and all, he goes to work.  We're

2    hardworking people.

3    Q    And is he friendly to people?

4    A    Very friendly.  Jokey.

5    Q    And do you ever play jokes on your uncle?

6    A    Yeah, almost every day.  If I have -- if my day is

7    not too busy, I'll call his phone and play a couple cranks

8    with him.

9    Q    And is he the type of person that's easy to play

10   these pranks on?

11   A    Yeah, very easy.

12   Q    Why is that?

13   A    Because he'll fall for everything.

14   Q    He'll fall for everything.

15   A    (Nods head.)

16          MR. BARBEE:  No further questions of this

17   witness.

18          THE COURT:  Mr. Muehleck.

19                      CROSS-EXAMINATION

20   BY MR. MUEHLECK:

21   Q    Mr. Torres, when did the defendant start working for

22   Gold Coast Roofing?

23   A    He works there about three years now.

24   Q    Off and on?

25   A    No.  Full time.

1   Q     When you would call him and joke with him, what phone

2   would you call from?

3   A     My cell phone to his.

4   Q     What cell phone is that, please, sir.

5   A     My number?

6   Q     Please.

7   A     960-4878.

8   Q     960-4878?

9   A     ---78, yes.

10  Q     And you said you'd pretty much call every day and

11  joke with him?

12  A     Well, I'm the supervisor.  I got to check on the

13  workers.

14  Q     Okay.  And when you check on the workers, that would

15  be the same time you joke with him?

16  A     Yeah, during -- throughout the day, sometime early in

17  the morning as early as five o'clock.

18  Q     In 2003 would you be joking with him every day when

19  you'd check on the workers?

20  A     My character is I'm a joker.  I'll play cranks on him

21  and everybody else.  That's the kind of person I am.  I'll

22  sometimes send him to the wrong job, just to boil his

23  blood, and then tell him you're at the wrong job.  You

24  don't belong working there.

25  Q     What are the hours of work?  Gold Coast Roofing?

```
 1   A    7:00 to 3:30, sometime a little later.

 2   Q    Start earlier -- start earlier in the morning than a

 3   lot of people?

 4   A    Huh?

 5   Q    Do you start earlier in the morning than a lot of

 6   people; is that the normal hours?

 7   A    Yeah.  It's a workday, 7:00 to 3:30.

 8   Q    And if it's a rainy day, do you have other work for

 9   him to do?

10   A    For some people, yeah.

11   Q    And for Mr. Pagan?

12   A    Mr. Pagan, yeah, we usually send him to the shop, do

13   deliveries or -- to keep him busy.  He's one of the guys

14   that don't call in with excuses.  He shows up Monday

15   through Friday.

16   Q    Where's Gold Coast Roofing located, sir?

17   A    Kailua-Kona.

18   Q    And where is that in relationship to where the

19   defendant was living in 2003?

20   A    Where is the what?

21   Q    Okay.  Kailua-Kona you said is where Gold Coast

22   Roofing is.

23   A    Right.

24   Q    Do you know where Mr. Pagan, the defendant, was

25   living in 2003?
```

1    A    Up in Waimea.

2    Q    How far is that, for the record, between your shop,

3    Gold Coast Roofing --

4    A    32 miles.

5            MR. MUEHLECK:  Moment, please, Your Honor.

6            Pass the witness.  I have nothing further.

7    Thank you.

8            MR. BARBEE:  No further questions of Mr. Torres.

9            THE COURT:  Thank you.  You're excused.

10    (Witness excused.)

11            THE COURT:  Next witness.

12            MR. BARBEE:  Yes, Your Honor.  We'll call at

13    this time Natalie Pagan.

14            THE CLERK:  Please raise your right hand.

15    (Witness sworn.)

16            THE CLERK:  Please be seated.  Please state your

17    name and spell your last name.

18            THE WITNESS:  Natalie P-A-G-A-N.

19                    DIRECT EXAMINATION

20    BY MR. BARBEE:

21    Q    Good morning, Miss Pagan.

22    A    Morning.

23    Q    Do you know Larry Pagan?

24    A    Yes.  He's my dad.

25    Q    And is he present here in the courtroom?

1    A    Yes.

2    Q    And could you describe what he's wearing.

3    A    Aloha shirt with cars on it.

4         MR. BARBEE:  Your Honor, may the record reflect

5    the witness has identified her father.

6         THE COURT:  Very well.

7    BY MR. BARBEE:

8    Q    Directing your attention to 2003 did your father have

9    a girlfriend in 2003?

10   A    Yes.  And he's still with her now.

11   Q    And what is her name?

12   A    Lillian Salinas, but we call her Aunty Boxy.  That's

13   her nickname.

14   Q    And do you know whether or not in 2003 your father's

15   girlfriend took a trip to Mexico?

16        MR. MUEHLECK:  I'm going to object without

17   foundation at this point.  And may call for hearsay.

18        THE COURT:  Again, if she knows of her own

19   personal knowledge.

20   BY MR. BARBEE:

21   Q    Do you personally know whether or not she went --

22   A    Yes.

23   Q    Okay.  And did she?

24   A    Yes.

25        MR. MUEHLECK:  Well, still without foundation,

 1    Judge.

 2              MR. BARBEE:  Well, Your Honor, short of her

 3    getting on the plane and going with her --

 4              MR. MUEHLECK:  That's one way of doing

 5    foundation, but if the witness -- hasn't established the

 6    foundation yet, I submit.

 7    BY MR. BARBEE:

 8    Q    Did there come a time --

 9              MR. BARBEE:  I'll try some more, Your Honor.

10              THE COURT:  All right.

11    BY MR. BARBEE:

12    Q    Did there come a time where she went to the airport

13    and got on a plane and left the Big Island to go to

14    Mexico?

15    A    Yes.

16    Q    And also in the year 2000 --

17              MR. MUEHLECK:  I'm going to ask more follow-up

18    questions.  "Did you go to -- see her go to the airport?

19    How do you know?" is the foundation question, I submit.

20              MR. BARBEE:  I think we've laid adequate

21    foundation, Your Honor.

22              MR. MUEHLECK:  Same objection.

23              THE COURT:  I'll allow the answer.

24              MR. BARBEE:  Thank you, Your Honor.

25              THE COURT:  You can proceed on cross-examination

 1   on that, Mr. Muehleck.

 2           MR. MUEHLECK:  Yes, Your Honor.

 3   BY MR. BARBEE:

 4   Q     Directing your attention to 2003 still, did there

 5   come a time where the police raided your grandmother's

 6   house?

 7   A     Yes.

 8   Q     And what is your grandmother's name?

 9   A     Ayami Nagata.

10   Q     And where did you and your grandmother live in that

11   house that was raided?

12   A     We still live there now.  It's 459 Iwalani Street --

13   Q     And what --

14   A     -- in Hilo, Hawai'i.

15   Q     In Hilo.  Okay.  And did there come a time I guess

16   in July of 2003 that the police entered your grandmother's

17   house?

18   A     Yes.

19   Q     And could you tell the jury what were you doing right

20   before the police came into your grandmother's house?

21   A     Well, we just came home from summer school, and we

22   went shopping.  And I was in the bathroom, my brother was

23   in the bathroom, and my grandma was just in the house,

24   doing -- like, just cleaning and whatever she does.

25           And then I heard the dogs, like, barking; so I

1    looked out the window, and I saw this guy standing

2    outside.  So I walked -- I got a little scared because

3    that's not usual for someone to just pop up to our house,

4    you know.  So I put on my clothes, and then I walked

5    outside my aunty's room to the living -- I mean to the

6    hallway.  And then there were like six or seven guys

7    pointing guns at me with like this heavy duty equipment on

8    with, like, masks.  And they told me put my hands up.  So

9    I was, like, "Okay.  I don't know what's going on."  So I

10    put my hands up.  And then one of the guys --

11                THE COURT:  Let's not run this narrative on too

12    long.

13    BY MR. BARBEE:

14    Q    Miss Pagan --

15    A    Sorry.

16    Q    That's okay.  Right prior to or sometime prior to the

17    police raiding your grandmother's house, did you sign for

18    a box that came from, I guess, FedEx?

19    A    Yes.  Because my dad told me that he was expecting a

20    letter.

21                MR. MUEHLECK:  I'm going to object because we're

22    getting into hearsay now.

23                THE COURT:  Sustained.

24    BY MR. BARBEE:

25    Q    So you did sign for a box that had come right prior

1    to the police raiding the house?

2    A    Yeah, but I figured she's in Mexico; so, you know --

3              MR. MUEHLECK:   Again, that's nonresponsive, Your

4    Honor.   The witness is running on, and I'll object.

5              THE COURT:   Sustained.

6    BY MR. BARBEE:

7    Q    Okay.   Just relax a little bit, and I'm going to try

8    to direct you with my questions to, you know, shorter

9    answers.

10   A    Okay.   Sorry.

11   Q    That's okay.   Just relax as much as you can.

12             Let me go back, then, again, to when the police

13   entered the house.   And you described that -- I believe

14   you said six or seven had guns pointed at you?

15   A    Yes.

16   Q    And were you -- did they order you to do anything?

17   A    Just to put my hands up.   And step outside with them.

18   Q    And did there come a time where -- after you had put

19   your clothes on after the shower, did there come a time

20   where you were uncomfortable and wanted to change your

21   clothes?

22   A    Yeah.   Because I just came home from school, and I'm

23   used to just coming home and changing my clothes into

24   house clothes because there's things to do, you know.

25   So --

1   Q    Let me stop you right there.

2   A    Sorry.

3   Q    And when you wanted to change clothes, can you say

4   whether or not the police let you change your clothes in

5   private or not?

6   A    They didn't want me to change my clothes in private.

7   They had a guy stand by the door and watch me change my

8   clothes.

9   Q    And what, if anything, else did the police tell you

10  to do with regard, if anything, to your father?

11  A    They made me call my dad.  They had us in the room

12  for a long time in separate rooms, then they put us

13  together.  And then he -- he called me out of the room by

14  myself, and he told me that I have to call my dad.

15  Q    And who -- who told you that?

16  A    Some guy with a mustache, like a -- I think his last

17  name was -- starts with an F.  I forget.

18  Q    Okay.  One of the police officers?

19  A    (Nods head.)

20  Q    And in response to them ordering you to call your

21  dad, did you comply or cooperate with them?

22  A    I was scared; so I just did it.

23  Q    Okay.

24       MR. BARBEE:  No further questions, Your Honor,

25  at this time.

1              THE COURT:  Mr. Muehleck.

2                     CROSS-EXAMINATION

3    BY MR. MUEHLECK:

4    Q    Miss Pagan, you said officers -- six or seven guys

5    pointed guns at you?

6    A    Yes.

7    Q    Where were you when this happened in the house?

8    Where did this happen?

9    A    I just got out of the bathroom, and I walked to the

10   hallway because I saw a guy standing outside, and I was

11   going to go tell my grandma who was that.

12   Q    All right.  And you were where?  In the hallway when

13   they pointed guns at you?

14   A    I just finished going to the bathroom.  So it's my

15   aunty's room.  She has a bathroom in it.  So I walked out

16   into the hallway, and that's where I saw the guys pointing

17   guns at me.

18   Q    And there were six of them?

19   A    Six or seven.

20   Q    They were all pointing guns at you.

21   A    Yes.  Just like that.

22   Q    And where -- where were all these guys while you were

23   in the hallway?  Where were they when they were pointing

24   guns at you when you were in the hallway?  Describe where

25   they were, please.

1    A    In front of me in the hallway pointing guns at me.

2    Q    So six guys were in the hallway --

3    A    Six or seven.  I'm not sure how many guys were there,

4    but I know there were about six or seven guys pointing

5    guns at me.

6    Q    All right.  And they all pointed guns at you?

7    A    Yes.

8    Q    Where was your grandma at that time?

9    A    I don't know.  I can't answer that because I just

10   went outside, and -- well, my grandma told me they pulled

11   her outside.  So I didn't see my brother or my grandma at

12   that time.

13   Q    And you were wearing what?

14   A    Long pants and -- I don't know if it was a sweater or

15   a shirt.  I don't remember.  It was a really long time

16   ago.

17   Q    You had just taken a shower?

18   A    (Shakes head.)  Using the bathroom.

19   Q    Okay.  And -- but they were in the hallway one behind

20   the other or all in a group pointing guns?

21   A    My hallway is not that big; so they're, like, kind of

22   cluttered up together.  But they were, like, just pointing

23   their guns at me.  But there were about six or seven guys,

24   and they were all bunched up together.

25   Q    And they said what?  They said what, "put up your

1    hands"?

2    A    "Put your hands up."

3    Q    And what?  Did you raise your hands?

4    A    I said, "Whoa.  I don't know what's going on."  And

5    then one of the guys just pulled me outside, and that's

6    where I met up with my grandma.

7    Q    They told you they were the police, didn't they?

8    A    No.  They just said, "Put your hands up."

9    Q    Didn't you say -- did you see police markings on

10   their clothing?

11   A    It said like the D.E.A. and stuff, yeah.  But that

12   was in the back.  I didn't see nothing in the front.

13   Q    Okay.  And you -- were they wearing ski masks?

14   A    As far as I remember, yeah.  They had heavy-duty

15   clothing, and I couldn't see their faces because they had

16   masks over it.

17   Q    They had masks?

18   A    Like, you know that black thing.  I don't know.

19   Q    All over their face, except for their eyes?

20   A    Not like Army men.  Like masks, you know, like -- you

21   know when you play paint ball, you have those mask things.

22   But it was dark, like black.  And so was their clothing.

23   Q    So you couldn't see their cheeks?

24   A    I couldn't see their faces, period.

25   Q    And all of them were like that?

1    A    Except for this one guy that pulled me out of the --

2    this one guy that pulled me out of the house didn't have a

3    mask on.

4    Q    So what?  Six of them did have these masks on?

5    A    Six or seven, yeah.

6    Q    You said somebody made you call your father.

7    A    Yes.

8    Q    And his last name started with an F something?

9    A    (Nods head.)  Yeah.

10   Q    Where were you when he made you call your father?

11   A    Oh, his last name was Fukuda.

12   Q    Fukuda.

13   A    Something like that.  He introduced me to himself --

14   I mean, to him.

15   Q    Did your brother leave to go play ball that

16   afternoon?

17   A    Yeah, he did, but it was like after they left because

18   they wouldn't let us go anywhere or use our phones or

19   anything.

20   Q    They never let him go?

21   A    No.

22   Q    Now, you say they made you call your father.

23   A    Yes.

24   Q    What, on your residence phone there?

25   A    Yes.

1    Q    And what'd you do?  Did you call him on his cell

2    phone?

3    A    Yes.

4    Q    And what -- did they tell you what to say or tell you

5    what to do, or what?

6    A    Yeah.  They told me to call my dad and tell him that

7    something came in the mail for him.

8    Q    And what was his cell phone number?

9    A    I think it was 990-7896 because it was my old cell

10   phone.

11   Q    He's had other cell phones; right?  Other cell phone

12   numbers before, your dad?

13   A    Not that I know of.

14   Q    Well, you said it was your cell phone.

15   A    It was my cell phone.  But I guess I was too young at

16   the time, I couldn't pay my bills; so my dad took over it.

17   Q    He was using it.

18   A    Yeah.

19   Q    When was that?

20   A    I don't recall.  It was so long ago.  I was like 14

21   at the time.

22   Q    Fourteen at what time?  The time you had the cell

23   phone?

24   A    Yeah.  I got it for my birthday.

25   Q    How old are you now?

1    A    Seventeen.

2    Q    So three years ago.

3    A    Yes.

4    Q    And your dad was using the phone.

5    A    Yeah.

6    Q    But the bill came in your name.

7    A    I'm too young to even own a credit card; so it went

8    in my dad's name.

9    Q    Did your dad arrange for that phone to be in your

10   name?

11   A    Like what are you trying to --

12   Q    I'm asking did the dad -- your dad set up the phone

13   under the name Natalie Pagan?

14   A    No.  He put it under his name, I think.  I don't

15   know.

16   Q    Didn't you just say the phone was under your name?

17   A    I said I had the phone before; it was my phone.  But

18   it wasn't under my name.

19   Q    When was it that you made -- the police officers had

20   you make the call to your dad at 990-7896?

21   A    I don't know, like couple -- maybe like an hour and a

22   half later.

23   Q    After they had gotten there?

24   A    Yeah.

25   Q    Your father had actually called in, hadn't he, to the

```
 1   house?

 2   A    I don't remember.  I don't think so.

 3   Q    Hadn't he called several times that day into the

 4   residence?

 5   A    My house?

 6   Q    Yeah.

 7   A    Not that I know of.  I don't remember.

 8   Q    That call -- did that phone have call waiting on it?

 9   Or let me rephrase that.

10        Did that call have voicemail on it -- that phone

11   have voicemail on it?  990-7896, your dad's phone?

12   A    I think every cell phone has voicemail.

13        MR. MUEHLECK:  One moment, please, Your Honor.

14   Q    What was the home phone number?

15   A    Do I have to give it to you?

16        MR. MUEHLECK:  Ask the witness to answer the

17   question, Your Honor, the home phone number.

18        THE WITNESS:  I don't really like -- my

19   grandmother doesn't like me giving out my number to

20   anybody; so I don't think I should give it to you.

21        MR. BARBEE:  Your Honor, we would object.  It's

22   not relevant.

23        THE COURT:  Pardon me?

24        MR. BARBEE:  Her home phone number is not

25   relevant, Your Honor.  We object.
```

1              MR. MUEHLECK:  Well, let me ask the question

2    here, Your Honor.

3    Q    Isn't it 959-7896?

4    A    Yes.

5    Q    And it was back then, too, at the time of the search

6    warrant at your property on July 21st of 2002, Miss

7    Nagata?

8    A    Yes.

9    Q    2003?  Excuse me.

10   A    Yeah.

11             MR. BARBEE:  I think Mr. Muehleck said Miss

12   Nagata.  It's Miss Pagan.

13   BY MR. MUEHLECK:

14   Q    Sorry.  Miss Pagan.  Excuse me.  Nagata is your

15   grandma's name; right?

16   A    Yes.

17   Q    Lillian Salinas is your -- you call her Aunty Boxy?

18   A    Yes.

19             MR. MUEHLECK:  Approach the witness with exhibit

20   38.

21             THE COURT:  You may.

22   BY MR. MUEHLECK:

23   Q    This is Aunty Boxy, is it not, on exhibit 38?

24   A    Yes.

25   Q    And her middle name is Momi'ala?

1    A    Yeah, I guess.  It says right there.

2    Q    And that's her?

3    A    Yeah.

4    Q    You said she was going to Mexico?

5    A    Yes.

6    Q    Wasn't your father expecting a letter from Lillian in

7    Mexico?

8    A    Yes, he was.  But as for --

9    Q    My question is he was expecting a letter; right?

10   A    Yeah.

11   Q    Okay.  And not a box, a letter; right?

12   A    Yes.

13   Q    And you testified before at a hearing under oath;

14   right?

15   A    Yes.

16   Q    And at that time you testified that your father was

17   expecting a letter from Lillian from Mexico; right?

18   A    A letter, yes.

19        MR. MUEHLECK:  One moment, Your Honor.

20   Q    When the police entered the home, had you talked to

21   your dad prior to the police coming into your residence?

22   A    No.

23        MR. BARBEE:  Your Honor, could we have a time

24   frame.

25   BY MR. MUEHLECK:

1   Q    Just prior to that day, prior to the police entering

2   the residence, after the package was delivered, had you

3   talked to your dad?  In between the package being accepted

4   by you and the police coming in the home, had you talked

5   to your dad on the phone?

6   A    Yeah.  Not on --

7   Q    On the phone?

8   A    I don't remember.

9   Q    Your dad didn't live there, did he.

10   A    No.

11   Q    Your dad's never lived with you; right?

12   A    When we were little.

13   Q    How long ago?

14   A    When we were little.  I don't know.

15   Q    Didn't you tell Agent Jones here that after the

16   package came you talked to your father on the phone?

17   A    I don't even remember talking to him.

18   Q    You remember this agent; right?

19   A    I don't remember him.  I don't remember --

20   Q    You don't remember Agent Jones?

21   A    I don't remember him.  I don't even know his name

22   till right now.

23   Q    You don't remember this person on my right --

24   A    I don't remember --

25         MR. BARBEE:  Your Honor, asked and answered.

1    Argumentative.

2              THE COURT:  He's trying to refresh her memory,

3    but I don't want you to be argumentative.

4    BY MR. MUEHLECK:

5    Q    When the police had you call your dad, were you

6    successful?  Did you get through to him?

7    A    I don't remember.  I'm not sure.

8              MR. MUEHLECK:  One moment, please, Your Honor.

9    Q    You said you -- they wouldn't let you change clothes

10   alone.

11   A    Yes.

12   Q    Which officer was this?  Who was this?

13   A    I don't remember.

14   Q    What were you wearing when you wanted to change

15   clothes, Miss Pagan?

16   A    I told you long pants, and I don't know if I was

17   wearing a shirt or a sweater, but it was hot.  It was the

18   summer.

19   Q    July 21st; right?

20   A    I don't remember the date either.

21   Q    Where did you go to change clothes?

22   A    In my room.

23   Q    And did you tell your grandma that you wanted to be

24   alone to change clothes?

25   A    I don't remember.

1    Q    Did you tell the police you wanted to be alone to

2    change clothes?

3    A    I just asked them if I could change my clothes, and

4    that's all I remember.

5    Q    And what did you change to?

6    A    To shorts and a spaghetti strap.

7    Q    In where?  Your room you went there?

8    A    In my room.

9    Q    And what happened?  You say what, a police officer

10    followed you?

11    A    They wouldn't let me go alone.  They told this police

12    officer that he had to, I guess, be there when I changed.

13    Q    Did you tell him you'd rather not have him there?

14    A    No, I didn't tell him anything.

15    Q    Did you ask him to turn his back?

16    A    I was 14 years old.  I'm not going to tell someone

17    way older than me to turn your back.  I didn't even know

18    this guy.  I didn't say anything to him.  I just wanted to

19    change my clothes because it was hot.

20    Q    And get into shorts and a spaghetti strap top?

21    A    Yes.

22    Q    I have to ask you, ma'am -- excuse me.  Miss.  You

23    didn't get naked; you just what, took off your blouse?

24    A    Took off my pants and I took off my whatever, shirt

25    or sweater.

1    Q    And you still had underwear on and a bra?

2    A    Yeah.

3    Q    And you wanted to change clothes and get into

4    something different rather than wait until the police

5    left?

6    A    Wouldn't you want to if it was really hot?  It was

7    really hot.  And plus that, all this pressure on me from

8    all these guys pointing guns at me and stuff.

9              MR. MUEHLECK:  Nothing further, Your Honor.

10             THE COURT:  Redirect, Mr. Barbee?

11             MR. BARBEE:  No, Your Honor.  We have no more

12    questions of Miss Pagan.

13             THE COURT:  Thank you.  You're excused.

14        (Witness excused.)

15             THE COURT:  Next witness.

16             MR. BARBEE:  Your Honor, this might be an

17    appropriate time for the court to do a colloquy related to

18    the defense's case.

19             MR. MUEHLECK:  Related, yes.  Right.

20             THE COURT:  Well, let's take a break.  Please be

21    back at quarter of.

22             I want to meet with counsel.

23        (Jury excused.)

24             THE COURT:  You wanted to talk to me,

25    Mr. Barbee, have a colloquy?

1          MR. BARBEE:  Yes, Your Honor.  Thank you very

2    much.  I have met with Mr. Pagan on many occasions and

3    discussed his constitutional right to testify in this

4    matter on his own behalf or, on the other hand, his

5    privilege against self-incrimination, his right not to

6    testify.  He has in my opinion made a knowing and

7    intelligent decision not to testify in this matter, and

8    that would be based upon both advice of counsel and his

9    own independent decision.

10          THE COURT:  Is that correct, Mr. Pagan?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  And as your counsel said, you

13    understand you do have a constitutional right to testify

14    and you also have a constitutional right not to testify.

15    You understand that?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  That's your decision, as you may

18    consult with your attorney.  And you -- I take it you have

19    decided you do not want to testify; is that right?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right.  Thank you.

22          THE DEFENDANT:  Thank you.

23          MR. BARBEE:  Yes, Your Honor.  We would, when

24    the jury returns, rest the defense case.

25          THE COURT:  Pardon me?

1          MR. BARBEE:  When the jury returns, Your Honor,
2     the defense will rest its case in chief.
3          THE COURT:  Okay.  And is there going to be any
4     rebuttal, Mr. Muehleck?
5          MR. MUEHLECK:  Yes, briefly, I think there will
6     be, Your Honor.  I have to call some witnesses, though.
7     I'd -- and I don't have them here.  I'd like to do it
8     Wednesday morning, if we could, Your Honor, and then go
9     right into instructions and argument.
10          THE COURT:  Can we -- can you get them here this
11     afternoon?
12          MR. MUEHLECK:  I cannot, Your Honor.  One of
13     them, I think, is off-island.  I'm sure he's off-island.
14          THE COURT:  Are they going to be testifying to
15     rebut what --
16          MR. MUEHLECK:  Yes.
17          THE COURT:  -- Natalie said?
18          MR. MUEHLECK:  Yes.  Natalie and what other
19     people --
20          THE COURT:  I mean, I think they already
21     testified contrary to her testimony.
22          MR. MUEHLECK:  Well, Officer Fukuda has not been
23     asked if he forced anyone to make a call.  I'm guessing he
24     wasn't asked that.  He was asked other things, but that
25     was never brought up with him.

1          And I think there's another witness, Your Honor,

2    that is not within, you know, a couple hours to get to the

3    court easily.

4          THE COURT:  So how long do you think your

5    rebuttal time will take?

6          MR. MUEHLECK:  Oh, less than an hour, Your

7    Honor.

8          THE COURT:  Can we say the same for your final

9    argument?

10          MR. MUEHLECK:  I hope so, Judge.  My voice is

11    not worth a lot.

12          THE COURT:  You've got a lot of ground to cover.

13    You've got all those phone calls that your case agent

14    didn't explain.

15          MR. MUEHLECK:  He might be able to explain it,

16    Your Honor.  Maybe we should let him give the closing

17    argument, Your Honor.  He could probably do a better job.

18          THE COURT:  We're, I guess, going to terminate a

19    lot earlier than anticipated yesterday.

20          Well, why don't we take a break now, and then I

21    guess the defendant will rest when we come back and then

22    we'll have to excuse the jury for the rest of the day.

23      (Court recessed at 10:30 A.M., until 10:50 A.M.)

24          THE COURT:  I want to meet with counsel at

25    sidebar.

```
 1              (At sidebar on the record:)

 2              THE COURT:  I take it you haven't reconsidered

 3    whether you want to proceed with final arguments today.

 4              MR. MUEHLECK:  No, Your Honor.

 5              MR. BARBEE:  Before his rebuttal case?

 6              THE COURT:  Well, I guess that comes first.

 7              MR. BARBEE:  Yeah.

 8              THE COURT:  Otherwise, we might have a verdict

 9    today; otherwise, we're going to be four days.

10              MR. BARBEE:  I'd be prepared to close today.

11              MR. MUEHLECK:  I can't get them here today.  I'm

12    sorry.

13              THE COURT:  My second question is whether we

14    could move from Wednesday to Tuesday.  Do you have

15    conflicts in your schedule, and, if so --

16              MR. MUEHLECK:  Not that somebody else couldn't

17    handle -- I do have other matters, but they can handle

18    them as they've handled them for me while I've been here

19    this week, Your Honor.  I have sentencings, you know, on

20    Tuesday.  But that could be done.  I think I may have --

21    Tuesday is the 17th?

22              MR. BARBEE:  Yes, I believe so.

23              MR. MUEHLECK:  Most of my -- I do have changes

24    of plea that I should do later, but that's -- I can have

25    people handle my stuff on Tuesday, Judge.  Tuesday's okay
```

1    with us.

2            THE COURT:  That way at least it's only three

3    days, rather than four.

4            MR. MUEHLECK:  Right.  We can do that.

5            THE COURT:  What about you, Mr. Barbee?

6            MR. BARBEE:  I have something, but I can't

7    remember exactly what it is.  But I think I can probably

8    either move it or get somebody to handle it.  I know I

9    have something in the morning.  I just don't recall what

10   it is.

11           MR. MUEHLECK:  I know I have stuff.

12           THE COURT:  As I recall when I selected the

13   jury, I told them that we'd be going into next week, but I

14   don't think I ever mentioned anything about holidays or

15   about --

16           MR. BARBEE:  I think you did.  You told them --

17           MR. MUEHLECK:  You told them we didn't have

18   tough stuff on Tuesday.  You did tell them that.

19           MR. BARBEE:  You said that you had other

20   business to do on Tuesday.

21           MR. MUEHLECK:  Right.

22           THE COURT:  Okay.  Well, I'll clear it with

23   them, too.

24           MR. MUEHLECK:  Sure.

25           MR. BARBEE:  Your Honor, it's our intention to

1    rest our case now.  We'd ask that the court instruct the

2    jury again that the defendant has no obligation to

3    testify, they're not to draw any negative inference from

4    his election not to testify, and also --

5          MR. MUEHLECK:  Do not deliberate or discuss the

6    case at this point.

7          MR. BARBEE:  Over the break.

8          MR. MUEHLECK:  Over the break.

9          THE COURT:  Okay.

10         (In open court on the record:)

11         THE COURT:  Mr. Barbee.

12         MR. BARBEE:  Yes, Your Honor.  Thank you.

13         At this point the defense will rest.

14         THE COURT:  And I understand the government has

15   a rebuttal case that you wish to put on next week.

16         MR. MUEHLECK:  Brief, Your Honor.  Very brief.

17         THE COURT:  So that puts us in a position where

18   we're going to have to let you out early today.

19         We do have a long weekend.  And as I mentioned

20   before, Monday is a holiday, and I think I told you that

21   on Tuesday we have other matters.  But in view of the

22   three-day weekend is there anyone who could not -- anyone

23   on the jury who could not meet here on Tuesday to hear the

24   rest of the case?  Anyone have a conflict?

25         You could all be here on Tuesday?  Okay.  Well,

1    thank you for that.

2         And I do want to remind you that the defendant

3    has a constitutional right not to testify, and you're not

4    to hold that against him or draw any inferences against

5    him because he did not testify.

6         And as I mentioned earlier, we don't want you to

7    be discussing the case or in any way deliberating or

8    discussing the case with anyone, including your fellow

9    jurors or other persons.

10        So at this time we'll adjourn for the weekend.

11   We'll meet again on Tuesday at 9:00 A.M.  Have a nice

12   weekend.

13        (Court adjourned at 10:57 A.M.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I, Debra Kekuna Chun, Official Court Reporter,

3    United States District Court, District of Hawaii, do

4    hereby certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled

6    matter.

7          DATED at Honolulu, Hawaii, July 11, 2006.

8

9                                    /s/ Debra Chun

10                                   DEBRA KEKUNA CHUN

11                                   RPR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25